HAL CUNNINGHAM (#243048)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, California 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: hcunningham@scott-scott.com
-and-
DEBORAH CLARK-WEINTRAUB
JOSEPH P. GUGLIELMO
THOMAS L. LAUGHLIN IV
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
Email: dweintraub@scott-scott.com
Email: jguglielmo@scott-scott.com
Email: tlaughlin@scott-scott.com

*Attorneys for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| WILLARD A. SHARRETTE, DAVID GOLDMAN, and ESTA GOLDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE INTERNATIONAL, a foreign company, CREDIT SUISSE SECURITIES (USA) LLC, a Delaware limited liability company, and DOES 1-100,<br><br>Defendants. | Case No. 4:13-cv-02783-SBA<br><br>**CONSOLIDATED AMENDED COMPLAINT**<br><br>Hon. Saundra Brown Armstrong |

CONSOLIDATED AMENDED COMPLAINT

I.     INTRODUCTION

1.      Lead Plaintiffs Willard A. Sharrette, David Goldman, and Esta Goldman ("Plaintiffs") bring this class action pursuant to §§9 and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and on behalf of all other persons or entities who purchased or otherwise acquired common stock of Energy Conversion Devices, Inc. ("ECD") between June 18, 2008 and February 14, 2012 (the "Class Period").

2.      This case arises out of a fraudulent scheme perpetrated by Defendants Credit Suisse International and Credit Suisse Securities (USA) LLC (collectively "Credit Suisse") and a group of predatory hedge funds to mislead investors and artificially drive down the price of ECD common stock.   This scheme caused ECD investors astronomical losses and contributed to ECD's bankruptcy in February 2012.

3.      In June 2008, investment bank Credit Suisse was the lead underwriter for two offerings of ECD securities that were made in tandem. The principal offering, ostensibly, was $316 million in notes convertible into ECD common stock (the "Convertible Notes Offering"). A convertible note is a type of hybrid security that bears characteristics of both stocks and bonds. Like bonds, convertible notes pay interest (in this case 3%) and have a maturity date (here, June 15, 2013).   At the same time, like stock, the price of convertible notes is more sensitive to the earnings prospects of the issuer than an ordinary bond because each note can be converted into equity.   The second securities offering was of 4,714,975 shares of ECD common stock (the "Stock Offering").   Through the Stock Offering, ECD created a pool of 3,444,975 shares that were made available to Credit Suisse to lend out pursuant to a share lending agreement ("Share Lending Agreement").[1]

4.      The offering documents falsely represented that the purpose of the Stock Offering, and the attendant share lending arrangement, was to promote the sale of the Convertible Notes by assisting investors in "hedging" their investment in these securities.   A

---

[1] The remainder of the ECD shares, approximately 1.3 million shares, were sold directly to investors.

hedge is an offsetting investment that limits the downside risk of a principal investment.  The use of the term "hedge" in the context of convertible notes specifically refers to a market neutral investment strategy whereby an investor buys convertible notes and limits the downside risk in the price of the notes by shorting the common stock of the company.  According to the offering documents, the pool of ECD stock created in the Stock Offering was to be lent out by Credit Suisse to investors in the Convertible Notes solely for the purpose of facilitating such hedging.  Indeed, the Share Lending Agreement expressly provided that these shares would be used "solely for the purpose of . . . facilitating the sale and the hedging of the Convertible Notes."

5.       Contrary to these representations, however, the purpose of the simultaneous and contingent Convertible Note and Stock Offerings was not to permit investors in the Convertible Notes to engage in market neutral hedging, but rather to allow predatory hedge funds that purchased the Notes to make huge, coordinated, short sales of ECD stock in order to decimate the price of ECD stock and reap huge profits from these short positions.  As detailed herein, Credit Suisse was the architect of and key participant in this manipulative scheme.   Credit Suisse solicited the participation of the hedge funds, fully aware of their intentions to drive down the price of ECD stock through massive short selling, and structured the two offerings to enable the hedge funds to make huge short sales of ECD stock without having to incur the normal risks associated with such trading.

