**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ECD INVESTOR GROUP, et al.,

Plaintiffs,

-against-

CREDIT SUISSE INTERNATIONAL, et al.,

Defendants.

14 Civ. 8486 (VM)(SJN)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSING CLASS CERTIFICATION**

LATHAM & WATKINS LLP

By: James E. Brandt
Christopher J. Clark
Virginia F. Tent
Jessica D. Rostoker
885 Third Avenue
New York, New York 10022-4834
Tel: (212) 906-1200
Fax: (212) 751-4864
james.brandt@lw.com
chris.clark@lw.com
virginia.tent@lw.com
jessica.rostoker@lw.com

Michael E. Bern (*of counsel*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
michael.bern@lw.com

*Attorneys for Defendants*
*Credit Suisse International and*
*Credit Suisse Securities (USA) LLC*

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ..................................................................................1

II.  STATEMENT OF UNDISPUTED FACTS .........................................................4

    A.  Convertible Notes Offering and Investing .........................................5

        1.  Convertible Notes......................................................................5

        2.  Convertible Arbitrage Investing.............................................5

    B.  ECD Decides to Issue Convertible Notes and Credit Suisse Executes the Offering ...............................................................................9

    C.  The Financial Crisis and Competition with Chinese Manufacturers Sharply Impact ECD's Business.................................14

    D.  Credit Suisse and Investors Respond to the Decline in ECD's Prospects ...........15

    E.  Plaintiffs' Allegations and the State of the Record Following Discovery ...........16

III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS BECAUSE PLAINTIFFS HAVE ADDUCED NO EVIDENCE OF MISREPRESENTATION OR MANIPULATION .........................................18

    A.  There Is No Evidence That Credit Suisse Made Misrepresentations in Violation of Section 10(b), Rule 10b-5, or Section 9(a)(4)................19

        1.  There Is No Evidence That Credit Suisse Made Any Actionable Misrepresentations or Omissions .........................20

            a.  Plaintiffs Cannot Show "Hedging" Is Limited to "Delta Neutral Hedging"..................................21

            b.  Credit Suisse in Fact Set Up the Convertible Noteholders with a Delta Neutral 78% Hedge Ratio....................22

        2.  Plaintiffs Failed to Adduce Any Evidence That Credit Suisse Acted with Scienter in Connection with Alleged Misrepresentations..................25

        3.  There Is No Evidence That Credit Suisse's Alleged Misrepresentations Caused Plaintiffs' Losses....................28

    B.  There Is No Evidence That Credit Suisse Engaged in Any Market Manipulation ....................32

        1.  Plaintiffs Failed to Adduce Evidence That Credit Suisse Engaged in Market Manipulation ....................33

2.    There Is No Evidence that Credit Suisse Acted with Scienter in
Connection with Its Alleged Market Manipulation..................................34

a.    Plaintiffs Have Adduced No Direct Evidence of Scienter ............35

b.    Plaintiffs Have Adduced No Circumstantial Evidence of
Scienter...................................................................................36

c.    Plaintiffs Adduced No Evidence of Heightened Section 9
Scienter...................................................................................37

3.    There Is No Evidence That Credit Suisse's Alleged Manipulation
Caused Plaintiffs' Losses ........................................................................38

IV.    PLAINTIFFS ARE NOT ENTITLED TO PROCEED AS A CLASS ...........................39

V.    CONCLUSION .................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986) ......................................................................................20

*Ansari v. New York Univ.*,
　179 F.R.D. 112 (S.D.N.Y. 1998) ...................................................................42

*Argus Inc. v. Eastman Kodak Co.*,
　801 F.2d 38 (2d Cir. 1986) .............................................................................29

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
　493 F.3d 87 (2d Cir. 2007) .............................................................................33

*Baum v. Phillips, Appel & Walden, Inc.*,
　648 F. Supp. 1518 (S.D.N.Y. 1986) ..............................................................40

*Chemetron Corp. v. Bus. Funds, Inc.*,
　682 F.2d 1149 (5th Cir. 1982) .................................................................27, 39

*Cohen v. Stevanovich*,
　722 F. Supp. 2d 416 (S.D.N.Y. 2010) .....................................................34, 41

*Comcast Corp. v. Behrend*,
　133 S. Ct. 1426 (2013) ...................................................................................42

*Crane Co. v. Westinghouse Air Brake Co.*,
　419 F.2d 787 (2d Cir. 1969) ...........................................................................40

*Cummiskey v. Chandris, S.A.*,
　719 F. Supp. 1183 (S.D.N.Y. 1989) ........................................................26, 41

*Ernst & Ernst v. Hochfelder*,
　425 U.S. 185 (1976) .......................................................................................27

*Fezzani v. Bear, Sterns & Co.*,
　384 F. Supp. 2d 618 (S.D.N.Y. 2004) ...........................................................41

*Freedman v. Value Health, Inc.*,
　34 F. App'x 408 (2d Cir. 2002) ......................................................................27

*Glickenhaus & Co. v. Household Int'l, Inc.*,
　787 F.3d 408 (7th Cir. 2015) .........................................................................31

*Gordon Partners v. Blumenthal,*
    293 F. App'x 815 (2d Cir. 2008) ........................................................................31

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    134 S. Ct. 2398 (2014) ......................................................................................42

*In re Initial Pub. Offering Sec. Litig.,*
    399 F. Supp. 2d 298 (S.D.N.Y. 2005)...............................................................31

*In re Initial Pub. Offering Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006) ...............................................................................41

*In re N. Telecom Ltd. Sec. Litig.,*
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)...............................................................21

*In re Ramp Corp. Sec. Litig.,*
    No. 05 CIV. 6521, 2006 WL 2037913 (S.D.N.Y. July 21, 2006) ........................33

*In re Rezulin Prods. Liab. Litig.,*
    361 F. Supp. 2d 268 (S.D.N.Y. 2005)...............................................................20

*In re Vivendi, S.A. Sec. Litig.,*
    838 F.3d 223 (2d Cir. 2016) ..............................................................................29

*In re Vivendi Universal S. A. Sec. Litig.,*
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)...............................................................33

*Kelsey v. City of New York,*
    No. 03-CV-5978, 2007 WL 1352550 (E.D.N.Y. May 7, 2007) ..........................26

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ..............................................................................29

*Mazuma Holding Corp. v. Bethke,*
    21 F. Supp. 3d 221 (E.D.N.Y. 2014)................................................................33

*Panfil v. ACC Corp.,*
    768 F. Supp. 54 (W.D.N.Y. 1991) ....................................................................27

*Ray v. Lehman Bros. Kuhn Loeb, Inc.,*
    624 F. Supp. 16 (N.D. Ga. 1984) ......................................................................40

*S. Cherry St., LLC v. Hennessee Grp., LLC,*
    573 F.3d 98 (2d Cir. 2009) ...............................................................................27

*Salvani v. ADVFN PLC,*
    50 F. Supp. 3d 459 (S.D.N.Y. 2014)................................................................39

*Salvani v. ADVFN PLC*,
   No. 13 Civ. 7082, 2014 WL 4828101 (S.D.N.Y. Sept. 23, 2014) .......................................21

*SEC v. Malenfant*,
   784 F. Supp. 141 (S.D.N.Y. 1992) ..................................................................................34

*Steginsky v. Xcelera Inc.*,
   658 F. App'x 5 (2d Cir. 2016) .......................................................................................42

*Stephenson v. Citco Grp. Ltd.*,
   700 F. Supp. 2d 599 (S.D.N.Y. 2010) ...........................................................................27

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) ......................................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 309 (2007) ......................................................................................................27

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011) ..................................................................... 32, 33, 34, 35

## RULES AND STATUTES

15 U.S.C. § 78i................................................................................................*passim*

15 U.S.C. § 78i(a) .............................................................................................33, 39

15 U.S.C. § 78i(a)(2) ..................................................................................... 20, 33, 40

15 U.S.C. § 78i(a)(4) .................................................................................. 19, 20, 26, 40

15 U.S.C. § 78j(b) .............................................................................................*passim*

17 C.R.R. § 240.10b-5......................................................................................*passim*

Fed. R. Civ. P. 23 .............................................................................................1, 41

Fed. R. Civ. P. 23(a) ........................................................................................42

Fed. R. Civ. P. 56 .............................................................................................1

Fed. R. Civ. P. 56.1 ..........................................................................................42

Fed. R. Civ. P. 56(c)..........................................................................................20

Defendants Credit Suisse International and Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse") respectfully submit this Memorandum of Law in Support of Their Motion for Summary Judgment and Opposing Class Certification, pursuant to the Federal Rules of Civil Procedure 56 and 23.

## I.     PRELIMINARY STATEMENT

Plaintiffs' case has failed.  After hundreds of thousands of dollars spent on discovery and motion practice, the facts are that Credit Suisse properly assisted its client by executing a routine offering of convertible notes and common stock (the "Offerings") for Energy Conversion Devices, Inc. ("ECD"), and creating a related share lending facility designed to assist investors in hedging investments in those notes.  Instead of dismissing their case, as they should have, Plaintiffs have presented an ever-changing set of baseless theories try to preserve some threat in an attempt to make it to trial.  In 2014, Plaintiffs filed a Consolidated Amended Class Action Complaint ("AC") that reflected a fundamental misunderstanding of how convertible notes offerings and hedging work, and irresponsibly asserted that Credit Suisse conspired with unnamed hedge funds to utilize the share lending facility not to facilitate hedging, "but rather to allow predatory hedge funds that purchased the Notes to make huge, coordinated, short sales of ECD stock in order to decimate the price of ECD stock and reap huge profits from these short positions."  SOF ¶ 85 (Dkt. 48 ¶ 5).  Plaintiffs alleged this "manipulative scheme" empowered hedge funds to "short ECD stock with impunity," "caused ECD investors astronomical losses," "dr[ove] the price of ECD common stock down from approximately $72 per share on June 18, 2008, to less than $1 in February 2012," and "contributed to ECD's bankruptcy."  SOF ¶¶ 85, 94 (Dkt. 48 ¶¶ 2, 5, 8, 9).

Discovery has utterly repudiated the core allegations of Plaintiffs' AC.  Plaintiffs failed to identify a shred of evidence to support their theory that Credit Suisse coordinated with third-

party hedge funds to decimate its own client's stock in order to curry favor with those funds. The record has established, moreover, that hedge fund investors in ECD's convertible notes did not utilize the Offerings to make *any* short sales of ECD's stock, let alone engage in "unrestrained short selling."  SOF ¶ 90 (Dkt. 48 ¶ 130).  Instead, trading records on which Plaintiffs' own expert relies establish that Credit Suisse in fact assisted these investors in ECD's convertible notes to stake out precisely the market neutral position that Plaintiffs' own expert maintained was appropriate to hedge their positions in ECD's notes.  SOF ¶¶ 118, 123-32.