6.       A short sale is a bet against a company's stock whereby an investor borrows the stock from a third party, sells the stock, which puts downward pressure on the stock price, and makes a promise to return the stock to the lender at a later date.  If the stock price goes down, the investor buys the stock at the new, lower, price and returns the stock to the lender, pocketing the difference between the two prices.  There are two significant risks that limit investors' ability to make short sales in the ordinary course, however, both of which Credit Suisse knowingly eliminated to facilitate the manipulation of ECD stock.  First, an investor must pay a fee to the lender to borrow the stock in order to short it, which can be quite high, especially as interest in shorting a stock increases.  Second, a short sale exposes an investor to potentially unlimited

downside risk in that there is theoretically no limit to how high the price of a shorted stock can rise, and the short seller is obligated to purchase the stock at the prevailing market price on the agreed date and return it to the lender.

7.     These risks – which normally limit the downward pressure short sellers can place on a stock – were nonexistent in this case.  To eliminate the risk that would otherwise have existed with respect to the cost of borrowing ECD stock, the Share Lending Agreement provided that Credit Suisse would lend the hedge funds ECD stock to short for a nominal fee of 1 cent, far below market rates.  Further, the conversion option embedded in the Convertible Notes removed the risk from a rising stock price because if the price of ECD stock rose sharply, the hedge funds could convert their Notes into ECD stock to cover their short positions without paying the higher market price.  Thus, through the scheme set up by Credit Suisse, these hedge funds effectively had insurance on their short positions.

8.     With the advantages created by Credit Suisse's scheme, the hedge funds were able to short ECD stock with impunity and did so by placing large, essentially riskless negative bets with the cheap pool of shares provided by Credit Suisse pursuant to the Share Lending Agreement.  As Credit Suisse and its hedge fund clients knew and intended, this massive, coordinated borrowing of ECD shares under the Share Lending Agreement and accompanying short selling was far in excess of anything that could legitimately be described as a "hedge" on the Convertible Notes.  To the contrary, it was an intentional, manipulative scheme to realize massive returns that were not available through a conventional hedged investment in convertible notes.

9.     The unrestrained short selling orchestrated by Credit Suisse and the hedge funds had predictable results, driving the price of ECD common stock down from approximately $72 per share on June 18, 2008, to less than $1 in February 2012, when ECD filed for bankruptcy protection, causing massive losses to investors.  Credit Suisse and its hedge fund clients, on the other hand, reaped enormous profits.

## II.     PARTIES

10.     Lead Plaintiff Willard Sharrette is an individual residing in Michigan who purchased ECD common stock on multiple occasions during the Class Period.  Mr. Sharrette's certification detailing his transactions in ECD stock during the Class Period was previously submitted to the Court as ECF No. 24-2.

11.     Lead Plaintiff David Goldman is an individual residing in New York who purchased ECD common stock on multiple occasions during the Class Period.  Mr. Goldman's certification detailing his transactions in ECD stock during the Class Period was previously submitted to the Court as ECF No. 24-2.

12.     Lead Plaintiff Esta Goldman is an individual residing in New York who purchased ECD common stock on multiple occasions during the Class Period.  Ms. Goldman's certification detailing her transactions in ECD stock during the Class Period was previously submitted to the Court as ECF No. 24-2.

13.     Defendant Credit Suisse International is an unlimited liability company domiciled in the United Kingdom, doing business in the United States.

14.     Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company headquartered in New York, New York. Credit Suisse Securities (USA) LLC acted as a managing underwriter in the June 18, 2008 offering alleged herein.  Both Credit Suisse entities were parties to the Share Lending Agreement described in the Common Stock Prospectus and the "3.00% Convertible Senior Notes due 2013" Prospectus Supplement filed with the United States Securities and Exchange Commission ("SEC") and dated June 18, 2008 ("Convertible Note Prospectus").  The Credit Suisse Defendants prepared and/or substantially contributed to the misleading statements in the Common Stock and Convertible Note Prospectuses as alleged herein.

15.     Defendants Credit Suisse International and Credit Suisse Securities (USA) LLC shall be referred to together as "Credit Suisse."

16.     Credit Suisse benefited in two ways from the scheme alleged herein.  First, Credit Suisse was paid a share of the $8.25 million commission for underwriting the Convertible Note

CONSOLIDATED AMENDED COMPLAINT

4

Offering.  Second, Credit Suisse was able to promote itself to hedge funds by helping them gain exorbitant profits through the short selling scheme Credit Suisse operated.  Investment banks, such as Credit Suisse, competed heavily for the approximately $4 billion in brokerage fees paid to investment banks by hedge funds by providing these funds with access to information and favorable investment options.  The short selling scheme Credit Suisse devised was an attractive investment option that allowed Credit Suisse to strengthen its brand name in the lucrative hedge fund brokerage fee market.