ECD's former leaders, meanwhile, uniformly rejected Plaintiffs' account of ECD's demise—instead affirming that the Offerings worked just as Credit Suisse had explained they would and explaining that the 2008 financial crisis, industry-wide headwinds, and low-cost Chinese competition, rather than the Offerings, led to the collapse of ECD.  SOF ¶¶ 13-19, 46-57, 72-77.  Far from exploiting that decline to "reap huge profits," as Plaintiffs allege, the record shows that investors in ECD's convertible notes *decreased* their short exposure over time, while Credit Suisse *purchased* millions of ECD shares—actions fundamentally incompatible with their supposed scheme to maximize short exposure to ECD.  SOF ¶¶ 64-67.

Faced with overwhelming evidence that the core theory of their AC is baseless, Plaintiffs have run from their initial allegations.  Having previously argued that it was "necessary" to take additional depositions of hedge funds to uncover the full extent of the alleged conspiracy, Plaintiffs reversed course and elected not to take the deposition of a *single* so-called predatory hedge fund.  SOF ¶ 105-10.  Plaintiffs likewise appear to have simply abandoned their unsupportable allegations that Credit Suisse drove ECD into bankruptcy, or acted improperly by permitting investors to establish a so-called hedge ratio (a measure of the balance between one's short position and one's notes' holdings) greater than 50%.  SOF ¶ 85 (Dkt. 48 ¶¶ 2, 9, 32-33).

And a good thing, because every single ECD witness testified that the company went bankrupt because of market forces, not stock trading.

Instead, left to rely almost exclusively on their purported experts, Plaintiffs have largely retreated to the allegation that Credit Suisse permitted hedge fund investors to "over-hedge" their investments in ECD's convertible notes, and that this alleged "misuse" of shares "led to as much as a 9.5% reduction in the price of ECD's common stock[.]"  SOF ¶¶ 115-17, 140.  The crux of Plaintiffs' remaining claim is that Credit Suisse agreed in the Share Lending Agreement dated as of June 18, 2008 with ECD (the "SLA") that it would use the borrowed shares only "for the purpose of directly or indirectly . . . facilitating the sale and the hedging of the convertible notes," but in fact intentionally permitted hedge funds to acquire short positions that were "far more . . . than necessary to hedge their positions in the Convertible Notes," amounting to "huge negative bets" against ECD stock.  SOF ¶ 87 (Dkt. 48 ¶ 40).

Here, too, however, discovery firmly establishes that Plaintiffs' allegations are unsustainable, requiring summary judgment for Defendants on at least three independent grounds.  First, Plaintiffs cannot show that Credit Suisse engaged in a misrepresentation or market manipulation.  As Judge Marrero appreciated, SOF ¶ 93 (Dkt. 82 at 45), Plaintiffs' claims hinge on the propositions that (1) "hedging," as used in the SLA, means only one specific "market neutral" form of hedging; and that (2) Credit Suisse did *not* help investors to acquire a market neutral position.  Plaintiffs cannot establish either.  Even Plaintiffs' own expert admits that hedging is generally understood to encompass any action by which an investor reduces risk through a counterbalancing investment—something indisputably applicable to investors' actions here.  SOF ¶ 34.  More fundamentally, Plaintiffs' expert admitted that Credit Suisse's trading

records establish that Credit Suisse, *did*, in fact, facilitate precisely the kind of market neutral hedging position that even Plaintiffs' expert agreed was appropriate. *See* SOF ¶¶ 118, 123-32.

Second, although those facts alone are sufficient to dispose of Plaintiffs claims, summary judgment is independently warranted because Plaintiffs cannot establish scienter. Having failed to adduce any evidence of conspiracy, Plaintiffs are left with nothing but unfounded speculation to support their claim that Credit Suisse intended to deceive investors and decimate ECD's stock.

Third, Plaintiffs cannot show that the purportedly excessive hedging on which they rely caused any loss. The undisputed trading records establish that the entirety of the "excess" short position on which Plaintiffs' case turns was perfectly offset by Credit Suisse's simultaneous sale to investors of an identical long position in ECD's common stock (thus raising an additional $42 million in capital for ECD)—such that it could not have caused loss. Plaintiffs also point to no corrective disclosure or materialization of risk that would allow it to demonstrate loss; finally, in the week during which Credit Suisse purportedly engaged in the "excessive" shorting that Plaintiffs claim devastated ECD's stock, the stock price *went up*.

Notwithstanding production of hundreds of thousands of pages of documents in this case, and the Court's extension of leave for them to take *extra* depositions, Plaintiffs have adduced no evidence supporting the required elements of their misrepresentation and manipulation claims. Where, as here, the undisputed evidence utterly fails to bear out the complaint's fundamental allegations, the Court can grant summary judgment with no qualms.

## II.    STATEMENT OF UNDISPUTED FACTS

Plaintiffs' AC attacks a standard securities transaction that has been executed literally dozens of times without once being the subject of a lawsuit or regulatory enforcement action. SOF ¶¶ 5-6. Certain background information is helpful in understanding the transaction at issue.

A.    **Convertible Notes Offering and Investing**

1.    **Convertible Notes**

Public companies raise capital through a variety of mechanisms, including by issuing debt, equity, or certain hybrid securities.  SOF ¶ 6.  This case principally concerns convertible notes, which are common hybrid securities comprising two elements: (1) a simple note in which the note's issuer promises to make periodic payments to the note's holder over the life of the note, and repay the face value of the note at the end of that lifetime; (2) an option to convert the note into a specified number of shares of the issuing company's common stock.  *See, e.g.*, SOF ¶ 21.  In effect, therefore, convertible notes are debt obligations that, at the holder's option and upon certain events, can be exchanged for equity.  *See* SOF ¶¶ 21-22.

The number of shares for which a convertible note may be exchanged constitutes the note's conversion ratio.  Thus, if $1,000 in convertible notes may be exchanged for 10 shares of stock, the convertible note is understood to have a conversion ratio of 10.  *Id.*  A noteholder will profit from exchanging its note for common stock only if those shares of common stock are worth more than the face value of the note.  SOF ¶ 31.  Thus, if a note carries a conversion ratio of 10 (*i.e.*, 10 shares of stock per $1,000 in notes), a note holder will profit from exercising its option to exchange the note for stock only if the company's share price is greater than $100.  That "breakeven" point is known as the "conversion price."  *See* SOF ¶ 21.  Because a convertible note becomes more valuable as a company's stock increases in value and surpasses its conversion price, the interests of a convertible note holder are aligned with the interests of the company's common stockholders.  *See* SOF ¶ 32 (Dkt. 48 ¶ 26).

2.    **Convertible Arbitrage Investing**

Convertible arbitrage investors are important consumers of convertible notes and were a principal target for ECD's 2008 capital raise.  *See, e.g.*, SOF ¶ 10-11, 35-36.  Convertible

arbitrage is an "investment strategy in which an investor holds a long position in a convertible note *and* a short position in the common stock of the issuer" that is "designed to hedge against movements in the price of the underlying stock." SOF ¶ 36. Convertible arbitrage investors "generally rely on sophisticated quantitative models in order to identify whether notes are over- or undervalued. If these investors identify convertible notes that are undervalued, in their estimation, they will generally purchase the convertible notes and then reduce the risk of their position with some kind of offsetting trade." SOF ¶ 40. No one disputes that convertible arbitrage and hedging are well-established and perfectly appropriate investment strategies. *See, e.g.*, SOF ¶ 32 (Dkt. 48 ¶ 26).

The most common offsetting trade is to reduce the risk of a "long" position in a convertible note by acquiring a "short" position in the underlying stock. SOF ¶¶ 32-33.[1] This process of using a secondary trade to reduce risk in another position is called "hedging." SOF ¶ 34; Ex. 7 (DeRosa Rep. ¶ 40) ("Hedging is a process whereby an investor reduces, eliminates, or neutralizes the risk of a position or portfolio with regard to one or more risks."); SOF ¶ 34 (Dkt. 48 ¶ 4) ("A hedge is an offsetting investment that limits the downside risk of a principle investment."). Investors employ different hedging techniques based on their overall investment strategies and the types of risk against which they hedge—which may include equity market risk, interest rate risk, credit risk, currency risk, and/or leverage risk. SOF ¶ 39.

Investors pursue numerous types of hedging strategies. *See* SOF ¶ 42 (noting variety of metrics that form the basis of hedging strategies). One common convertible arbitrage hedging approach, called "delta neutral hedging," aims to achieve a particular balance between a long

---

[1] In a short sale, an investor borrows the stock from a third-party and sells the stock. The short sale is then closed out when the investor reacquires and returns those shares to the lender at a later date ("covering the short"). *See* SOF ¶ 29. The short sale and the subsequent covering transaction generate profits for the short seller if the security goes down in price, and losses for the short seller if the security goes up in price. Thus, selling short is economically the opposite of "going long" or purchasing the security. *See* SOF ¶ 29 .

position in a company's convertible notes and a short position in the company's underlying stock so as to minimize or eliminate risk from upward *or* downward movement of the company's underlying stock.[2]  If the investor assessment of the note's value is correct, "[t]he offsetting trade achieves a low-risk hedged position for the [investor], allowing it to profit if it is correct about its assessment of the convertible notes, *regardless of whether the underlying stock price rises or falls*." SOF ¶ 39 (emphasis added); *id.* (Dkt. 48 ¶ 26) (investors seek "a market neutral position").  "Hedging doesn't have to be delta neutral."  SOF ¶ 43.  Delta neutral hedging is simply "one of the lower-risk hedge techniques because of its ability to significantly reduce the equity sensitivity while taking advantage of the equity volatility." *Id.*

In convertible arbitrage investing, the delta,[3] SOF ¶ 39, is a measure of the short position necessary to minimize or eliminate the risk from stock price movement inherent in holding a long position in convertible notes at a particular time.  The delta neutral hedge ratio is expressed as the percentage of shares that an investor needs to short to achieve a delta neutral position with respect to the shares into which the note may be converted.  SOF ¶ 45.[4]  Different investors use distinct, often proprietary models to calculate the delta for a particular position at a particular time, such that different investors will calculate somewhat different hedge ratios for a particular convertible note at a given moment in time.[5] *See* SOF ¶¶ 40-41.

---

[2] Delta is just one of the model outputs that convertible arbitrageurs rely upon in order to measure risks they want to reduce through hedging.  Other so-called "greeks" include gamma (change in equity sensitivity); vega (change in implied volatility); theta (change in convertible's price over time); rho (change in value against interest rate); chi (change in value against spot exchange rate); omicron (change in value against credit spread); upsilon (change in value against credit recovery rate); and phi (change in value against underlying stock dividend yield).  SOF ¶ 42.

[3]  A delta neutral hedging strategy seeks to minimize the risk represented by "delta" (that is, the convertible note's equity sensitivity).  SOF ¶¶ 39, 43.  Accordingly, a convertible arbitrage fund pursuing a delta-neutral hedging strategy would maintain a hedge ratio equal to the delta generated by its model.  SOF ¶ 45. For example, in the context of delta-neutral hedging, a delta of 0.78 would correspond to a hedge ratio of 78%. *Id.*

[4]  For instance, assume that the conversion ratio for a particular convertible note is 12, providing that $1,000 in notes may be exchanged for 12 shares of stock.  If the delta is 0.50, then an investor would need to short 6 shares of stock (or 50% of 12 shares) in order to execute a delta neutral hedge in its investment in the convertible note.