17.     Plaintiffs are unaware of the true names and capacities of those defendants sued herein as Does 1 through 100, inclusive and therefore, sue these defendants by such fictitious names. These Doe Defendants are hedge funds that engaged in short selling of ECD common stock as alleged herein. Plaintiffs will seek leave of Court to amend this Complaint when such names are ascertained.

**III.     JURISDICTION AND VENUE**

18.     The claims asserted herein arise under and are pursuant to §§9 and 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

21.     In connection with the acts, statements, and other wrongful conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets and exchanges.

**IV.     SUBSTANTIVE ALLEGATIONS**

**A.     Energy Conversion**

22.     ECD was a pioneering manufacturer of solar power technology, specifically, photovoltaic solar laminates that generated clean, renewable energy by converting sunlight into

electricity. ECD's solar laminates had unique characteristics that differentiated them from conventional crystalline solar modules, including physical flexibility, light weight, high durability and ease of installation. These characteristics made ECD's products particularly suitable for rooftop application, ECD's target market. ECD manufactured its solar laminates using a proprietary process and technology that it developed through nearly 30 years of research.

**B.  Credit Suisse Misleads Energy Conversion Into a Financing Scheme That Was Secretly Designed By Credit Suisse and Its Client Hedge Funds to Allow for Rampant Manipulation of ECD Stock**

23.  The manufacture of solar panels is a capital-intensive industry and, in 2008, ECD needed to raise money so that it could boost production and meet a growing demand for its products.

24.  On its face, the financing scheme pitched by Credit Suisse provided ECD with financing that could be used to fund the Company's expansion. In the Convertible Note Offering, ECD would raise $316 million through the sale of Notes bearing a 3% coupon due in June 2013. Each individual Note had a face value of $1,000 and could be converted into 10.892 shares of ECD stock. At this conversion rate, a holder of the Convertible Note would be paying $91.80 for each share of ECD stock. At the time of the Offering, the price of ECD stock was approximately $72, so a holder of a Convertible Note would not have an incentive to convert a Note into ECD stock unless the price of ECD stock rose significantly, to at least be greater than $91.80.

25.  Under the terms of the Share Lending Agreement between Credit Suisse and ECD, Credit Suisse ran the program that allowed hedging of the Convertible Notes. ECD transferred the shares to Credit Suisse so that it could lend out the shares. Credit Suisse covenanted in the Share Lending Agreement that it would use the ECD stock "solely for the purpose of directly or indirectly (y) facilitating the sale and the hedging of the Convertible Notes by the holders thereof or, (z) with the prior written consent of the Lender, facilitating the sale and the hedging of any additional convertible securities which the Lender may issue from time to time by the holders thereof."

26.     "Hedging" does not involve rampant short selling.  Rather, an investor seeking to hedge a convertible bond will short only the number of shares necessary to protect against the downside risk to the notes created by swings in the equity price of the underlying stock, thereby creating a market neutral position.  The appropriate number of shares necessary to do this is called the "hedge ratio."  Typically, when, as here, the market price of the underlying stock is substantially below the conversion price, the necessary hedge ratio is less than 50 percent of the number of shares that a note can be converted into.  *See, e.g.*, Thoma, Beat, "Convertible Bonds – Strategies and Concepts," Fisch Asset Management (2013).  Moreover, the hedge ratio declines as the price of the underlying stock goes down because under these circumstances the convertible note behaves more like a bond and less like a stock.  For this reason, an investor pursuing a strategy of hedging an investment in convertible notes will actually start buying the stock of a company when the price of the stock declines, taking downward pressure *off* the stock and creating buy-side demand that would support the price of the stock.  In short, the interests of an investor in convertible notes engaging in short sales as part of a hedging strategy are aligned with those of the underlying company's shareholders because both are "long" on the Company, that is, both are betting on the Company and hoping for its profitability.  Thus, an investor in a convertible note with a share hedge hopes to make money by virtue of an increase in the price of the stock above the conversion price, which would allow the noteholder to convert the note into stock at a profit.