[5]  As noted previously, delta (or equity sensitivity) is not the only type of risk that can be properly hedged.  *See supra* n.3. The hedge ratio reflects a complicated calculation accounting a wide variety of risks, including interest rate risk,

Because the delta for a particular stock turns on a variety of factors that are constantly changing, pursuing a delta neutral hedging strategy requires the ability to hedge *dynamically* (*i.e.* to adjust the size of the hedge over time).  SOF ¶ 41.  "[S]ince the delta of an option does not remain constant, the trader's position remains delta hedged (or delta neutral) for only a relatively short period of time."  *Id.* ¶¶ 41, 58  When the delta increases, a strictly delta neutral investor will need either to increase its short position or decrease its long position to remain delta neutral. *See Id.*  When the delta decreases, by contrast, such an investor must either decrease its short position or increase its long position.  *Id.*

Companies raising capital can make their convertible notes more attractive to investors pursuing delta neutral hedging strategies by offering them a mechanism to hedge their long position in convertible notes by acquiring an offsetting short position that can be dynamically adjusted over time.  *See, e.g.*, SOF ¶¶ 10-11, 58.  One way companies facilitate this result is by lending a number of shares to a financial institution to establish a "share lending facility," which is available to be lent out for shorting (or the economic equivalent, *see infra*) to investors in the company's convertible notes.  *Id.*  By so doing, companies provide investors with assurance that they will be able to obtain a sufficient offsetting short position over the lifetime of the convertible notes to permit adjustment of the hedge ratio to maintain their desired hedged position.  SOF ¶¶ 10-11, 25.  Absent such a facility, the potentially greater difficulty and cost associated with establishing and maintaining a short position would make the underlying convertible notes a less attractive investment.  *See, e.g.*, SOF ¶¶ 10-11, (Dkt. 48 ¶ 6); SOF ¶ 11. It is undisputed that creating a share lending facility in connection with a convertible notes offering is not improper, misleading, or manipulative.  SOF ¶ 33 (Dkt. 48 ¶ 4); SOF ¶¶ 28, 32.

---

credit risk, liquidity risk, legal provision and prospectus risk, currency risk, and leverage risk, in addition to equity market risk.  *See* SOF ¶ 39.

**B.      ECD Decides to Issue Convertible Notes and Credit Suisse Executes the Offering**

Although ECD met with numerous banks to discuss means of raising capital, it sought further advice from Credit Suisse and UBS because of their experience and expertise with numerous methods of raising capital, and Credit Suisse's strong reputation in renewable energy transactions.  SOF ¶ 5.  Credit Suisse and UBS recommended that ECD proceed with an offering of convertible notes coupled with an equity offering, including shares to be offered in connection with a share lending facility.  This advice was based on a number of factors, including cost of capital, sizing capacity, and maximizing the number of investors in the convertible notes.  *Id.* ¶ 8.

The share lending facility was critical to attracting investors and permitted ECD to raise the capital it needed on more attractive financial terms.  *See, e.g.*, *id.* ¶ 8 (detailing undisputed testimony that a convertible notes offering without a share lending facility would have resulted in a smaller capital raise or higher cost to ECD); *id.* ¶ 11  (hedge funds "wouldn't have invested in the offerings had we not been able to . . . come up with a source of stock borrow").  Ultimately, ECD decided to lend Credit Suisse 3,444,975 shares of ECD stock "to facilitate privately negotiated transactions or short sales" for a fee of $0.01 per share.  *Id.* ¶ 23  (Dkt. 48 ¶ 3).

ECD recognized that one risk of creating a share lending facility is that the increased short sales associated with creating the facility could negatively impact the price of ECD's stock.  SOF ¶ 14.  ECD "accepted that downside risk," however, because it considered it to be outweighed by the "upside" offered by "raising th[e] capital and progressing on [its] growth plans."  *Id.*  ECD's former leadership has consistently affirmed that it appreciated the benefits and risks of the Offerings, including the SLA, and viewed Credit Suisse's recommendations as constructive.  *See id.* ¶¶ 12-13.  Similarly, ECD's former leaders have uniformly rejected Plaintiffs' claim that Credit Suisse committed deceptive or misleading acts.  *See id.*

In June 2008, Credit Suisse executed the Offerings.  The 3,444,975 shares that Credit Suisse borrowed from ECD pursuant to the SLA were equal to the number of shares into which the notes could be converted, and Credit Suisse was required to return these shares on or before June 15, 2013.  *Id.* ¶ 23.  Of these shares, on June 18, 2008, Credit Suisse sold 2,723,300 into the market alongside the 1,460,500 shares sold by ECD.  SOF ¶ 24.  By borrowing shares from ECD and selling them into the market, Credit Suisse effectively established a short position in ECD stock to facilitate hedging by investors in ECD's convertible notes.  *Id.* ¶¶ 13, 30.[6]

Credit Suisse then offered convertible notes investors the opportunity to acquire the economic substance of Credit Suisse's short position through "total return swaps."  SOF ¶ 31.  A total return swap is a private contract between two parties by which they agree to make payments to each other on the basis of the performance of different assets specified in the contract.  SOF ¶ 31.  In this case, convertible arbitrage investors entered into swaps pursuant to which they were obligated to pay Credit Suisse the total return on ECD's stock.[7]  *Id.*  In so doing, investors could acquire a synthetic short position that was economically equivalent to engaging in a short sale of ECD's stock.  *Id.*  If ECD's share price increased, swaps holders would have been obligated to pay Credit Suisse when unwinding or closing the swaps, whereas Credit Suisse could end up paying the swaps holders if ECD's share price declined.

By purchasing total return swaps, convertible arbitrage investors in ECD's convertible notes could hedge the equity risk embedded in their long position in ECD's notes.  Unlike short sales, however, which take place in the public market and can impact share price, *see, e.g.*, SOF ¶ 14, swaps are private contracts that do not impact the total shares of the company's stock that

---

[6] On June 20 and 23, 2008, Credit Suisse also sold and immediately repurchased, in two tranches, the remaining 721,675 borrowed shares at market prices, a process known as a "double print" by which an underwriter makes new shares legally tradeable without increasing the number of shares in the market.  SOF ¶¶ 24-25.

[7] In exchange, Credit Suisse committed to pay investors LIBOR minus a fixed number of basis points.  SOF ¶ 31. LIBOR is a benchmark interest rate that banks charge other banks for short-term loans.  SOF ¶ 31.

are "short" in the market.  *Id.* ¶¶ 23, 31; *see also* SOF ¶ 135.  Importantly, therefore, investors whose hedging related to the SLA did *not*, by entering into swaps, engage in any short sales of ECD stock whatsoever.  *See, e.g.*, SOF ¶ 31.  Those swaps, as off-market transactions, did *not* have the market-depressing effect of the short sales alleged in the AC.  SOF ¶ 31.

During the process of marketing ECD's convertible notes to investors, Credit Suisse used financial modeling software to calculate a hedge ratio that it believed would allow investors to acquire a delta neutral position.  SOF ¶ 45.  At the time of the Offerings, Credit Suisse calculated this ratio as 78%. *Id.*  That number implies that investors seeking to acquire a delta neutral position would acquire a short position equivalent to 78% of the shares into which the investor's holdings in ECD's notes could be converted.[8]  *Id.*  ECD's convertible notes provided that a noteholder would receive a payment equal to the value of 10.8932 shares of ECD stock.  A hedge ratio of 78%, therefore, indicated that investors executing a delta neutral hedging strategy should establish a short position of approximately 8.5 shares per $1,000 face value of ECD convertible notes in order to attain a delta neutral position.  Each investor's quantitative model could have differed, however, and each investor could have asked Credit Suisse to sell them swaps with a different hedge ratio in mind.  SOF ¶ 41.  Investors engaged in dynamic hedging, moreover, reasonably would have anticipated that the hedge ratio would evolve over time, requiring them to readjust the balance of their long and short positions.  *Id*.

Because a hedge ratio is calculated on the basis of the entirety of an investor's positions in a company's convertible notes and stock, SOF ¶ 44, convertible note investors could have obtained their desired hedge ratio (78% or otherwise) through any number of equivalent combinations of holdings in notes, stock, and swaps.  For instance, the holder of $1,000 in

---

[8] Plaintiffs' AC alleged that the appropriate hedge ratio was "less than 50 percent."  SOF ¶ 85  (Dkt. 48 ¶¶ 26, 32); *see also id.* ¶ 31.  Plaintiffs' expert, however, calculated that the appropriate delta was ".7685, which is virtually identical to the delta of .78 that is referenced in the Credit Suisse materials."  SOF ¶ 45.

convertible notes could have established a delta neutral position by (1) selling short $780 worth of ECD stock; (2) acquiring through swaps a synthetic short position equivalent to $780 in ECD stock; (3) acquiring through swaps a synthetic short position equivalent to $500 worth of ECD stock and selling short an additional $280 worth of ECD stock, or (4) acquiring a synthetic short position equivalent to $1000 in ECD stock, and purchasing $220 in ECD stock.  Each and every one of these formulations results in a net 78% hedge ratio.

Credit Suisse utilized the latter method to facilitate hedging by certain investors in ECD's convertible notes.  SOF ¶¶ 45, 132.  Through the Offerings, Credit Suisse enabled investors in ECD convertible notes to acquire simultaneously (a) swaps up to a hedge ratio of 100% (*i.e.*, a swap position via which the investor hedged its long position in convertible notes by acquiring a short interest in an equivalent number of shares to those it would have received if it converted its notes), *as well as* (b) the additional long shares of common stock necessary to achieve a net hedge ratio of 78%.  *See, e.g.*, SOF ¶¶ 45, 118 ("It is [DeRosa's] understanding that the hedge fund investors also purchased ECD stock in the tandem offerings").

Plaintiffs' expert has admitted that if one recognizes the common stock acquired by investors as part of the Offerings when simultaneously investing in ECD convertible notes and swaps, convertible arbitrage investors investing in ECD notes achieved a hedge ratio of 78%—a number "virtually identical" to the number that Plaintiffs' expert himself suggests would have been the appropriate hedge ratio to execute a delta neutral hedging strategy.  *See* SOF ¶¶ 111, 118; *see also id.* ¶¶ 123-32 (detailing DeRosa's admissions that investors acquired a hedge ratio of 78% if one counts both the swaps and the common stock investors acquired through the

Offerings); *id.* Ex. 52 (DeRosa Transcript 122:8-17) (conceding that, accounting for long shares purchased by the hedge funds, investors' hedge ratios were 78%).[9]

Credit Suisse informed ECD—and ECD indisputably understood—that Credit Suisse planned to execute the share lending facility in exactly the manner that it did: by permitting investors to establish a hedge ratio of 100% and simultaneously purchase common stock to reduce the net hedge ratio.  *See* SOF ¶ 13.  By permitting investors to acquire swaps at a hedge ratio of 100%, Credit Suisse made it more efficient for convertible arbitrage investors to maintain a delta neutral position as the price of ECD stock rose.  Because hedge ratios are dynamic, convertible arbitrage investors pursuing a delta neutral position must constantly adjust their overall balance of short and long positions in order to meet an ever-evolving hedge ratio. SOF ¶¶ 41, 58.  Had investors attempted to achieve and maintain a delta neutral position *solely* via swaps, they would have had to renegotiate the terms of those agreements each time their calculation of delta changed to maintain their desired hedge ratio, whereas stock purchases and sales can be effected virtually instantaneously.  In effect, the convertible noteholders expressed bullishness with respect to ECD: they wanted to ensure that they could adjust their hedge ratios upward as the ECD stock price *rose* simply by selling their long shares into the market and without having to renegotiate their swaps or locate shares to borrow and short.[10]  SOF ¶ 16.