27.     In view of the foregoing, an investor in ECD's Convertible Notes pursuing a legitimate hedging strategy during the Class Period would have only needed to short a minimal number of ECD shares per Note to achieve a proper hedge because the market price of ECD stock was substantially below the conversion price.

28.     Rather than operating the Share Lending Agreement solely to allow "hedging" as had been represented to investors and as it had agreed to do, however, Credit Suisse permitted the hedge funds that purchased the Convertible Notes to borrow substantially all of the shares in

the pool and engage in rampant short selling of ECD stock far beyond the volume of selling necessary to any legitimate hedging strategy.

29.     In fact, the tandem offering of Convertible Notes and Stock was part and parcel of a scheme designed to allow hedge funds to manipulate ECD stock for huge profits. The scheme manipulated the market for ECD stock by eliminating the high borrowing costs that would normally deter massive short selling.  To effectuate a short sale, an investor normally has to borrow the stock from a third party and pay interest on that loan.  However, the scheme hatched by Credit Suisse and the hedge funds eliminated this cost by allowing the hedge funds to borrow common stock virtually for free.  Whereas a short seller ordinarily may have to pay a significant percentage of the value of a stock that is difficult to borrow (such as one where the share price is declining as was the case with respect to ECD), *see, e.g.*, D'Avolio, Gene, "The Market For Borrowing Stock," Journal of Financial Economics 66 (2002), the borrowing cost to the hedge funds pursuant to the Share Lending Agreement was just one cent per share.  Thus, whereas it would have cost the hedge funds millions of dollars a year to borrow the roughly 3.4 million ECD shares loaned pursuant to the Share Lending Agreement, the borrowing cost was just $34,000.

30.     Furthermore, the Convertible Notes practically eliminated the risk of short squeezes associated with aggressive short positions.  In a normal situation, a short seller can suffer potentially unlimited losses because there is no limit to how high the price of a stock that has been shorted can rise.  The Convertible Notes eliminated this risk because in the event that the price of ECD stock did rise, a hedge fund could simply convert the Note into shares of ECD stock to cover their position.  Each Note could be converted into 10.8932 shares of ECD.  So a hedge fund could short up to this number of shares without running any risk that the price of ECD stock would go up and cause the hedge fund to lose money on its short position.  This conversion right acted as an insurance policy on the hedge funds' shorting.

31.     Through these arrangements, Credit Suisse created a perfect "heads I win, tails you lose," investment vehicle to sell to hedge funds.  The dramatic extent to which Credit Suisse

rigged the game is shown in the below chart, which depicts investment returns for a hypothetical hedge fund that purchased a single Convertible Note and who sold short 10.8932 shares, the number of ECD shares that the Note could be converted into:

**Investment Returns for Convertible Noteholder Shorting 10.8932 Shares**

Background Terms

ECD Stock Price:  $72
Conversion Price: $91.80
Note Face Value: $1000
Interest Rate on Notes: 3%
Total Interest on Notes Through Maturity: $150
Maturation Period: 5 years

The Transaction

Purchase 1 Note on June 15, 2008 with 3% discount:  - $970
Sell short 10.8932 shares at $72:  + $784
Net investment: $185

Investment Returns Based on Stock Price of ECD Stock at Maturity

| Stock Price | $.02 | $10 | $40 | $70 | $91.80 | $150 |
|---|---|---|---|---|---|---|
| Initial Investment | -$185 | -$185 | -$185 | -$185 | -$185 | -$185 |
| Cash paid by Noteholder to cover Short | -$.22 | -$109 | -$436 | -$763 | -$1000 | $0 (short covered through conversion right in Note) |
| Proceeds paid to Noteholder from Redemption of the Note | $1000 | $1000 | $1000 | $1000 | $1000 | $0 (note converted) |
| Interest paid to Noteholder on Note | $150 | $150 | $150 | $150 | $150 | $150 |
| Net Cash Flow from Investment (a sum of the preceding four rows) | $965 | $856 | $529 | $202 | $-35 | $-35 |
| Net Investment Returns (Net Cash Flow/ Initial Investment) | 521% | 463% | 285% | 109% | -19% | -19% |