The Offerings proved a success for ECD.  Credit Suisse and UBS, along with three additional bookrunners, generated substantial commitments for the common stock shares and

---

[9] Plaintiffs' expert utilizes for his own analysis other data within the certified Credit Suisse trading records that definitively establish convertible arbitrage investors in ECD did, in fact, act in a manner consistent with securing and maintaining a delta neutral hedging strategy.  SOF ¶¶ 123-32.  Inexplicably, however, Plaintiffs' expert asserted that these records could somehow be faulty with respect to detailing stock trades made by ECD notes investors.  *Id.* ¶ 119.  Because Plaintiffs have pointed to no alternative source of trading data suggesting notes investors were not executing a hedging strategy but were instead seeking massive short positions, there is no factual dispute.  Nor can Plaintiffs' expert create such a dispute when he relies on the same data for his analysis.

[10] Indeed, as ECD's stock price rose following the Offerings, notes investors, including Advent, BNP Paribas, Marathon, Wachovia, Morley, and Sunrise, sold their shares and notes, closed their swaps, and took their profits.

convertible notes in the lead up to the Offerings, undertaking a seven-day, three-city road show during which they met with 28 potential investors.  SOF ¶ 46.  The Offerings of both ECD's stock and convertible notes were oversubscribed, an indication to the company and market that the Offerings were a success.  *Id.* ¶ 47.  Ultimately, ECD sold more than $100 million in common stock and more than $300 million in convertible notes, raising the substantial capital it sought to boost production and meet growing demand for its products.  *Id.* ¶¶ 17-19, 46.

On every day between June 19, 2008 and June 26, 2008—the week after Credit Suisse had completed the short sale of 2.7 million shares of ECD stock to support the swaps with convertible notes investors—ECD's stock price *exceeded* its stock price on the date of the Offerings.  SOF ¶ 48.  ECD's convertible notes traded 10 percent higher during the same time period.  *Id.*  ECD's stock price fluctuated over the summer, but by August 20, 2008, it was again higher than the offering price—and remained above that price through the end of August 2008.  *Id.*  These facts put the lie to Plaintiffs' claims that Credit Suisse was part of a conspiracy to lower ECD's stock price.  During the months following the only significant short sales associated with the Offerings, ECD's share price indisputably rose. SOF ¶¶ 48-49.

## C.   The Financial Crisis and Competition with Chinese Manufacturers Sharply Impact ECD's Business

Several months after the Offerings were executed, however, during the fall of 2008, both the capital and credit markets suffered historic crashes.  *Id.* ¶ 50.  The solar industry suffered along with the broader market, *id.*, and ECD performed in line with its industry.  *Id.*  The industry's headwinds included credit-challenged customers hesitant to invest in solar roofing projects, and reduced subsidies for solar power in the United States and Europe. *Id.* ¶ 51.

ECD, moreover, ultimately came to face company-specific challenges.  ECD's solar energy generating products were structurally different from most other solar panel

manufacturers' products sold in 2008: ECD used amorphous silicon in its solar laminate rather than more expensive, but higher energy-generating, crystalline polysilicon used in solar panels. *Id.* ¶ 52. ECD's competitive advantage dissolved in 2009, however, as polysilicon became much less expensive, making it harder, if not impossible, for ECD to compete. *Id.* ¶ 53. Each witness with personal knowledge of ECD's business testified that this "perfect storm"—not the Offerings—led to the collapse in ECD's business. *See, e.g., id.* ¶¶ 53-56, 72-77.

### D.      Credit Suisse and Investors Respond to the Decline in ECD's Prospects

In 2009 and 2010, ECD's stock price declined substantially, moving far below the conversion price of ECD's convertible notes. SOF ¶ 59. The hedge ratio for a convertible note tends to be lower when the stock price is well below the conversion price. SOF ¶ 60. When the stock price declines, the value of the noteholder's option to convert decreases because the likelihood that conversion will be profitable (*i.e.*, that the stock price will exceed the conversion price by the conversion date) is lower. SOF ¶ 61.

As the delta for the convertible notes declined, convertible arbitrage investors pursuing a delta neutral strategy required a smaller short position in order to achieve a delta neutral position. As a result, they unwound their swaps positions with Credit Suisse. SOF ¶ 63 (DeRosa Rep. ¶ 106). And as investors drastically reduced their short positions, Credit Suisse no longer needed such a large offsetting short position in the market to support the swaps and therefore *purchased* ECD common stock in the market.[11] SOF ¶ 64. Credit Suisse's purchases of ECD stock could not, and did not, cause the price of ECD stock to decline. SOF ¶¶ 56, 82, 96-107 (evidence and witness testimony that ECD's stock price decline was due to market and industry forces).

---

[11] By virtue of originally borrowing 2,723,300 shares of ECD stock and selling that stock to the market on June 18, 2008, Credit Suisse acquired a short position. Credit Suisse then transferred the economic substance of that short position to investors via swaps, leaving its short position relative to ECD precisely balanced with its long position relative to investors hedging their investments in ECD's convertible notes. SOF ¶ 31. As the hedge ratio declined, and investors reduced their short positions accordingly, Credit Suisse purchased an offsetting amount of ECD stock and set it aside in a segregated account. SOF ¶¶ 63-66.

Indeed, these purchases fatally undermine Plaintiffs' purported short selling conspiracy. Critically, by unwinding their swaps, investors *reduced their short position* in ECD.   And by purchasing ECD common stock, Credit Suisse *increased its long position* in ECD.[12]  This was as the stock price was going down.   Those undisputed facts are of course, fundamentally inconsistent with the Plaintiffs' allegation that Credit Suisse was helping hedge funds to improperly *increase* their short positions in ECD "in order to decimate the price of ECD stock." SOF ¶ 5 (Dkt. 48 ¶ 5).

By 2012, ECD concluded that its business plan was unlikely to succeed and filed for bankruptcy.  SOF ¶ 69-70.  In disclosing the causes of its bankruptcy, ECD listed many potential factors largely relating to the financial crisis and increased competition from Chinese manufacturers.  *Id.* ¶ 71-72.  None of the many factors ECD identified pointed to the short selling of its stock, or any conduct that in any way related to Credit Suisse.  *Id.*; *see also id.* ¶¶ 73-77. None of the three former ECD officers or directors deposed in this matter indicated that Credit Suisse was in any way responsible ECD's stock price decline.  *Id.* ¶ 77.  Rather, as ECD's former Treasurer, explained, the decline "was *all* market-driven."  SOF ¶ 76 (emphasis added).

### E.     Plaintiffs' Allegations and the State of the Record Following Discovery

The gravamen of the AC is that Credit Suisse set out to betray its client ECD and benefit unnamed "predatory" hedge funds.  SOF ¶ 85 (Dkt. 48 ¶ 5).  Specifically, Plaintiffs alleged that "the purpose of the simultaneous and contingent Offerings of convertible notes and common stock was not to permit investors in the convertible notes to engage in market neutral hedging, but rather to allow predatory hedge funds that purchased the notes to make huge, coordinated,

---

[12] Although Credit Suisse was overall a net buyer of ECD common stock, on nine days during the Class Periods, Credit Suisse trivially increased its daily net short position in the market in response to changing hedge ratios and investor actions.  SOF ¶ 68.  None was for more than 100,000 shares (less than 3% of the borrowed shares); the smallest was 200 shares.  SOF ¶ 68.

short sales of ECD stock in order to decimate the price of ECD stock and reap huge profits from these short positions." *Id.* Discovery contradicted every shred of this.

First, having promised to name the "predatory" hedge funds with whom Credit Suisse purportedly conspired, and after moving for additional depositions to uncover evidence to support Plaintiffs' allegation that "Credit Suisse solicited the participation of the hedge funds, fully aware of their intentions to drive down the price of ECD stock through massive short selling," *id.*, Plaintiffs ultimately declined even to depose a single hedge fund, let alone amend their AC to add as a defendant a single investor in ECD's convertible notes. SOF ¶ 95, 110. Plaintiffs themselves appear to appreciate that there was no conspiracy. Indeed, neither Plaintiffs nor their experts could identify a single communication supporting Plaintiffs' alleged conspiracy. *See, e.g.*, SOF ¶¶ 101-02.

Second, Plaintiffs' own expert rebutted Plaintiffs' claim that investors in ECD's convertible notes acquired a short position through the Offerings vastly in excess of that required to engage in "any legitimate hedging strategy." SOF ¶¶ 87, 118 Ex. 1 (Dkt. 48 ¶ 28). To begin with, Plaintiffs' own expert rejected Plaintiffs' claim that the appropriate hedge ratio at the time of the Offerings was "less than 50 percent," *id.* ¶ 85 (Dkt. 48 ¶ 56), instead calculating the appropriate hedge ratio to be 76.85%, a number he admitted was "virtually identical" to the hedge ratio actually facilitated by Credit Suisse. SOF ¶ 111 (DeRosa Rep. ¶ 86). Crucially, moreover, Plaintiffs' expert admitted that (accounting for the swaps and common stock investors actually acquired through the Offerings), investors did, in fact, consistently obtain a hedge ratio of 78%, SOF ¶¶ 118, 123-134, precisely the hedge ratio Plaintiffs' expert himself admits was appropriate "in order to hedge against the equity risk embedded in the notes," SOF ¶ 111.

Finally, discovery thoroughly contradicted Plaintiffs' claim that Credit Suisse helped the hedge funds to "engage in rampant short selling of ECD stock" that "dr[ove] the price of ECD common stock down from approximately $72 per share on June 18, 2008, to less than $1 in February 2012." SOF ¶¶ 85, 94 (Dkt. 48 ¶¶ 9, 28). To begin with, investors did not engage in any short selling through the Offerings, let alone rampant short selling. To the contrary, Plaintiffs' own expert admitted that Credit Suisse helped investors to acquire "*synthetic* short positions through total return swaps." SOF ¶ 31 (emphasis added). Such private, off-market swaps transactions could not and did not impact the price of ECD's stock. SOF ¶ 31. In addition, ECD's stock price *went up* following Credit Suisse's execution of the only significant short sales connected to the Offerings. SOF ¶¶ 48-49. And both Credit Suisse and hedge funds' actual market behavior over time was shown by discovery to be flatly inconsistent with the purported conspiracy to profit from the decline of ECD's stock: as ECD's stock price declined, investors materially reduced their short positions in ECD's stock, and Credit Suisse materially increased its stockpile of ECD shares in response. *Id.* ¶¶ 64-67. Such actions are consistent with investors executing a delta neutral hedging strategy, and inconsistent with a conspiracy to maximize gains off a decline in the ECD stock price. SOF ¶ 68. Finally, contrary to Plaintiffs' assertions, ECD's former leadership offered unrebutted testimony that market and competitive factors caused the decline in ECD stock, not the Offerings or short selling. SOF ¶¶ 54-57, 71-77.