CONSOLIDATED AMENDED COMPLAINT

32.     As demonstrated by the above chart, the manipulative scheme created by the tandem package of the Convertible Note and Stock Offerings amounted to a powerful, largely risk free, downward bet against ECD stock.  Contrary to a true "hedge" in which the interests of shareholders and noteholders are aligned, the opposite was true pursuant to Defendants' manipulative scheme.  In fact, the hedge funds' investment in the Convertible Notes was more profitable the further ECD's stock price declined.  As shown in the above illustration, a hedge fund that buys a Convertible Note with a face value of $1,000 for $970 (there was a 3 percent discount), but then shorts 10.8932 shares of ECD stock trading at $72, receives back proceeds of $784.31.  If, for example, the stock price declines to $0.02, the investment return is a whopping 519% on the initial investment, with almost all of the profit coming from the short sales, the difference between $72 and $.02 multiplied by 10.892.   By contrast, in the event ECD's stock price rises significantly, the value of the investment actually declines 19%.  As this example illustrates, employing a hedge ratio in excess of 50%, as the hedge funds did here is not a market neutral "hedge" against the downside risk in the Convertible Notes.  To the contrary, the short sales were the primary investment objective, with the Convertible Notes being used as a way to remove the risks traditionally associated with short sales.

33.     Moreover, somewhat counterintuitively, these massive profits would accrue even if Credit Suisse and the hedge funds drove ECD into bankruptcy, as ultimately occurred.  ECD was a capital-intense Company whose assets allowed for a substantial recovery on the Convertible Notes in bankruptcy.  Thus, even if the bankruptcy only paid fifty cents on the dollar, an investor in the Note-short sale scheme would still double its money.

34.     The investment returns for a proper "hedge" on a Convertible Note would have looked quite different.

**Investment Returns for Convertible Noteholder Shorting 5.4466 Shares**

Background Terms

ECD Stock Price:  $72
Conversion Price: $91.80
Note Face Value: $1000

Interest Rate on Notes: 3%
Total Interest on Notes Through Maturity: $150
Maturation Period: 5 years

The Transaction

Purchase 1 Note on June 15, 2008 with 3% discount:   - $970
Sell short 5.4466 shares at $72:  + $392
Net investment: $578

Investment Returns Based on Stock Price of ECD Stock at Maturity

| Stock Price | $.02 | $10 | $40 | $70 | $91.80 | $150 |
|---|---|---|---|---|---|---|
| Initial Investment | -$578 | -$578 | -$578 | -$578 | -$578 | -$578 |
| Cash paid by Noteholder to cover Short | -$.11 | -$55 | -$218 | -$381 | -$500 | $817 |
| Proceeds paid to Noteholder from Redemption of the Note | $1000 | $1000 | $1000 | $1000 | $1000 | $1634 (the Note is converted into 10.8932 shares at $150 per share) |
| Interest paid to Noteholder on Note | $150 | $150 | $150 | $150 | $150 | $150 |
| Net Cash Flow from Investment (a sum of the preceding four rows) | $572 | $517 | $354 | $191 | $72 | $389 |
| Net Investment Returns (Net Cash Flow/ Initial Investment) | 99% | 89% | 61% | 33% | 12% | 67% |

35.     As shown by the above chart, the returns overall are far more modest for a hedging strategy, though still attractive.

36.     Moreover, in contrast to the scenario in which an investor shorts 10.892 shares per note, an investor applying a proper hedge would likely not profit if ECD were driven into a bankruptcy.  For example, if the price of ECD went to $.02 and the ECD went into bankruptcy, with the Notes paying 50 cents on the dollar through the bankruptcy estate, an investor having a hedge of 5.4466 shares would make almost no return, or could potentially even lose money if the bankruptcy occurred in the first two years after the Note was purchased.

**C.**      **Credit Suisse Misled ECD Investors Concerning the Purpose, Nature and Effect of the Financing Scheme It Had Implemented**

37.      Credit Suisse intentionally and knowingly caused the Common Stock Prospectus and Convertible Notes Prospectus to include materially false and misleading statements that concealed the true purpose of the financing scheme.

38.      The Prospectuses falsely represented to ECD investors (as Credit Suisse falsely represented to ECD) that the purpose of the simultaneous Stock and Convertible Note Offerings was only to allow Convertible Note investors to "hedge" their investments in the Convertible Notes.  Similarly, the Convertible Note Prospectus stated that an affiliate of the underwriter "has agreed to use the borrowed shares to facilitate the establishment by investors in the notes, and certain other of our securities, of hedge positions in such securities."