## III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS BECAUSE PLAINTIFFS HAVE ADDUCED NO EVIDENCE OF MISREPRESENTATION OR MANIPULATION

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

"Where [ ] the nonmoving party would have the burden of proof at trial, ordinarily it is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *In re Rezulin Prods. Liab. Litig.*, 361 F. Supp. 2d 268, 271 (S.D.N.Y. 2005) (citing *Celotex* 477 U.S. 317, 322-23 (1986)).

Plaintiffs assert claims against Credit Suisse under Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Section 9(a)(4)[13] of the Exchange Act predicated on alleged misrepresentations and omissions in offering materials. Plaintiffs' misrepresentation claims fail for at least three independently dispositive reasons: (1) Plaintiffs cannot establish falsity with respect to Credit Suisse's statements; (2) Plaintiffs cannot prove that Credit Suisse acted with scienter; and (3) Plaintiffs cannot prove loss causation.

In addition, Plaintiffs assert claims against Credit Suisse under Section 10(b), Rule 10b-5, and Section 9(a)(2) for manipulation of the market. Plaintiffs' market manipulation claims also fail for at least three independently dispositive reasons: (1) Plaintiffs cannot establish that Credit Suisse engaged in manipulative transactions; (2) Plaintiffs cannot prove that Credit Suisse acted with scienter; and (3) Plaintiffs cannot prove loss causation.

## A.   There Is No Evidence That Credit Suisse Made Misrepresentations in Violation of Section 10(b), Rule 10b-5, or Section 9(a)(4)

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must establish: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misstatement or omission; (5) economic loss; and (6) that Plaintiffs' reliance was the proximate cause of their injury. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148,

---

[13] As noted in the Court's Decision on the Motion to Dismiss, "Plaintiffs do not indicate in the [AC] the provisions of Section 9 out of which their claims arise." SOF ¶ 86 (Dkt. 82 at 25). The Court construed the AC "to allege misrepresentations or omissions of material fact in violation of Section 9(a)(4), and a series of manipulative market transactions in violation of Section 9(a)(2)." *Id.* Defendants adopt this construction for purposes of this motion.

157 (2008). Moreover, Plaintiffs must establish that "the challenged statements were false *when made*." Ex. 86 (Dkt. 82 at 58) (emphasis added).

Although Section 9(a)(4) "'closely parallels' Section 10(b) and Rule 10b-5, . . . 'at least one court in this Circuit has noted that Section 9(a)(4) creates a higher burden of proof than Section 10(b).'" *Id*. at 31 (quoting *Salvani v. ADVFN PLC*, No. 13 Civ. 7082(ER), 2014 WL 4828101, at *12-13 (S.D.N.Y. Sept. 23, 2014)). Section 9(a)(4) requires a "(1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Salvani*, 2014 WL 4828101, at *13 (citation omitted).

Failure to prove any one of the required elements "necessarily renders all other facts immaterial and requires summary judgment in favor of defendants." *In re N. Telecom Ltd. Sec. Litig*., 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) (internal quotation marks and citations omitted). In this case, summary judgment is appropriate because Plaintiffs have failed to adduce evidence to prove not just one but many required elements of their misrepresentation claims.

### 1. There Is No Evidence That Credit Suisse Made Any Actionable Misrepresentations or Omissions

Plaintiffs' surviving misrepresentation claim centers around Section 10(b) of the SLA, which provides that the "Loaned Shares will be used, if at all, solely for the purpose of *directly or indirectly . . . facilitating the sale and the hedging of the Convertible Notes*." SOF ¶ 36 (emphasis added). Specifically, Plaintiffs allege that

> [r]ather than operating the Share Lending Agreement solely to allow 'hedging' as had
> been represented to investors and as it had agreed to do, however, Credit Suisse permitted
> the hedge funds that purchased the Convertible Notes to borrow substantially all of the
> shares in the pool and engage in rampant short selling of ECD stock far beyond the
> volume of selling necessary to any legitimate hedging strategy.

(Dkt. 48 ¶ 28). Plaintiffs' misrepresentation claim thus hinges on whether Credit Suisse lied

20

intentionally when it agreed to facilitate "hedging" of the convertible noteholders' investments. SOF ¶ 125.  Plaintiffs' claim is predicated on the position that (1) "hedging," as used in the SLA, must mean "delta neutral hedging," *Id.* ¶ 36; and that (2) Credit Suisse used the share lending facility to help convertible notes investors engage in "excess" hedging beyond what could be considered delta neutral. *Id.* ¶ 122.  Plaintiffs are wrong on both counts.

> **a.  Plaintiffs Cannot Show "Hedging" Is Limited to "Delta Neutral Hedging"**

As Judge Marrero recognized, Plaintiffs cannot prevail on a misrepresentation claim unless they can show that investors in ECD's convertible notes were not "pursuing a legitimate hedging strategy."  Dkt. 48 ¶ 26; *see also* SOF ¶ 133 (Dkt. 82 at 44) ("If the term 'hedging' does not in fact refer to the specific, market neutral strategy alleged by Plaintiffs, and if the strategies employed by the Credit Suisse Defendants' hedge fund clients can appropriately be characterized as 'hedging,' then the Credit Suisse Defendants' 'scheme' entailed little misrepresentation.").

Plaintiffs argue that "hedging" in the context of convertible notes refers *solely* to a "market neutral investment strategy whereby an investor buys convertible notes and limits the downside risk in the price of the notes by shorting the common stock of the company."  SOF ¶ 37 (Dkt. 48 ¶ 4).  But they can point to no industry testimony or secondary source supporting that narrow view.  To the contrary, their own expert defines hedging broadly, as "a process whereby an investor reduces, eliminates, or neutralizes the risk of a position or portfolio with regard to one or more risks." SOF ¶ 34 Ex. 7 (DeRosa Rep. ¶ 40); *see also* SOF ¶ 37.  Delta neutral hedging is "*one* of the lower-risk hedge techniques," but not the only one.  *See supra* at 7.  Moreover, DeRosa's attempt to narrowly define the broad term "hedging" inappropriately arrogates the Court's role in interpreting legal terms.  *See* Mot. to Exclude Section III.D.

It is not seriously disputed that Credit Suisse helped investors in ECD's convertible notes, at minimum, to "reduce[] … the risk" of their long position in notes. SOF ¶¶11, 15, 33-36.  Even if Plaintiffs were correct that Credit Suisse had enabled investors to acquire a hedge ratio of 100%—rather than recognizing that long share purchases reduced their net hedge ratios to 78%—that would mean nothing more than that the investors had established "synthetic short positions equal to 100 percent of the full conversion rate of their ECD convertible note position." SOF ¶ 31.  In other words, a hedge ratio of 100% implies parity between one's short interest in shares and one's long interest in the number of shares into which a note could be converted. Plaintiffs cannot and do not seriously contend that such a position would not constitute a "counterbalancing investment" that would "reduce[] … the risk" of those investors' long position in notes.  SOF ¶ 34 (DeRosa defining "hedging").  Plaintiffs failed to adduce any evidence that hedging refers only "to the specific, market neutral strategy alleged by Plaintiffs," or that establishing *a hedge ratio of 100%* does not meet basic definitions of hedging, SOF ¶ 93 Ex. 95 (Dkt. 82 at 44).  Because the plain meaning of the term "hedging" is clear, there is no need to add words that do not appear in the SLA, and Plaintiffs' misrepresentation claim must fail.

### b.   Credit Suisse in Fact Set Up the Convertible Noteholders with a Delta Neutral 78% Hedge Ratio

Even if Plaintiffs could establish a genuine dispute about whether "hedging" means *only* delta neutral hedging, Plaintiffs' misrepresentation claim still fails because the evidentiary record establishes that Credit Suisse did, in fact, facilitate delta neutral hedging by investors in ECD's convertible notes.  Plaintiffs' own proffered expert concedes that (1) an investor who secured a 78% hedge ratio on the date of the Offerings would acquire "a delta-neutral position," SOF ¶ 45, and (2) each investor he *claims* acquired an "excessive" short position *in fact* attained a 78% hedge ratio once one accounts for both the swaps and the common shares that those investors

simultaneously acquired from Credit Suisse at the time of the Offerings, SOF ¶¶ 118, 124-134. Those two undisputed facts alone are dispositive of Plaintiffs' misrepresentation claim.

Although Plaintiffs' AC originally asserted that an investor who "employ[ed] a hedge ratio in excess of 50%" would not be undertaking "a market neutral 'hedge' against the downside risk in the Convertible Notes," SOF ¶ 85 Ex. 1 (Dkt. 48 ¶ 32), that statement was false. As Plaintiffs' expert now concedes, Credit Suisse correctly calculated that investors could acquire a delta neutral hedging position by establishing a hedge ratio of 78%. *See* SOF ¶ 45.

The undisputed record establishes that Credit Suisse intended to, and did, facilitate convertible investors' efforts to establish positions at the time of the Offerings reflecting a net hedge ratio of 78%. SOF ¶¶ 118, 124-134. For instance, an internal Credit Suisse email from June 19, 2008—one day after the Offerings—confirms that Credit Suisse's transactions with the convertible noteholders were designed to permit investors to "get themselves on a net 78 delta." SOF ¶ 45 ("Customers entered into short exposure via swaps on (2,723,312) vs Delta 1 (100 delta) and then bo[ugh]t phys[ically] 599,129 [shares] (22 delta) to get themselves on a net 78 delta or net (2,124,183) [shares]."). Helping investors to establish a 78% aggregate net hedge ratio accorded with the preferences of noteholders, most of whom were pursuing a delta neutral strategy. *See, e.g.*, SOF ¶ 45.

Credit Suisse's trading records, moreover, establish that Credit Suisse did, in fact, help each convertible noteholder to attain a 78% net hedge ratio on the date of the Offerings. SOF ¶¶ 124-134. Investors in ECD's notes that hedged via swaps up to the hedge ratio of 100% also acquired long positions sufficient to bring down their net hedge ratio of 78%. SOF ¶¶ 118, 123-134. Plaintiffs' own expert conceded that "hedge fund investors also purchased ECD stock in the tandem offerings." SOF ¶ 134. He conceded that had he accounted for those shares in his

calculations, the result would have been correct hedge ratios of 78%.  *See* SOF ¶¶ 118, 123-134.