39.      The Common Stock Prospectus likewise stated that:

> We will not receive any proceeds from the sale of the borrowed shares in this offering, but we will receive a nominal lending fee of $0.01 per share from CSI for the use of these shares. CSI will receive all the proceeds from the sale of the borrowed shares, and it has agreed to use the borrowed shares to facilitate privately negotiated transactions or short sales by which investors hedge their investments in the notes…

40.      These disclosures were entirely false and misleading because they did not disclose (i) that Credit Suisse had designed the Offerings to allow hedge funds to make massive negative bets against ECD stock without the risks normally associated with short sales, (ii) that Credit Suisse was on both sides of the offerings, simultaneously selling the stock and Notes to investors while soliciting hedge funds to make giant bets against the stock, (iii) that Credit Suisse knew from its solicitation conversations that hedge funds intended to and would make huge bets against ECD stock, not merely place short sales to "hedge" against downside risk on the Convertible Notes, (iv) that these huge negative bets would act as an anchor on the price of ECD stock, dragging it inexorably downward to the detriment of ECD shareholders, and (v) that the downward movement of ECD's stock price would not be the result of market forces but the

CONSOLIDATED AMENDED COMPLAINT

inevitable result of the market manipulation perpetrated by Credit Suisse and its client hedge funds.

41.     As stated in the Stock Offering Prospectus, in advance of the offering, Credit Suisse "solicited indications of interest, based on the purchase price negotiated with those potential purchasers, from convertible notes investors seeking to establish a hedge position" and "established a 'clearing price' for a number of borrowed shares at which both purchasers of our common stock were willing to purchase borrowed shares offered hereby and investors in our convertible notes were willing to establish hedge positions."   Thus, Credit Suisse knew in advance of the Offerings how hedge funds planned to exploit the financing scheme to make large sales of ECD stock.

**D.     The Scheme Launches, Causing ECD Stock to Plummet**

42.     The twin offerings of Convertible Notes and Stock occurred on June 18, 2008 and ECD provided Credit Suisse with 3,444,975 shares to use for short sales to "hedge" against investment in the Convertible Notes.   As was later revealed in ECD's bankruptcy filing, Credit Suisse lent almost all of these shares out for short sales, retaining less than 200,000 shares.  This volume of short sales was highly material.  Around the time of the offering, the short interest was approximately 6.7 million shares, so that the additional 3.2 million shares shorted through this scheme represented an increase of roughly 48 percent in the short interest.

43.     Given the volume of shares loaned by Credit Suisse for short sales, it is clear that, contrary to the misrepresentations in the Prospectuses, investors in the Convertible Notes were making far more short sales then necessary to hedge their positions in the Convertible Notes. With approximately 3.2 million shares shorted and only 316,250 Convertible Notes sold, investors were shorting more than 10 ECD shares per Note on average.   At these ratios, 10+ shares shorted per Note, the shares were not a hedge.   As explained above, given ECD's stock price, a hedging strategy would have translated into about half as much shorting, roughly 5.5 shares or less shorted per Note.   Rather than a hedge, and as depicted in paragraph 31, the combined investment in a Convertible Note with a 10+ share shorted per Note was a highly

1  negative bet against ECD stock, which had the effect of driving down ECD stock and returning

2  huge profits to the short selling hedge funds.

3       44.     In fact, it is likely that many of the hedge funds who participated in this scheme

4  shorted far larger amounts of ECD stock.  A review of Energy Conversion's 13F filings reveals

5  that some of the investors in the Convertible Notes were small investors or companies that would

6  not have participated in the aggressive manipulation described herein.  For example, insurance

7  companies and investment banks held some of the Convertible Notes.   Excluding these types of

8  investors from the pool shows that a smaller pool of hedge funds, holding approximately 180,000

9  Convertible Notes, were likely responsible for much or all of the short sales.

10       45.     Reflecting these facts, after the June 18, 2008 public offering, the short volume

11  steadily rose to more than double what it had been on the date of the offering and the price of

12  ECD stock predictably collapsed.

13
14

15
16
17
18
19
20
21
22
23
24
25
26
27
28

46.    The sharp increase in the short interest was a problem for ECD because ECD stock was the "currency" used by the Company to secure financing and run its business.  Thus, the sharp decline in the value of ECD stock inhibited ECD's ability to continue to operate.