Although DeRosa opined that a number of hedge fund convertible noteholders[14] had excessive (*i.e.* greater than delta neutral) hedge ratios, he admitted at his deposition that those calculations and conclusions disregarded the 599,000 long shares of ECD stock purchased by convertible noteholders as part of the Offerings.  SOF ¶ 118.  When asked why he did not consider the hedge funds' long shares of ECD stock, DeRosa responded that he didn't "know where these shares came from."  *Id.* ¶ 119.  Those shares, however, were provided to investors by Credit Suisse from its part of the Offerings and were indisputably included in the same Credit Suisse trading data that DeRosa used to calculate convertible noteholders' daily hedge ratios for his Report.  *Id.* ¶ 120.  DeRosa, moreover, did not express any concerns about the Credit Suisse data in his report, and, at deposition, could not identify any basis in the evidentiary record to dispute its accuracy.  *Id.* ¶ 121.

As is discussed in greater detail in Defendants' Motion to Exclude, filed concurrently, DeRosa's omission of relevant data from his "excess short shares" calculations renders his opinions unreliable, unscientific, and without factual basis.  *See* Mot. to Exclude at Section III.B. There is no scientific basis for DeRosa's apparent position that the Credit Suisse trading data should be viewed as accurate, complete, and reliable when it details investors' short positions, but should be disregarded completely when it details their long positions.  Importantly, moreover, DeRosa's apparently purposeful decision to disregard relevant evidence does not create an issue of material fact.  DeRosa's unsupported opinion is no substitute for fact evidence. *See, e.g., Kelsey v. City of New York*, No. 03-CV-5978, 2007 WL 1352550, at *6 (E.D.N.Y. May

---

[14] Specifically, DeRosa opined that the following hedge fund convertible noteholders had "excessive" (*i.e.* greater than delta neutral) hedge ratios: Aristeia Capital, Canyon Capital,  QVT Financial, Jabre Capital, Polygon Global Securities, Forest Investments, RG AC Radcliffe, Silverback Asset Management, Advent Capital, and Basso Capital Management.  SOF ¶¶ 124-34.

7, 2007) ("To find, as plaintiffs argue, that the conclusory assertions of an expert are sufficient to survive summary judgment, regardless of the merits of the underlying case, would effectively eliminate plaintiffs' obligation, pursuant to Rule 56(e), to 'set forth specific facts showing that there is a genuine issue for trial.'"); *Cummiskey v. Chandris, S.A.*, 719 F. Supp. 1183, 1190 (S.D.N.Y. 1989) ("[T]he use of unreliable and unfounded expert testimony . . . is insufficient to defeat defendants' motion."), *aff'd* 895 F.2d 107 (2d Cir. 1990).   By excluding the notes investors' long shares, DeRosa overstated the true hedge ratios for each of investors hedging in connection with the Offerings—a fact DeRosa admitted at deposition.  SOF ¶¶ 124-134.

Because Plaintiffs' own expert acknowledges that Credit Suisse's records establish that Credit Suisse helped investors to obtain a 78% hedge ratio on the date of the Offerings— precisely the level of hedging that DeRosa claims–baselessly—the "[r]eaders of the share lending agreement" would have expected, SOF ¶¶ 111—and points to no basis for doubting the accuracy of those records (on which he elsewhere relies), Plaintiffs' misrepresentation claim necessarily fails.   Plaintiffs' failure to show that Credit Suisse made any false or misleading statements in the SLA is by definition fatal—whether under Section 9 or Section 10.   *Panfil v. ACC Corp.,* 768 F. Supp. 54, 59 (failure to show material misstatement or omission under Rule 10b-5 also required dismissal of Section 9 claim).

**2.   Plaintiffs Failed to Adduce Any Evidence That Credit Suisse Acted with Scienter in Connection with Alleged Misrepresentations**

Plaintiffs also cannot prove that Defendants acted with the requisite scienter.  The federal securities laws punish only conduct that is intentionally deceptive.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976).   Accordingly, to hold Defendants liable, Plaintiffs must prove that Defendants acted with an "'intent to deceive, manipulate, or defraud.'" *S. Cherry St., LLC v. Hennessee Grp., LLC,* 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs,*

25

*Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319 (2007)).  Plaintiffs may "show scienter with evidence either of defendant's motive and opportunity to commit fraud or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Freedman v. Value Health, Inc.,* 34 F. App'x 408, 410 (2d Cir. 2002).  In the Second Circuit, conscious recklessness means "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry*, 573 F.3d at 109 (internal quotation marks and citation omitted); *see also Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 621-22 (S.D.N.Y. 2010).  To sustain their Section 9 claim, in addition to establishing scienter, Plaintiffs would also need to prove that Defendants intended for their alleged misrepresentations and omissions to "induce a purchase or sale." *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1162 (5th Cir. 1982) ("[T]he 'intent to induce' requirement creates a higher burden of proof for the plaintiff under section 9(a)(4) than that borne under Rule 10b-5(b).").

Here, therefore, to establish scienter, Plaintiffs must prove that at the time it negotiated the SLA, Credit Suisse intended to mislead investors about the way in which the borrowed shares would be used.  And, to prove scienter sufficiently to support their Section 9 claim, Plaintiffs would need to go even further and establish that they made the allegedly misleading statement with the specific purpose of inducing Plaintiffs to buy ECD common stock.  Plaintiffs cannot meet either burden of proof.[15]  Even assuming, *arguendo*, that Credit Suisse's use of the term "hedging" in the SLA constituted a misrepresentation, Plaintiffs have adduced no evidence whatsoever to show that Credit Suisse intended for "hedging" to be interpreted by ordinary

---

[15] Because the Court dismissed "Plaintiffs' claims arising out of misleading statements or omissions allegedly made in the two Prospectuses of Energy Conversion Devices, Inc.," SOF ¶ 91 (Dkt. 82 at 99), Plaintiffs cannot rely on the Prospectus Supplements in order to attribute knowledge or intent to Credit Suisse.  Many of Plaintiffs' allegations of scienter can be dismissed out of hand because they relate back to the Prospectus Supplements. *See, e.g.*, SOF ¶ 87 (Dkt. 48 ¶¶ 37-41).

investors to foreclose the possibility that Credit Suisse would facilitate investors' desired hedge ratio through a *combination* of swaps and common stock, as opposed to through swaps alone.

More fundamentally, Plaintiffs can point to no evidence to support their improbable theory that Credit Suisse *intentionally* sought to deceive investors in order to execute a scheme "to drive down the price of ECD stock through massive short selling."  SOF ¶¶ 85 (Dkt. 48 ¶ 5). Plaintiffs have not developed an iota of evidence to support their speculative claim that Credit Suisse employed the alleged scheme to "strengthen [its] brand name in the lucrative hedge fund brokerage fee market," SOF ¶¶ 88, 97, 101-02 (Dkt. 82 at 73) (citing Dkt. 48 ¶ 16), at ECD's expense.  To the contrary, the evidence shows that ECD was a valued client of Credit Suisse's, that Credit Suisse "look[ed] forward to building a long term partnership with ECD," and that it hoped the Offerings would prove "[the] first of many deals."  SOF ¶ 7.  Similarly, Credit Suisse was motivated to perform well for ECD in order to continue building its brand as a solar energy underwriter.  SOF ¶ 5.  Plaintiffs can point to no evidence of scienter other than pure speculation about Credit Suisse's alternative motives.  But "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion."  *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986) (Internal quotation marks and citation omitted).

Finally, Plaintiffs can point to no evidence to support their counterintuitive claim that Credit Suisse intended to deceive investors into *purchasing* ECD common stock[16]—something that would contradict Credit Suisse's purported intention "to *decimate* the price of ECD stock." SOF ¶ 85 (Dkt. 48 ¶ 5).  Plaintiffs fall well short of meeting their burden under Section 10, Rule 10b-5, or Section 9.

---

[16] Plaintiffs define their "Proposed Misrepresentation Class" as "consisting of all persons who purchased shares of [ECD] common stock between June 18, 2008 and December 31, 2010 inclusive . . . and who were damaged thereby. SOF ¶ 95 (Dkt. 137 at 1).

**3.**     **There Is No Evidence That Credit Suisse's Alleged Misrepresentations Caused Plaintiffs' Losses**

Finally, summary judgment is warranted on Plaintiffs' misrepresentation claims because Plaintiffs have not presented any evidence to meet their burden to show that "plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted).   To show proximate cause, a loss stemming from a misrepresentation "must be (1) foreseeable and (2) caused by the materialization of the concealed risk."   (Dkt. 82 at 97) (internal footnote omitted); *see also Lentell*, 396 F.3d at 173.   "Put more simply, proof of loss causation requires demonstrating that 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (citation omitted) (emphasis in original).   Plaintiffs can make no such showing.

Plaintiffs' basic theory is that Credit Suisse conspired with hedge fund investors in ECD's convertible notes to allow those investors to "mak[e] far more short sales then necessary to hedge their positions in the Convertible Notes."   SOF ¶ 85 (Dkt. 48 ¶ 43).   In particular, Plaintiffs' expert asserts that, to achieve a 78% hedge ratio (a delta neutral hedging position), investors in ECD's convertible notes at the time of the Offerings "required synthetic short positions equal to 2,124,183 shares to establish a neutral hedge."   SOF ¶ 117.   Rather than sell short 2,124,183 shares, however, Credit Suisse sold short 2,723,312 shares (akin to a hedge ratio of 100%)—or roughly 599,000 more than he claimed was necessary.   SOF ¶ 118.   Plaintiffs allege that the "predictable result[]" of this increased short selling was to "driv[e] the price of ECD common stock down from approximately $72 per share on June 18, 2008, to less than $1 in February 2012."   SOF ¶ 85 (Dkt. 48 ¶ 9).   The undisputed facts developed during discovery, however, make clear that Plaintiffs cannot show that the short selling on which they rely caused

28

any losses whatsoever—let alone "caused ECD investors astronomical losses and contributed to ECD's bankruptcy." SOF ¶ 94 (Dkt. 48 ¶ 2).

Plaintiffs' theory is untenable for numerous reasons. First, the undisputed record evidence establishes, and Plaintiffs' own expert concedes, that investors in ECD's convertible notes acquired 599,000 long shares of ECD stock from Credit Suisse through the Offerings at the same time as Credit Suisse's purported excessive short sale of the same amount. *See* SOF ¶ 118. That, of course, was not coincidence, but a reflection of how investors achieved their desired delta neutral positions. *See* SOF ¶ 45. Even if the SLA could somehow be viewed as a misrepresentation—which it cannot—the undisputed record establishes that the *net* hedge ratio resulting from the Offerings and the share lending facility was equivalent to precisely the 2,124,183 shares that Plaintiffs' expert himself admits readers of the SLA would have expected. *See* SOF ¶ 45. Plaintiffs cannot therefore establish any losses, let alone the losses they claim.

Second, loss causation requires a plaintiff to prove that "the decline in the market price was due to the fraud, as opposed to other market factors, such as changed investor expectations, the actualization of the company's risks, or other conditions that may account for some or all of the lower price." *Gordon Partners v. Blumenthal*, 293 F. App'x 815, 817 (2d Cir. 2008); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015) (same). Here, however, ECD's stock *went up* following Credit Suisse's short sale of 2.7 million shares on June 18, 2008. SOF ¶ 48. Moreover, ECD's former leaders uniformly and definitively established that ECD's *eventual* share decline was the product of the financial crisis, headwinds in the solar industry, and increased foreign competition—not from short selling. *See, e.g.*, SOF ¶¶ 54-57 (the decline "was *all* market-driven.") (emphasis added). Credit Suisse's expert likewise

concluded that for explaining the sustained decline of ECD's share price over the Class Period, none of the evidence points toward short selling through Credit Suisse."[17]  SOF ¶¶ 79-82.