47.    By February 14, 2012, when ECD filed for bankruptcy protection, the short attacks caused the stock price that had been trading at $72 per share to collapse completely.

## V.    CLASS ALLEGATIONS

48.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired ECD stock between June 18, 2008 and February 14, 2012, inclusive, (the "Class Period") and who were damaged thereby.

49.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ECD's stock was actively traded on NASDAQ, an efficient market.  While the exact number of Class members is unknown to Plaintiffs at this time, it can be ascertained through appropriate discovery.  On information and belief, Plaintiffs allege that there are at least hundreds of members in the proposed Class.

50.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Federal securities laws complained of herein.

51.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in securities class actions.

52.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    a.    Whether the Federal securities laws were violated by Defendants' conduct or statements as alleged herein;

b.     Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about ECD and the offering; and

c.     To what extent the members of the Class have sustained damages, and the proper measure of damages suffered.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to redress individually the wrongs done to them.  Furthermore, there will be no difficulty in the management of this action as a class action in this Court.

54.     Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine, first set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) for the following reasons:

a.     ECD's publicly traded securities were actively traded in an efficient market on NASDAQ during the Class Period;

b.     ECD was a regulated issuer and filed periodic reports with the SEC;

c.     ECD regularly communicated with public investors via established market communication techniques;

d.     The market reacted to public information disseminated by ECD and its underwriters;

e.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of ECD's shares; and

f.     Without the knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other Class members purchased ECD securities

between the time Defendants misrepresented or failed to disclose material facts and the time ECD filed for bankruptcy protection.

## COUNT I

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

55.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

56.     During the Class Period, Defendants carried out a plan which was intended to, and did, (a) deceive the investing public, including Plaintiffs and the Class; and (b) artificially drive down the price of ECD stock.

57.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of ECD securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

58.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

59.     Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of ECD common stock, were privy to and participated in the creation of the Prospectuses, and were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.  Further, Defendants' conduct itself as an underwriter was deceptive.

60.     Defendants had actual knowledge of the misrepresentations, omissions and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially drive down the value of ECD stock.

CONSOLIDATED AMENDED COMPLAINT

61.     By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of ECD publicly traded securities during the Class Period.

### COUNT II

**(Violation of Section 9 of the Exchange Act
Against All Defendants)**

63.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

64.     Defendants violated §9 of the Exchange Act in that, together with the hedge funds with which they conspired, they engaged in a scheme to depress the price of ECD stock and induce the sale of ECD stock by others.  Further, through their dissemination of false statements in the Stock and Convertible Note Prospectuses, Defendants misled investors concerning the nature of their actions and its effect on ECD stock.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of ECD publicly traded securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follow:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper,

1

## JURY TRIAL DEMAND

2        Plaintiffs hereby demand a trial by jury

3                      SCOTT+SCOTT, Attorneys at Law, LLP

4                      /s Hal D. Cunningham

5                      Hal D. Cunningham
707 Broadway, Suite 1000

6                      San Diego, CA 92101
Telephone: 619-233-4565

7                      Facsimile: 619-233-0508
Email: hcunningham@scott-scott.com

8

9                      Deborah-Clark Weintraub

10                   Joseph P. Guglielmo
Thomas L. Laughlin IV

11                   SCOTT+SCOTT, Attorneys at Law, LLP
The Chrysler Building

12                   405 Lexington Avenue, 40th Floor
New York, NY  10174

13                   Tel:  (212) 223-6444

14                   Fax:   (212) 223-6334
Email: dweintraub@scott-scott.com

15                          jguglielmo@scott-scott.com
          tlaughlin@scott-scott.com

16

17                   LEWIS & ROBERTS, PLLC
Gary V. Mauney

18                   One Southpark Center
6060 Piedmont Row Drive South, Suite 140

19                   Charlotte, NC 28287
Tel: (704) 347-8990

20                   Fax: (704) 347-8929
garymauney@lewis-roberts.com

21

22                   James A. Robert III
3700 Glenwood Avenue, Suite 410

23                   Raleigh, NC 27612
Tel: (866) 322-9873

24                   Fax: (919) 981-0199
JimRoberts@lewis-roberts.com

25

26                   *Counsel for Lead Plaintiffs*

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of February, 2014 at San Diego, California.

/s/ Hal D. Cunningham
Hal D. Cunningham
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
Email: hcunningham@scott-scott.com