Third, Plaintiffs cannot establish that any asserted losses flowed from the materialization of the alleged concealed risk.  As Judge Marrero noted,

> [w]here the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss.  By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e. a corrective disclosure.

 (Dkt. 82 at 97-98) (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005)).  Here, Plaintiffs cannot show either.

To the extent that Plaintiffs allege that the alleged misstatement concealed a risk of excessive short selling, that cannot be reconciled with the SLA itself, which indisputably provided that ECD would lend Credit Suisse "3,444,975 shares to use for short sales" to "directly or indirectly . . . facilitat[e] the sale and the hedging of the Convertible Notes."  SOF ¶ 37 (Dkt. 48 ¶¶ 3, 25, 42).  The public having been alerted that Credit Suisse could sell short as many as 3,444,975 shares, it is absurd for Plaintiffs to allege that Credit Suisse concealed a risk that it would execute a short sale involving less than 80% of that total.  *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed.").  Credit Suisse's short sale of approximately 2.7 million shares was fully disclosed to the market, SOF ¶ 23-24 (Dkt. 48 ¶¶ 3, 25, 42),  and was followed by an entire week during which the price of ECD stock *exceeded* its pre-Offerings levels, SOF ¶ 48.

---

[17] The alleged class period defined in the AC includes "all those who purchased or otherwise acquired ECD stock between June 18, 2008 and February 14, 2012."  SOF ¶ 95 (Dkt. 48 ¶ 48).  On November 8, 2016, Plaintiffs filed their Motion for Class Certification, truncating the class period to end on December 31, 2010.  SOF ¶ 95 (Dkt. 137 at 1).  For purposes of his expert report, Defendants' expert used the class period as defined in Plaintiffs' AC.

In any event, Credit Suisse executed the overwhelming majority of its short selling within one week of the Offerings.[18]  Following materialization of that allegedly "concealed risk," the price of ECD stock did not sink—but rather *rose*.  Indeed, ECD's stock price exceeded its stock price on the date of the Offerings on every day between June 19, 2008 and June 26, 2008.  SOF ¶ 48.  To the extent that Credit Suisse's short sales were a "concealed risk" at all—a conclusion at odds with the evidentiary record—that "concealed risk" had materialized by June 26, 2008 at the latest.  Because ECD's stock *rose* between the alleged misstatement and the materialization of the risk, Plaintiffs cannot show that the alleged misstatement caused any losses, let alone caused ECD's bankruptcy more than three years later.

Nor can Plaintiffs show a corrective disclosure.  "Unless plaintiffs can allege that their losses were attributable to some form of revelation to the market of wrongfully concealed information, they are not recoverable in a private securities action."  *In re Ramp Corp. Sec. Litig.*, No. 05 CIV. 6521, 2006 WL 2037913, at *9 (S.D.N.Y. July 21, 2006); *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 233 (E.D.N.Y. 2014) (same); *see also In re Vivendi Universal, S. A. Sec. Litig.,* 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (holding that under the materialization of the risk theory of loss causation, the "concealed risk" must "come[] to light in a series of revealing events that negatively affect stock price over time").  Here, however, Plaintiffs cannot point to any corrective disclosure of Credit Suisse's purported scheme that could have caused ECD's stock price to decline.[19]

---

[18] Credit Suisse sold short 2,723,300 shares of ECD common stock on June 18, 2008 (the date of the Offerings) and did a double-print of the remaining 721,675 shares of ECD common stock within a few days of the Offerings.  SOF ¶ 25.  According to DeRosa's analysis, Credit Suisse had its largest net short position in the Truncated Class Periods on June 19, 2008, when it was net short approximately 2,348,800 shares.  SOF ¶ 63.  Following that point, Credit Suisse was overall a net purchaser of ECD stock.  SOF ¶¶ 64-67.

[19] Plaintiffs' loss causation argument also fails because they have failed to offer a damage model for their misrepresentation claim.  In their Motion for Class Certification, Plaintiffs explained that Ringgenberg would "demonstrate that Credit Suisse's scheme to misuse the share lending facility had a profound negative effect on ECD's share price."  SOF ¶ 147 (Dkt. 137 at 5).  Indeed, Ringgenberg opined that the "price decline due to the

**B.      There Is No Evidence That Credit Suisse Engaged in Any Market Manipulation**

To state a claim for manipulation under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must establish: "'(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange.'" Ex. 95 (Dkt. 82 at 27) (quoting *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)).  "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure."  *Wilson*, 671 F.3d at 130. Misrepresentations and omissions alone, however, "cannot support a claim of market manipulation;" instead, there must be "'wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity.'"  (Dkt. 82 at 27) (quoting *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010)).  "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  (Dkt. 82 at 28) (quoting *Wilson*, 671 F.3d at 130).

To state a claim under Section 9(a)(2) of the Exchange Act, Plaintiffs must show "'(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others[.]'"  *Id.* at 29 (quoting *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992)); *see also Cohen*, 722 F. Supp. 2d at 426 (dismissing Section

---

Supply Effect," SOF ¶ 147, was caused by the "expansion in the supply of ECD shares in the market as a result of Defendants' misuse of the borrowed shares."  SOF ¶ 147.  He confirmed in his deposition that he was "not asked to opine on alleged misrepresentations" and that he did not "consider[] the [effect] of information disclosure or no[n] disclosure by Credit Suisse."  SOF ¶ 147.  In other words, it is clear that Ringgenberg's damages model does not even attempt to explain any injury suffered by Plaintiffs' Proposed Misrepresentation Class.

9(a) claim because no details were provided showing that short selling was a manipulative act, "even assuming that the effect of such trading was to depress the price of [the] stock").

Plaintiffs' market manipulation claims fail for many of the same reasons as Plaintiffs' misrepresentation claims: (1) Plaintiffs cannot establish that Credit Suisse engaged in market manipulation; (2) Plaintiffs cannot prove that Credit Suisse acted with scienter; and (3) Plaintiffs cannot prove loss causation.

> **1.   Plaintiffs Failed to Adduce Evidence That Credit Suisse Engaged in Market Manipulation**

Plaintiffs' market manipulation claims stem from the allegation that Credit Suisse and the hedge funds orchestrated a "massive, coordinated borrowing of ECD shares under the Share Lending Agreement" that allowed for "short selling . . . far in excess of anything that could legitimately be described as a 'hedge' on the Convertible Notes."   SOF ¶ 90 (Dkt. 48 ¶ 8). Although the Court found such allegations sufficient to survive a motion to dismiss, they are insufficient in light of discovery to survive summary judgment.

"In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." *Wilson*, 671 F.3d at 130.  As explained in Section III.A.1, however, Plaintiffs have failed to show that Credit Suisse engaged in any misrepresentation. *See* SOF ¶ 93 (Dkt. 82 at 44-45) ("If the term 'hedging' does not in fact refer to the specific, market neutral strategy alleged by Plaintiffs, and if the strategies employed by the Credit Suisse Defendants' hedge fund clients can appropriately be characterized as 'hedging,' then the Credit Suisse Defendants' "scheme" entailed little misrepresentation.").  As explained above, Plaintiffs have pointed to no evidence to support their claim that "hedging" referred solely to one narrow type of hedging (delta neutral hedging) to the exclusion of all other hedging.   The record establishes otherwise.  *See, e.g.*, SOF ¶ 34.  Even if Plaintiffs could show that "hedging" referred

solely to delta neutral hedging, moreover, the undisputed record establishes that Credit Suisse intended to, and did, "directly or indirectly . . . facilitat[e]" convertible arbitrage investors' efforts to establish initial positions reflecting a net hedge ratio of 78%. *See supra* Section III.A.1.b. Plaintiffs' expert's contrary conclusion failed to account for the long positions that he admits investors acquired from Credit Suisse at the same time that they entered into their swaps. SOF ¶ 118. Finally, Plaintiffs themselves acknowledge that the actual short selling engaged in by Credit Suisse fell well within the parameters of the range of short selling that Credit Suisse and ECD disclosed to the market might occur. *Compare* SOF ¶ 23 (Dkt. 48 ¶ 42) ("ECD provided Credit Suisse with 3,444,975 to use for short sales") *with* SOF ¶ 24 (DeRosa Rep. ¶ 72) ("Credit Suisse sold short approximately 2,723,300 shares on June 18, 2008"); *see also Wilson*, 671 F.3d at 130 ("[T]he market is not misled when a transaction's terms are fully disclosed.") (citation omitted). As noted previously, both the Prospectus Supplements and the SLA disclosed to the investing public that up to 3,444,975 shares could be shorted to facilitate the hedging of the ECD convertible notes. SOF ¶ 23. Having already alerted the public that Credit Suisse could short up to approximately 3.4 million shares, Credit Suisse could not manipulate the market by shorting only 2.7 million of those shares. Because Plaintiffs have no credible evidence of any market manipulation by Credit Suisse, their manipulation claims must fail.

### 2. There Is No Evidence that Credit Suisse Acted with Scienter in Connection with Its Alleged Market Manipulation

Plaintiffs also cannot prove that Defendants acted with scienter. Plaintiffs survived a motion to dismiss by alleging that the "Credit Suisse Defendants orchestrated the Offerings for the purpose of allowing their hedge fund clients to make huge profits while sinking the price of ECD stock." SOF ¶ 88 (Dkt. 82 at 41). As explained in Section III.A.2, *supra*, however, Plaintiffs have developed no evidence supporting the conclusion that Credit Suisse intended to

mislead and defraud investors by decimating ECD's stock in order to enrich hedge fund investors in ECD's convertible notes. Although it permitted Plaintiffs to proceed to discovery, the Court cautioned that the AC lacked any "extensive factual detail" about how the alleged co-conspirators worked together or "from which manipulative intent c[ould] be inferred." SOF ¶ 89 (Dkt. 82 at 42). Notwithstanding substantial discovery, including Credit Suisse's production of more than 300,000 pages of documents and extremely large data files, and the production of more than 33,000 pages of documents from approximately 40 hedge funds, Plaintiffs are still unable to add any meat to the bones of their allegations. At this stage, that failure is fatal.

### a.   Plaintiffs Have Adduced No Direct Evidence of Scienter

Notwithstanding ample opportunity to gather support for the allegations in their AC, Plaintiffs have uncovered no evidence to support their claims about Credit Suisse's motivation and intent, let alone that Credit Suisse conspired with hedge funds "to drive down the price of ECD stock through massive short selling" to enable the hedge funds "to realize massive returns" at ECD's expense. SOF ¶ 85 (Dkt. 48 ¶¶ 5, 8). After seeking leave from this Court to take a total of sixteen depositions, claiming that it was "necessary" to depose various hedge funds to uncover the alleged conspiracy, Plaintiffs tellingly opted in the end not to depose a single hedge fund, nor to seek leave to amend their AC to include any hedge funds as defendants. SOF ¶¶ 105-10.

Plaintiffs have been similarly unable to go beyond the bald allegations in their AC, to establish any facts supporting their allegations about Credit Suisse's motive. As noted *supra* at Section III.A.2, Plaintiffs adduced no evidence that ECD was "relatively expendable" to Credit Suisse or that Credit Suisse saw the ECD transaction as way to "ingratiate themselves with the hedge fund market, opening the door for more and more lucrative business from that market in the future – business that may [have] been unattainable by them without the manipulation and

deception Plaintiffs describe in the [AC]."  SOF ¶ 88 (Dkt. 82 at 74-75).  The record contains no evidence substantiating Plaintiffs' claim that Credit Suisse intended to decimate one of its clients—a client paying it $8.25 million—in order to benefit unnamed hedge funds whose affiliation (and compensation) to Credit Suisse are utterly unknown.  SOF ¶ 7.  To the contrary, the evidence shows that ECD was a valued client of Credit Suisse's, that Credit Suisse hoped to continue its business relationship with ECD well beyond the Offerings, that Credit Suisse proposed what it considered to be a sound transaction structure to ECD, and that ECD, fully informed about the risks associated with putting in place a share lending facility, was in favor of the proposed transaction structure.  *See supra* Section III.A.2.

> **b.    Plaintiffs Have Adduced No Circumstantial Evidence of Scienter**

Because there is no direct evidence that Defendants intended to drive down the price of ECD stock, Plaintiffs will presumably attempt to rely on alleged "circumstantial evidence" to show conscious misbehavior or recklessness on the part of Credit Suisse.  As the Court previously recognized, Plaintiffs have alleged that scienter may be inferred here from: "(1) the structure of the Offerings, which allegedly removed traditional obstacles to high-volume short selling and placed perverse incentives on investors[20] . . . (2) the solicitation-related communications the Credit Suisse Defendants had with potential investors prior to the Offerings . . . ; and (3) the 'rampant' short selling that occurred after the Offerings, driving down the price of ECD's stock[.]"  SOF ¶ 89 (Dkt. 82 at 80).  Discovery has repudiated each of these theories.

First, discovery established that Plaintiffs' AC misapprehended how the Offerings and share lending facility worked:  Credit Suisse did not "lend the hedge funds ECD stock to short" at all, let alone "for a nominal fee of 1 cent, far below market rates."  SOF ¶ 23 (Dkt. 48 ¶ 7).

---

[20] Plaintiffs' claims relating to the "structure of the Offerings" are entirely rooted in the Prospectus Supplements and should be dismissed for that reason alone.  *See supra* n.15.

Rather, *Credit Suisse* paid $0.01 to ECD for each share it borrowed, while hedge funds entered into total return swaps with Credit Suisse under separate payment arrangements.  *See* SOF ¶ 23. Moreover, because the records indicate that the investors in ECD's convertible notes *did*, in fact, secure delta neutral hedging positions by purchasing both swaps and common shares, SOF ¶¶ 118, 124-34, investors *did not* "reap[] more and more profits the lower the price of ECD's stock price sunk."  SOF ¶ 94 (Dkt. 82 at 83).

Second, Plaintiffs cannot identify a single "solicitation conversation" between Credit Suisse and hedge funds that demonstrates that Credit Suisse "knew . . . that hedge funds intended to and would make huge bets against ECD stock, rather than merely place short sales to 'hedge' against downside risk on the Convertible Notes."  SOF ¶ 101 (Dkt. 48 ¶ 40).  Third, Plaintiffs have not pointed to any other evidence that Credit Suisse facilitated "rampant" short selling. SOF ¶ 33 (Dkt. 48 ¶ 28).  To the contrary, the evidentiary record establishes that Credit Suisse facilitated hedging by the convertible noteholders in line with the target aggregate hedge ratio of 78% that Credit Suisse calculated at the time of the Offerings.[21]  *See supra* Section III.A.1.b.

Because Plaintiffs can point to no evidence of scienter on Credit Suisse's part to manipulate the market or to deceive investors, summary judgment for Defendants is proper.

### c.      Plaintiffs Adduced No Evidence of Heightened Section 9 Scienter

Plaintiffs can also offer no evidence that Credit Suisse intended for its alleged market manipulation to *induce* Plaintiffs to purchase or sell ECD common stock.  *Salvani v. ADVFN*

---

[21] Grasping at straws, Plaintiffs may attempt to make something of the fact that the manner in which the borrowed shares were tracked within Credit Suisse changed over time.  SOF ¶ 27 ("Is there any way when you are doing youre [sic] sweeps to flag these?  We are having prob[lem]s managing the position and what should be locked up[.]"); *id.* ("Per our phone conversation and below email, we are still unaccounted for 208,076 shares which needs to be borrow[ed] and booked for 2ek9t" and "Just spoken to Jason from Inventory Management, who has recalled the stock.  The recall is currently failing . . . .  Stock loan will be chasing on this.").  However, there is no evidence contradicting testimony that these borrowed shares were at all times held in Credit Suisse's custody or suggesting that they were used for any improper purpose.

*PLC*, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014); *Chemetron*, 682 F.2d at 1162.  Credit Suisse disclosed that it could sell short as many as 3,444,975 shares, which is fundamentally incompatible with an intent to deceive investors to induce the purchase and sale of securities. And as noted previously, Credit Suisse's short sales were followed by an entire week during which the price of ECD stock *exceeded* its pre-Offerings levels, SOF ¶ 48.

All the evidence in this case shows that Credit Suisse proposed a transaction that it believed to be advantageous to ECD, that it valued its relationship with ECD, that ECD management was fully informed of and approved the proposal, and that the transaction was successful.  *See* Section III.A.2, *supra*.  Defendants are aware of not a single document produced, or line of testimony uttered, that shows any intent by Credit Suisse to sabotage its own client by driving down the price of ECD stock.  *See, e.g.*, *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1531 (S.D.N.Y. 1986) (granting summary judgment for defendant on Section 9(a) claim after plaintiffs failed to submit sufficient evidence to establish a manipulative purpose); *Ray v. Lehman Bros. Kuhn Loeb, Inc.*, 624 F. Supp. 16, 22 (N.D. Ga. 1984) (citing *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969)).

### 3.      There Is No Evidence That Credit Suisse's Alleged Manipulation Caused Plaintiffs' Losses

Finally, Plaintiffs cannot establish loss causation with regard to their manipulation claims because Plaintiffs have not linked any conduct on the part of Credit Suisse to their alleged damages.  The Court permitted Plaintiffs to proceed past the motion to dismiss stage on the basis of their allegations that the Offerings "allowed investors to manipulate and depress ECD's stock price," and that "following the Offerings, short sales of ECD stock skyrocketed while the price of ECD stock plummeted," suggesting that "the Offerings caused a depression in the price of ECD stock from which ECD never recovered."   SOF ¶ 94 (Dkt. 82 at 96).  As explained in

Section III.A.3, *supra*, however, the record is clear that investors' higher hedge ratios established via swaps with Credit Suisse were offset by the their purchases of stock and that the decline in ECD's share price was caused by market factors, not the Offerings.  Indeed, the record indicates that ECD's share price *rose* following the allegedly manipulative act.

Plaintiffs also have failed to adduce a single piece of evidence showing that Credit Suisse conspired with hedge funds to drive down the price of ECD stock.  Just as Plaintiffs cannot prove that Credit Suisse manipulated the market, Plaintiffs also cannot prove that Credit Suisse's alleged market manipulation caused their losses.  *See, e.g.*, *Cohen*, 722 F. Supp. 2d at 433; *Fezzani v. Bear, Sterns & Co.*, 384 F. Supp. 2d 618, 643 (S.D.N.Y. 2004).  Plaintiffs' allegations of loss causation also fail for all of the reasons discussed in Section III.A.3, *supra*.

Nor does Plaintiffs' purported damages expert offer them any hope of proving loss causation.  As is discussed in greater detail in Defendants' Motion to Exclude, filed herewith, Ringgenberg's "price impact" analysis is fatally flawed because it was calculated using wholly inappropriate and biased inputs.  *See* Mot. to Exclude Section IV.B-C; *Cummiskey*, 719 F. Supp. at 1190 (holding "unreliable and unfounded expert testimony" no bar to summary judgment).

## IV.    PLAINTIFFS ARE NOT ENTITLED TO PROCEED AS A CLASS

Plaintiffs seeking class certification must submit "enough evidence, by affidavits, documents, or testimony," to prove that it has satisfied all of the Rule 23 requirements.  *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  The district court considers "all of the relevant evidence admitted at the class certification stage," and makes a "definitive assessment of Rule 23 requirements."  *Id*. at 41-42.  Rule 23 requires proof of numerosity, commonality, typicality, and adequacy of representation, as well as predominance and superiority.  Fed. R. Civ. P. 23.  "[F]ailure to prove any element precludes certification."

*Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).   Given space constraints, Defendants address here only two of many fatal deficiencies. [22]

Plaintiffs have not satisfied the typicality requirement of Rule 23(a) because each of the three Lead Plaintiffs has a "unique susceptibility to the defense of non-reliance render[ing] her an unsuitable representative plaintiff."  *Steginsky v. Xcelera Inc.*, 658 F. App'x 5, 8 (2d Cir. 2016).   Lead Plaintiffs are atypical because each of them pursued a strategy of holding as many shares of ECD stock for as long as they could they did not rely on the integrity of the market in purchasing and selling ECD stock.  *See* SOF ¶¶ 96-104.

Plaintiffs fail to prove predominance because they provide no methodology for calculating damages on a class-wide basis.   "[A] model purporting to serve as evidence of damages . . . must measure only those damages attributable to" Plaintiffs' theory of liability. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  Here, Plaintiffs provide no damages methodology whatsoever for their misrepresentation claims, and their manipulation damages methodology is unscientific, unreliable, and simply incorrect.  *See* Mot. to Exclude Sections III-IV.  Plaintiffs are therefore not entitled to presumption of reliance based on common proof of a price impact caused by Defendants' misconduct and "without the presumption of reliance, . . . common issues would not 'predominate' over individual ones."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2416 (2014) (internal citations omitted).

**V.   CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment should be granted in its entirety and Plaintiffs' motion for class certification should be denied in its entirety.

---

[22] Should the Court find the arguments set forth in this document—together with the Rule 56.1 Statement of Undisputed Facts submitted herewith—insufficient to deny class certification, Defendants respectfully request the opportunity to brief the issues pertaining to class certification more fully.

Dated: March 28, 2017

New York, New York

LATHAM & WATKINS LLP

By:    /s/ Christopher J. Clark
James E. Brandt
Christopher J. Clark
Virginia F. Tent
Jessica D. Rostoker
885 Third Avenue
New York, New York 10022-4834
Tel: (212) 906-1200
Fax: (212) 751-4864
james.brandt@lw.com
chris.clark@lw.com
virginia.tent@lw.com
jessica.rostoker@lw.com

Michael E. Bern (*of counsel*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
michael.bern@lw.com

*Attorneys for Defendants*
*Credit Suisse International and*
*Credit Suisse Securities (USA) LLC*

41