**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ECD INVESTOR GROUP, et al.,

                               Plaintiffs,

        -against-

CREDIT SUISSE INTERNATIONAL, et al.,

                               Defendants.

14 Civ. 8486 (VM)(SJN)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DAVID F. DEROSA AND MATTHEW C. RINGGENBERG

LATHAM & WATKINS LLP

By:  James E. Brandt
      Christopher J. Clark
      Virginia F. Tent
      Jessica D. Rostoker
      885 Third Avenue
      New York, New York 10022-4834
      Tel: (212) 906-1200
      Fax: (212) 751-4864
      james.brandt@lw.com
      chris.clark@lw.com
      virginia.tent@lw.com
      jessica.rostoker@lw.com

      Michael E. Bern (*of counsel*)
      555 Eleventh Street, NW, Suite 1000
      Washington, D.C. 20004-1304
      Tel: (202) 637-2200
      Fax: (202) 637-2201
      michael.bern@lw.com

      *Attorneys for Defendants*
      *Credit Suisse International and*
      *Credit Suisse Securities (USA) LLC*

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ................................................................1

II.    LEGAL STANDARDS ........................................................................5

    A.    The *Daubert* "Gatekeeping" Standard ................................5

    B.    Causation Standards ........................................................7

III.   DEROSA'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS UNSUPPORTED AND UNRELIABLE ...............................................8

    A.    DeRosa Has No Experience or Expertise Relevant to Convertible Notes or Share Lending Facilities ........................................8

    B.    DeRosa's "Excess Short Shares" Opinions Have No Methodological Basis or Support in the Evidentiary Record ..............................9

    C.    DeRosa Has No Support for His Opinion that ECD's Convertible Notes Were "Busted" Throughout 2009 and 2010 ..............................12

    D.    DeRosa Offers No Evidentiary Basis for Limiting the Term "Hedging" in the SLA to Delta-Neutral Hedging and Improperly Arrogates the Court's Role in Interpreting Contractual Language .....................14

IV.   RINGGENBERG'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS UNSUPPORTED AND UNRELIABLE ..........................................16

    A.    Ringgenberg Has No Experience Relevant to the Calculation of Damages in a Purported Class Action ........................................16

    B.    Ringgenberg's Work Is Inconsistent with His Price Impact Model ...................16

    C.    Ringgenberg's Opinions Rest on Conclusions That Are at Odds With Academic Studies He Cites and Fail to Consider Relevant Data ........................................17

        1.    Ringgenberg's "Mean Estimate of Elasticity" Is Based on His Incorrect Reading of Cherry-Picked Studies ..............................17

        2.    Ringgenberg's Calculation of "ECD Elasticity from Index Removal" Excludes Relevant Data ........................................19

    D.    DeRosa and Ringgenberg Fail to Consider Alternative Explanations, Including the Financial Crisis and Ensuing Economic Recession ........................................20

V.    CONCLUSION ................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ................................................................................. 5, 9

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  No. 09 Civ. 2227, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015) ......................... 9

*Astra Aktiebolag v. Andrx Pharma., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002) ................................................................. 12

*Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*,
  Nos. 12-cv-5803, 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) ................ 9, 10, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ...................................................................................*passim*

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ................................................ 6, 8, 10, 14

*Doe v. Am. Med. Sys., Inc.*,
  96 F. App'x 758 (2d Cir. 2004) ..................................................................... 17, 20

*Fernandez v. Cent. Mine Equip. Co.*,
  670 F. Supp. 2d 178 (E.D.N.Y. 2009) ................................................................ 16

*Five Borough Bicycle Club v. City of New York*,
  684 F. Supp. 2d 423 (S.D.N.Y. 2010) ................................................................ 7, 9

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................................. 9

*Golding v. City of New York*,
  No. 15-cv-3498, 2016 WL 5478435 (S.D.N.Y. Sept. 27, 2016) ......................... 10

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999) ................................................................................. 5

*Highland Capital Mgmt. L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................ 15

*Humphrey v. Diamant Boart, Inc.*,
  556 F. Supp. 2d 167 (E.D.N.Y. 2008) .................................................................. 6

*In re Fosamax Prods. Liab. Litig.*,
   924 F. Supp. 2d 477 (S.D.N.Y. 2013) ...................................................................7

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   758 F. Supp. 2d 264 (S.D.N.Y. 2010) ...................................................................8

*In re Rezulin Prods. Liab. Litig.*,
   369 F. Supp. 2d 398 (S.D.N.Y. 2005) ..............................................6, 7, 17, 20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ...............................................................................................6

*Lappe v. Am. Honda Motor Co.*,
   857 F. Supp. 222 (N.D.N.Y. 1994) .......................................................................6

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................................6

*Marx & Co. v. Diners' Club Inc.*,
   550 F.2d 505 (2d Cir. 1977) ................................................................................15

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. N.Y. 2008) ...................................................................6, 12

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997) ...........................................................................6, 7, 12

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ...........................................................................15

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...........................................................6, 9, 16

*Stelman v. United States*,
   No. 14-CV-05363 (SN), 2016 WL 5315196 (S.D.N.Y. Sept. 21, 2016) ..................6, 9, 12

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)...............................................................................15

*United States v. Jacques Dessange, Inc.*,
   No. S2 99 Cr. 1182, 2000 WL 294849 (S.D.N.Y. Mar. 21, 2000) .......................15

*United States v. Kaplan*,
   490 F.3d 110 (2d Cir. 2007) ................................................................................10

*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004) ....................................................................................7

## RULES

Fed. R. Evid. 702 ................................................................................................*passim*

Fed. R. Evid. 702(a) .................................................................................................10

Fed. R. Evid. 702(b) ..................................................................................................9

Fed. R. Evid. 702(c) ..................................................................................................9

## OTHER AUTHORITIES

*Price Elasticity of Demand*, INVESTOPEDIA,
    http://www.investopedia.com/terms/p/priceelasticity.asp (last visited March 26,
    2017)......................................................................................................................16

## I.   **PRELIMINARY STATEMENT**

Defendants Credit Suisse International and Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse") respectfully submit this Memorandum of Law in Support of Their Motion to Exclude the Testimony of David F. DeRosa ("DeRosa") and Matthew C. Ringgenberg ("Ringgenberg"), proffered as experts by Plaintiffs, pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]  The time has come for Plaintiffs to demonstrate the truthfulness of the fact allegations in their Consolidated Amended Class Action Complaint ("AC").  But the actual facts establish that Plaintiffs' core allegations are false.[2]  Indeed, Plaintiffs have abandoned their AC and rely instead on their proffered experts' testimony.  But it, too, is contradicted by the factual record. Unsupported opinions cannot, however, stand in for actual facts.  Moreover, that DeRosa and Ringgenberg have no relevant expertise, use approaches not generally accepted by the scientific community of experts in financial economics, and ignore alternative explanations, only underscores how unhelpful and irrelevant their testimony is.  Their unsupported opinions cannot and do not save Plaintiffs from summary judgment or merit class certification.

As explained below, neither DeRosa, who has never in his life been involved with convertible notes, nor Ringgenberg, who has never in his life been qualified as an expert in a case, meets the standard for qualification as an expert under *Daubert*.  More significantly, both of them demonstrably cherry pick evidence and simply ignore undisputed evidence that

---

[1]   Plaintiffs' proffered expert on market efficiency, Tara A. Stephenson, also has no substantive qualification to offer an opinion regarding efficiency in the market for ECD stock.  However, given that her opinion is consistent with the analysis and opinions of Defendants' expert, Charles M. Jones, and inconsistent with Ringgenberg's opinion that sales of ECD shares in 2008 affected ECD's stock price years later, *see* n.19, *infra*,  Defendants do not challenge Ms. Stephenson's testimony here and instead cite it affirmatively in support of summary judgment.

[2]   Defendants' Rule 56.1 Statement of Undisputed Material Facts ("SOF") and Memorandum of Law in Support of Defendants' Motion for Summary Judgment and Opposing Class Certification, submitted herewith, discuss in detail how the facts as developed disprove Plaintiffs' allegations and undermine their claims.

devastates Plaintiffs' case. Finally, the theory DeRosa advances in support of liability is made of whole cloth with no support in the academic literature or indeed anywhere other than in his own well-compensated opinion. Accordingly, the Court should reject these experts under *Daubert*.

Discovery has proven false countless allegations in Plaintiffs' AC, including many that led the Court to deny Defendants' motion to dismiss because it was required, at that stage, to assume they were true. Credit Suisse did not organize a conspiracy[3] with hedge funds to earn "huge profits" by betting against and driving down the stock price of its client Energy Conversion Devices, Inc. ("ECD"), whose stock and convertible notes[4] offerings Credit Suisse underwrote. SOF ¶¶ 46, 88 (Dkt. 82 at 40 (citing Dkt. 48 ¶¶ 29-36, 45), 42 (citing Dkt. 48 ¶¶ 5, 41, 45, 56), 80 (citing Dkt. 48 ¶ 41)). Nor did Credit Suisse lend out millions of shares to its hedge fund clients so that the hedge funds could sell those shares short. SOF ¶¶ 85, 89 (Dkt. 82 at 39-40 (citing Dkt. 48 ¶ 42) (noting the Court accepted on a motion to dismiss that "these allegations are based on data rather than on circumstantial evidence"), 48 (citing Dkt. 48 ¶ 43)). Nor did the convertible noteholders hedge[5] their investments at a ratio[6] of more than ten shares per note on average, SOF ¶ 85 (Dkt. 82 at 40) (citing Dkt. 48 ¶ 43), "far more . . . than was necessary for investors to 'hedge' their positions in ECD's convertible notes." SOF ¶ 85 (Dkt. 82 at 42) (citing Dkt. 48 ¶¶ 5, 41, 45, 56). Indeed, Plaintiffs' own expert contradicts their

---

[3] Although the AC alleges that Credit Suisse conspired with hedge fund clients to manipulate the price of ECD stock, Plaintiffs never sought to amend their AC (as they promised the Court that they would do) to identify a single hedge fund as one of the Doe defendants Plaintiffs alleged were Credit Suisse's co-conspirators. SOF ¶¶ 85, 95 (Dkt. 48 ¶¶ 17, 64). Indeed, Plaintiffs did not take the deposition of a single hedge fund in this case, despite expressly requesting and receiving leave from this Court to do so, SOF ¶¶ 109-10, acknowledging the falsity of the conspiracy allegations.

[4] "A convertible bond provides the performance attributes of common stock and a bond . . . . The upside of the convertible comes from its common stock component, while the downside protection comes from the cash coupon, fixed maturity, and status in the capital structure . . . ." SOF ¶ 21.

[5] "Hedging" is "[a] trading technique involving the sale of one security or option against a purchase of another related security. The object is to minimize risk in one position while attempting to profit from inefficiencies in the market's valuations of the various securities." SOF ¶ 34.

[6] A "hedge ratio" is "[t]he number of underlying common shares sold short or represented by a put or call option divided by the number of shares into which the bonds are convertible." SOF ¶ 38.

allegation that investors should have hedged no more than 5.5 shares per convertible note (which equated to hedging 50%).  *Compare* SOF ¶ 85 (Dkt. 48 ¶¶ 32, 34) (50% was a "proper 'hedge'") *with* SOF ¶ 45 (DeRosa Rep. ¶ 73) (78% was a delta-neutral hedge in June 2008).

Following fact discovery, it is clear that many of the core factual allegations in Plaintiffs' AC are inaccurate.  Each fact witness in this case testified that Credit Suisse raised more capital than originally anticipated in the successful offerings of ECD convertible notes and common stock on June 18, 2008 (the "Offerings"), but that thereafter, market forces, including the financial crisis of 2008 and ensuing major recession, as well as industry and company-specific factors (such as loss of government subsidies, low-cost Chinese competition, and sharp shifts in commodity input pricing), caused ECD's stock price decline and ultimate bankruptcy.  *See* SOF ¶¶ 73-76.  The record is unequivocal that Credit Suisse held ECD shares in a segregated account, building up a stockpile of more than three million shares during the time when Plaintiffs claim Credit Suisse was flooding the market with shorted borrowed shares.  *See* SOF ¶¶ 27, 66-67.

Faced with the failure of their claims, Plaintiffs have jettisoned the core allegations of their AC: they no longer claim that "unrestrained short selling orchestrated by Credit Suisse and the hedge funds" drove "the price of ECD common stock down from approximately $72 per share on June 18, 2008 to less than $1 in February 2012, when ECD filed for bankruptcy protection"[7] and "Credit Suisse and its hedge fund clients, on the other hand reaped enormous profits."  SOF ¶ 88 (Dkt. 48 ¶ 9).  Having abandoned nearly every factual foundation of the AC, Plaintiffs now try to replace that theory with the fanciful opinions of their hired guns.  Plaintiffs' new theory is that the running balance of some expert-concocted measure called "excess short shares"—which do not represent short sales by hedge funds into the market—of ECD stock

---

[7]  Indeed Plaintiffs amended their alleged class period so that it ends on December 31, 2010—more than a year before ECD filed for bankruptcy.  *See* SOF ¶ 95 (Dkt. 137 at 1).

caused the stock price to decline.  This is a theory that DeRosa made up, that no one has heard of or studied before, and that is contradicted by the actual evidence in this matter.

DeRosa has no professional experience with investments in convertible notes—let alone convertible arbitrage[8] strategies and the underwriting and offering of convertible notes. Moreover, DeRosa's methodology for calculating "excess short shares," far from being accepted within the economic community, exists nowhere in academic literature or anywhere else for that matter.  DeRosa similarly conjured from thin air his opinion that, starting in January 2009, the ECD convertible note was "busted" and thus unhedgeworthy.  Given that DeRosa has admitted that he miscalculated the actual hedge ratio for investors in ECD's convertible notes at the time of the Offerings, included in his calculations only those transactions that would inflate Plaintiffs' damages, and arbitrarily assumed that investors should not have hedged their investments in 2009 and 2010 at all despite himself calculating a hedge ratio well above zero for those two years—there is simply no reason for the Court to have confidence in his opinions.  To the extent, moreover, that DeRosa attempts to impose his opinion about the interpretation of the term "hedging" in the June 2008 Share Lending Agreement between Credit Suisse and ECD (the "SLA"), that uninformed and unwarranted arrogation of the Court's role in matters of contract interpretation should likewise be rejected.

Similarly, Plaintiffs depend on Ringgenberg's fatally-flawed testimony purporting to offer a damages model for Plaintiffs' manipulation claims.  Ringgenberg reaches well beyond his academic expertise in this—his first—case as a testifying expert, opining that Credit Suisse's

---

[8]  "The practice of convertible arbitrage includes the traditional purchase of a convertible while shorting its underlying stock."  SOF ¶ 36.  "Convertible arbitrage is often considered a relative-value strategy because convertible arbitrage funds often establish a market-neutral profile with very little correlation to the equity markets. The profit potential is largely a function of relative price inefficiencies between the convertible and common stock along with the series of cash flows derived from the hedge."  SOF ¶ 36.

short sales in 2008 were a persistent drag on ECD's share price for a period of at least two years after the sales.  Although he claims to rely on a standard economic equation to determine the price impact of Credit Suisse's alleged misconduct, the inputs Ringgenberg chooses for his model range from a biased estimate of price elasticity to the categorically incorrect importation of DeRosa's *running balance* of "excess short shares" to stand in for the metric of *change in quantity* called for in Ringgenberg's professed model.

Any one of these shortcomings, standing alone, would be more than sufficient to exclude DeRosa and Ringgenberg's testimony; taken as an interwoven whole, however, their opinions—divorced from the facts of this case—can provide no assistance to the Court.  Based on the Court's clear gate-keeping standard pursuant to *Daubert*, DeRosa and Ringgenberg's testimony must be rejected as untested, unsupported, and unreliable.

## II.    LEGAL STANDARDS

### A.    The *Daubert* "Gatekeeping" Standard

Courts do not and should not accept testimony proffered as expert evidence pursuant to Rule 702 unless the party proffering the alleged expert has shown that the opinions are worthy of consideration.  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citing *Daubert*, 509 U.S. at 595; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.").

Determining the admissibility of Plaintiffs' alleged experts' evidence at the summary judgment stage is appropriate because "as the 'gatekeeper for expert testimony,' the court

'performs the same role at the summary judgment phase as at trial; [and] an expert's report is not

a talisman against summary judgment.'" *See Stelman v. United States*, No. 14-CV-05363 (SN),

2016 WL 5315196, at *9 (S.D.N.Y. Sept. 21, 2016) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55,

66 (2d Cir. 1997)).  As this Court explained in *Rezulin*:

> *Daubert* observed that the relaxation for expert witnesses of the usual requirement
> of first-hand knowledge presumably "is premised on an assumption that the
> expert's opinion will have a reliable basis in the knowledge and experience of his
> discipline."  For that reason, a trial judge must "make certain that an expert . . .
> employs in the courtroom the same level of intellectual rigor that characterizes the
> practice of an expert in the relevant field."

*In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 419-20 (S.D.N.Y. 2005) (quoting

*Daubert*, 509 U.S. at 592; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

When district courts exercise their gatekeeping responsibility, "the first question is

'whether the expert has sufficient qualifications to testify.'" *Davis v. Carroll*, 937 F. Supp. 2d

390, 412 (S.D.N.Y. 2013) (quoting *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 174

(E.D.N.Y. 2008)).  Rule 702 clearly "mandates that experts 'stay within the reasonable confines

of [their] subject area, and cannot render expert opinion on an entirely different field or

discipline.'" *Id.* at 413 (alteration in original) (quoting *Lappe v. Am. Honda Motor Co.*, 857 F.

Supp. 222, 227 (N.D.N.Y. 1994)).  That is, "'[a]n expert qualified in one subject matter does not

thereby become an expert for all purposes.'" *Id.* (alteration in original) (quoting *Malletier v.

Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)).  When an expert purports to

opine on a subject he has no "education, expertise, or experience in," such testimony is

inadmissible.  *SEC v. Tourre*, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013).

Moreover, at a fundamental level, "'[a]n expert's opinions that are without factual basis

and are based on speculation or conjecture' are 'inappropriate material for consideration on a

motion for summary judgment.'" *Stelman*, 2016 WL 5315196, at *11 (quoting *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)); *Raskin*, 125 F.3d at 66.

Courts consider the following specific factors in assessing reliability: (a) whether the theory has

"widespread acceptance;" (b) whether the analysis is supported by the evidentiary record; (c)

whether the expert has accounted adequately for obvious alternative explanations; and (d)

whether the analysis was performed properly.  *Rezulin*, 369 F. Supp. 2d at 420-21; *United States

v. Tin Yat Chin*, 371 F.3d 31, 41 (2d Cir. 2004) (upholding exclusion of expert testimony not

supported by data or facts in the evidentiary record); *Five Borough Bicycle Club v. City of New

York*, 684 F. Supp. 2d 423, 443 (S.D.N.Y. 2010) (excluding testimony "rest[ing] on flawed

methodology [and] unsupported assumptions"); *see also* Fed. R. Evid. 702 advisory committee's

note (2000); *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 493 (S.D.N.Y. 2013).

Plaintiffs proffer DeRosa and Ringgenberg to testify on issues relating to liability,

damages and class certification.  They thus bear the burden to prove, *inter alia*, that DeRosa and

Ringgenberg are qualified to testify on the subjects they address, that their opinions are based on

rigorous standards and are supported—not contradicted—by the evidentiary record, that DeRosa

and Ringgenberg have considered and rejected alternative explanations for their results, and that

their methodologies have been generally accepted by the scientific community in financial

economics.  *See Rezulin*, 369 F. Supp. 2d at 420-21; *Tin Yat Chin*, 371 F.3d at 41; *Five Borough

Bicycle Club*, 684 F. Supp. 2d at 443.  Plaintiffs cannot do so.

**B.    Causation Standards**

DeRosa and Ringgenberg's core opinions appear to be, respectively, that Credit Suisse

sold short too many of the shares of ECD stock that it had borrowed pursuant to the SLA and

that Credit Suisse's "excess" shorting of ECD stock caused a decline in ECD's share price from

June 18, 2008 through December 31, 2010.  Plaintiffs' manipulation claims require a

demonstration of causality between Credit Suisse's allegedly manipulative short sales and

market effect.  *See, e.g., In re Merrill Lynch Auction Rate Sec. Litig.*, 758 F. Supp. 2d 264, 277-78 (S.D.N.Y. 2010) (holding securities fraud claims of misrepresentation and/or manipulation "require allegations of but-for and proximate cause, called 'loss causation'").

Plaintiffs have offered *no* damages model with respect to their misrepresentation claims.

## III.  DEROSA'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS UNSUPPORTED AND UNRELIABLE

### A.  DeRosa Has No Experience or Expertise Relevant to Convertible Notes or Share Lending Facilities

DeRosa's opinions should be excluded because Plaintiffs cannot show that he is qualified to testify as an expert on industry custom and practice with respect to the hedging of investments in convertible notes and the establishment of share lending facilities[9] to support such investments.  *See, e.g., Davis*, 937 F. Supp. 2d at 412.  DeRosa's work experience does not even touch on convertible notes or share lending facilities, which are the specific focus of his opinions.  *See* SOF ¶ 143.  DeRosa's Ph.D. has no connection to convertible notes, SOF ¶ 143, he has never traded or hedged convertible bonds, SOF ¶ 143, and he has never worked on or studied the negotiation of a share lending facility in any capacity.  SOF ¶ 143.  In fact, DeRosa has never previously reviewed a share lending agreement similar to the SLA about which he now offers opinions in this case.  SOF ¶ 143.  None of DeRosa's publications discuss convertible securities, SOF ¶ 143, or a share lending facility in any way.  SOF ¶ 143.  Although DeRosa has testified numerous times, he has never testified in a matter concerning convertible securities or share lending facilities.  SOF ¶ 143.  The sum total of his convertible-securities-related experience is that he was briefly part of the education department of a bank that taught an

---

[9] Companies offering convertible notes may lend their underwriters a bloc of shares (a "share lending facility") that can be sold short in order to hedge investments in the notes.  Such facilities are designed to make the notes more attractive to investors whose investment strategy requires them to hedge in specific ways and who would not purchase the notes without a guaranteed ability to obtain the requisite hedge position.  *See* SOF ¶¶ 10-11.

internal class on bond trading and that he sits on the board of hedge funds.  SOF ¶ 143.  Because

DeRosa utterly lacks the requisite education, expertise, or experience in convertible securities

and share lending facilities, his testimony should be excluded.  *Anderson News, L.L.C. v. Am.*

*Media, Inc.*, No. 09 Civ. 2227, 2015 WL 5003528, at *3 n.3 (S.D.N.Y. Aug. 20, 2015)

(excluding proffered expert's testimony because "testimony regarding the 'customs and practices

of high-level business executives' is not equivalent to testimony regarding the customs and

practices of a particular, specialized industry") (citation omitted); *see also Tourre*, 950 F. Supp.

2d at 677-79; *Stelman*, 2016 WL 5315196, at *11.

### B.    DeRosa's "Excess Short Shares" Opinions Have No Methodological Basis or Support in the Evidentiary Record

It is axiomatic that an expert's testimony is inadmissible if it is not "based on sufficient

facts or data" or not "the product of reliable principles and methods."  Fed. R. Evid. 702(b), (c);

*see also Five Borough Bicycle Club*, 684 F. Supp. 2d at 443 (excluding expert testimony that

"rest[ed] on flawed methodology [and] unsupported assumptions"); *Crown Cork & Seal Co. v.*

*Credit Suisse First Boston Corp.*, Nos. 12-cv-5803, et al., 2013 WL 978980, at *3 (S.D.N.Y.

Mar. 12, 2013).  In keeping with the district court's gatekeeping function,

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district
> court to admit opinion evidence that is connected to existing data only by the *ipse*
> *dixit* of the expert.  A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Amorgianos*, 303 F.3d at 266.

DeRosa has admitted that with respect to the concept of calculating "excess short shares"

upon which he bases his opinions, he is not aware of any publication, relevant legal research, nor

any peer reviewed studies addressing that concept of excess short shares or any of other person

in the financial economics field who studies the concept of excess short shares.  *See* SOF ¶ 143.

The opinions that DeRosa offers as to the fact and number of "excess short shares" of ECD stock

that Credit Suisse allegedly caused to be in circulation in the market are his creation from whole cloth.[10]  These opinions should therefore be rejected as unsupported suppositions.  *See*, *e.g.*, *Crown Cork & Seal Co.,* 2013 WL 978980, at *3; *Davis*, 937 F. Supp. 2d at 417.

Worse yet, in calculating his "excess short shares," DeRosa made assumptions and performed calculations that are flatly contradicted by the data upon which he claimed to rely. For example, he stated that he relied on Credit Suisse's trading data "as the basis for a daily calculation of each hedge fund investors' [sic] position in ECD convertible notes" to calculate the hedge funds' daily hedge ratios in his Appendix 4.  SOF ¶ 120.  Although he recognized that a hedge ratio should take into account an investor's long and short positions, SOF ¶¶ 44, 118, DeRosa nevertheless chose to disregard for his analysis all ECD shares purchased (*i.e.*, long) by ECD notes investors from Credit Suisse as an integral part of the Offerings.  SOF ¶ 118. Although DeRosa conceded he could have identified in Credit Suisse's data the purchases and sales of ECD shares by the notes investors, SOF ¶ 120, he nevertheless chose to omit long shares from his hedge ratio calculations, fully cognizant that this choice caused him to overstate the hedge ratios of investors who purchased almost 600,000 long shares of ECD stock in the Offerings.  SOF ¶¶ 44, 118, 134. This choice led him to calculate hedge ratios of 100% when in fact the net hedge ratios were 78%.  SOF ¶¶ 118, 134.

At deposition, DeRosa ultimately admitted that, once he included the long shares purchased in the Offerings.  SOF ¶¶ 118, 123-34, the actual net hedge ratio for hedge fund after hedge fund that invested in ECD notes was 78%—which DeRosa stated was "virtually identical"

---

[10] To the extent that DeRosa's method of calculating "excess short shares" does not require a reliable model that has been subject to study and debate in the economic community, it is clear that the Court has no need for application of any "scientific, technical, or other specialized knowledge" to perform its own calculation. *See* Fed. R. Ev. 702(a); *Golding v. City of New York*, No. 15-cv-3498, 2016 WL 5478435, at *3 (S.D.N.Y. Sept. 27, 2016) ("An opinion is not based on specialized knowledge where it is 'the product of reasoning processes familiar to the average person in everyday life.'") (quoting *United States. v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007)).

to the ratio he "correctly estimated" at the time of the Offerings, SOF ¶ 111— rather than the 100% hedge ratio that he had claimed, *see* SOF ¶¶ 111, 118.  In total, by failing to include the hedge funds' purchases of long shares, DeRosa over-counted almost 600,000 shares as "excess short shares" in his Appendix 6.  Incredibly, notwithstanding his claims of expertise, DeRosa was unable even to calculate a hedge fund's simple hedge ratio in order to confirm or refute the calculations he used in his report.  SOF ¶ 145.  He claimed that his calculator was not working, but refused the offer of another calculator.  SOF ¶ 145.  Only after asking that Defendants' consulting expert, who was present at the deposition, walk him through the correct method step by step, was DeRosa able to calculate a hedge ratio—and demonstrate that, notwithstanding the 100% hedge ratios calculated in his report, the investors' hedge ratios were in fact 78%.  SOF ¶¶ 118, 145; *see also* SOF ¶¶ 123-34 (cataloguing examples of DeRosa's admittedly incorrect calculation of net hedge ratios).

Similarly, DeRosa failed to account properly for Credit Suisse's "double print"[11] of approximately 720,000 shares.  SOF ¶ 135.  Although Credit Suisse almost immediately repurchased more than 720,000 shares from the market after selling them (completing the shares' registration) and so held those shares (i.e., was *not short* to the market ), DeRosa also counted these 720,000 shares as "excess *short* shares" in his Appendix 6 (emphasis added).  SOF ¶ 135.  DeRosa admitted at his deposition that the trading data Credit Suisse produced in this case shows Credit Suisse's same-day repurchases of the double-print shares.[12]  SOF ¶ 135.  By counting only

---

[11] A "double print" is a process by which an underwriter makes new shares legally tradeable, without increasing the number of shares in the market.  SOF ¶ 25.  Mechanically, it means that the underwriter sells shares that it receives from an issuer at market price and almost simultaneously purchases the same number of shares out of the market at a market price that is virtually identical to the sale price.  SOF ¶ 25.  By performing a double print at the same time as the registration statement is issued, the shares become properly registered and freely tradable under the securities laws for future use should they be needed.  *See* SOF ¶ 25.

[12] Although DeRosa claimed at deposition that Ex. 54 (CS-ECD0000001 Spreadsheet) was "not a complete record," SOF ¶ 119, he did not know if that claim was reflected in his report.  SOF ¶ 119.  No such misgivings kept him from

the sale side of the double print transactions, SOF ¶ 135, DeRosa over-counted another approximately 720,000 shares as "excess short shares."

In short, in addition to lacking a sound methodology for calculating "excess short shares," DeRosa omitted relevant data from his calculations; had he included all relevant data, his "excess short shares" would evaporate.[13]  Accordingly, DeRosa's opinions regarding "excess short shares" are "without factual basis and are based on speculation," and thus "inappropriate material for consideration on a motion for summary judgment."  *Stelman*, 2016 WL 5315196, at *11; *Major League Baseball Props., Inc.*, 542 F.3d at 311; *Raskin*, 125 F.3d at 66.

### C.   DeRosa Has No Support for His Opinion that ECD's Convertible Notes Were "Busted" Throughout 2009 and 2010

DeRosa's analysis was also distorted by an unfounded assumption that inflated radically his calculation of "excess short shares": he assumed that the notes investors should not have hedged their investments *at all* in 2009 and 2010.  Notwithstanding the clear language of the SLA permitting hedging, DeRosa claims that by January 2, 2009, the ECD notes had become a "busted convertible,"[14] which led him to assume that the proper hedge ratio for ECD notes for all of 2009 and 2010 was zero.  *See* SOF ¶ 111.  It appears that DeRosa manually zeroed out the daily delta[15] calculations in Appendix 5 rather than using his *actual* daily delta calculations

---

relying on the data when it suited his purposes.  DeRosa testified that he had made no attempt to confirm that Credit Suisse's data was accurate, such as by comparing it with trading records produced by hedge funds.  SOF ¶¶ 120-33. Yet when directed to Appendix 2 of his expert report, DeRosa claimed that he had "misunderstood" the earlier question and admitted to checking the hedge fund records against Credit Suisse's data.  SOF ¶ 120.

[13] DeRosa equivocated about whether an expert should even look at all relevant data, SOF ¶ 145, which is clearly required under *Daubert*.  *See Astra Aktiebolag v. Andrx Pharma., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) ("[An] expert's testimony will nevertheless fail to meet [*Daubert*] and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case.  If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded[.]").

[14] A "busted convertible" is "[a] convertible selling essentially as a straight bond."  SOF ¶ 111.  A bond in the "'busted convertible range' means the convertible is out-of-the-money and considerably more sensitive to its fixed-income features than to its equity features."  SOF ¶ 111.

[15] "Delta" is "[a] measure of the change in the convertible's price with respect to the change in the underlying common-stock price."  SOF ¶ 39.

contained in his Appendix 6.[16]  *See* SOF ¶ 111.  Again, DeRosa cites no studies, publications, or other texts in his report in support of this choice, and offered no basis for doing so at deposition. Notably, the term "busted convertible" appears nowhere in the SLA, SEC offering disclosures, or even Plaintiffs' AC.  SOF ¶ 114.  DeRosa introduced this concept for the first time in his report.

A standard text on convertible arbitrage, which DeRosa cited among the publications he reviewed in preparing his report, makes clear, however—even to readers without a convertible arbitrage background—that so-called "busted convertibles" have a delta greater than zero when the stock price is greater than zero:



**FIGURE 3.2**   Delta Change with Underlying Stock Price Changes.

SOF ¶ 113.  Indeed, Figure 3.2 is consistent with DeRosa's own calculations of deltas significantly greater than zero for all of 2009 and 2010 in his Appendix 6.  SOF ¶ 115.  Because DeRosa's assumption that the ECD notes should have been hedged at zero for all of 2009 and

---

[16] In his Appendix 5, which purports to show DeRosa's "Daily Delta Calculation," DeRosa's last column, labeled "Option delta (Based on historical 365 day volatility)" drops from 79% to 0% between December 31, 2008 and January 2, 2009 and remains at 0% thereafter.  SOF ¶ 111.  To be clear, in Appendix 6, DeRosa shows his calculation of a delta of more than 79% on January 2, 2009, deltas above 70% through June 2009, and deltas above 50% well into February 2010.  SOF ¶ 111.  Although DeRosa himself calculated significant, non-negligible deltas for 2009 and 2010, which appear in his Appendix 6, he zeroed out all of those calculated deltas in Appendix 5 based on his opinion that the ECD notes were a "busted convertible" as of January 2, 2009.  SOF ¶ 111.

2010 is not based on scientific work or generally-accepted methodology, and is, in fact, at odds with his own delta calculations for that time, as well as the fact evidence, *see* SOF ¶ 113, it should be excluded as unreliable. *Davis*, 937 F. Supp. 2d at 417.

DeRosa tries to justify assuming a zero hedge ratio for 2009 and 2010, at odds with his own work, by claiming that ECD's notes and stock had ceased to move in the same direction by that time: "the hedging relationship [had] decoupled." SOF ¶ 112. But his regression analysis is a major departure from any accepted methodology in financial economics. He is, in essence, claiming that a bananas-to-oranges study proves that apples do not roll downhill like oranges. He purports to prove that the prices of ECD's stock and convertible notes did not move in related ways on each day during a time period by comparing a *running balance* of profits and losses on the hedged convertible notes position over time (the banana)—rather than the *daily* profit and loss on the stock and notes (the apple)—against the *daily changes* in the prices of the stock and convertible notes (the orange). SOF ¶ 112. DeRosa did not identify a single academic study regressing a cumulative measure against a change metric to "measure co-movement in two assets." SOF ¶ 112. And with good reason, because it makes no sense. SOF ¶ 112.

**D.    DeRosa Offers No Evidentiary Basis for Limiting the Term "Hedging" in the SLA to Delta-Neutral Hedging and Improperly Arrogates the Court's Role in Interpreting Contractual Language**

DeRosa asks that the Court accept his interpretation of the SLA simply because he says so. SOF ¶ 111. He assumes that "[the] hedging referred to in the SLA – according to industry custom and practice – is delta-neutral hedging[.]" SOF ¶ 144. At deposition, DeRosa admitted he has no other authority outside of his own opinion that "hedging[,]" as used in the SLA, is delta-neutral hedging. SOF ¶ 144 ("That is just mine."). When asked whether he reviewed any industry authorities that define hedging in the context of convertible securities arbitrage hedging, DeRosa responded: "[I] [d]idn't need to, I know how it works. I know these things. I'm an

14

expert – I'm here as an expert testifying – I don't need supporting documents.  I'm telling you

that's the way that convertible bond arbitrage works," SOF ¶ 144, despite having never worked

with a convertible bond in his life.  SOF ¶ 144.  DeRosa's opinion on the definition of "hedging"

as used in the SLA is by his own admission an unsupported supposition, and should be rejected.

*See Crown Cork & Seal*, 2013 WL 978980, at *3.  In contrast, an acknowledged expert in the

field of convertible note arbitrage, in the only document DeRosa cites that is specific to

convertible notes, defines "hedging" far more expansively—as a "trading technique involving

the sale of one security or option against a purchase of another related security [in which t]he

object is to minimize risk in one position while attempting to profit from inefficiencies in the

market's valuation of the various securities," SOF ¶ 34—undermining DeRosa's self-serving and

unsupported assertion and demonstrating his lack of expertise with convertible note arbitrage.

Moreover, as a question of contract interpretation, the meaning of "hedging" in the SLA

should properly be decided by the Court.  *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D.

33, 48 (S.D.N.Y. 2016) ("[C]ourts exclude expert testimony that 'provide[s] legal opinions, legal

conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court.'")

(alterations in original) (quoting *Highland Capital Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461,

470 (S.D.N.Y. 2005)); *United States v. Jacques Dessange, Inc.*, No. S2 99 Cr. 1182, 2000 WL

294849, at *2 (S.D.N.Y. Mar. 21, 2000).  Where, as here, an expert has no basis for interpreting

a legal term,[17] the Court must find his opinion inadmissible.  *See United States v. Bilzerian*, 926

F.2d 1285, 1294 (2d Cir. 1991) (citing *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d

Cir. 1977)).

---

[17]  "[T]estimony about industry practice may not be used to circumvent the prohibition on testimony that
encompasses an ultimate legal conclusion."  *Jacques Dessange*, 2000 WL 294849, at *2.  Here, although DeRosa
purports to rely on "industry custom and practice," as noted above, he admitted that he has no basis or authority for
his interpretation of "hedging" in the SLA, SOF ¶ 143, and no experience hedging convertible note investments.
SOF ¶ 143.

IV.    **RINGGENBERG'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS UNSUPPORTED AND UNRELIABLE**

   A.    **Ringgenberg Has No Experience Relevant to the Calculation of Damages in a Purported Class Action**

Ringgenberg's report and testimony, like DeRosa's, should be excluded because Plaintiffs cannot show that he is qualified to testify as an expert. The opinions Ringgenberg offers do not relate to expertise in the mechanics and informational value of short selling, his field of study. Rather, his proffered testimony relates to the calculation of the elasticity of demand[18] for ECD shares and the calculation of damages caused by alleged market manipulation. He has never been admitted as an expert in any proceeding. SOF ¶ 146. Inexperience is not conclusive, but it is a factor courts properly consider in assessing an alleged expert's qualification. *See Fernandez v. Cent. Mine Equip. Co*., 670 F. Supp. 2d 178, 183-84 (E.D.N.Y. 2009). Ringgenberg has also admittedly never worked on an expert report or published work relating to elasticity, SOF ¶ 146, or on an expert report or published work involving analysis of the stock price impact of an alleged oversupply of shares. SOF ¶ 146. His lack of relevant experience strongly suggests that he cannot satisfy the requirements of Rule 702. *See Tourre*, 950 F. Supp. 2d at 677-79; *Fernandez*, 670 F. Supp. 2d at 183-84.

   B.    **Ringgenberg's Work Is Inconsistent with His Price Impact Model**

Beyond his inexperience, Ringgenberg's opinions regarding the stock price impact of alleged market manipulation must be excluded because his work is inconsistent with his chosen model, as well as entirely dependent on DeRosa's fatally-flawed opinions. *See* Section III.A-B, *supra*. Ringgenberg incorporates DeRosa's "excess short shares" calculations into his price

---

[18]  Economists use the term "price elasticity of demand" to how responsive demand for a good is to changes in its price. Generally, elasticities of demand are negative (*i.e.*, the demand curve is downward-sloping in Econ 101) because as prices rise, people buy less. *See, e.g.*, *Price Elasticity of Demand*, INVESTOPEDIA, http://www.investopedia.com/terms/p/priceelasticity.asp (last visited March 26, 2017).

impact calculation, SOF ¶ 136, even though DeRosa's "excess short shares" results are a cumulative *share balance*, SOF ¶ 136, and Ringgenberg's own formula calls for a *change in the quantity* of shares.  SOF ¶ 136.  Ringgenberg's price impact model, "Equation (2)," provides:

$$Price\ Impact\ (\%) = \frac{\frac{\Delta Quantity}{Quantity}}{Elasticity}$$

SOF ¶ 136.  He nevertheless used DeRosa's daily *cumulative balance* of "excess short sales" as the "Δ Quantity" (change in quantity) input in Equation (2).  SOF ¶ 136.  Ringgenberg's  price impact calculations are thus inconsistent with his model—he does not include any measure of the *change in the quantity* of ECD shares in the market.[19]  For this reason, his opinions about the "price impact" of Credit Suisse's assumed misconduct and the "but-for price" of ECD shares with respect to assumed misconduct are unreliable, irrelevant, and inadmissible.  *See Doe v. Am. Med. Sys., Inc.*, 96 F. App'x 758, 759 (2d Cir. 2004); *see also Rezulin*, 369 F. Supp. 2d at 425.

C. **Ringgenberg's Opinions Rest on Conclusions That Are at Odds with Academic Studies He Cites and Fail to Consider Relevant Data**

Ringgenberg further distorts his stock price impact calculations by manipulating the elasticity input for his Equation (2).  His elasticity estimate of -0.47 reported in his Exhibit 3.1 is the average of three elasticity estimates.  Each of his inputs is flawed, but flaws in the first two approaches are more than sufficient to show Ringgenberg's bias and unreliability.

1. **Ringgenberg's "Mean Estimate of Elasticity" Is Based on His Incorrect Reading of Cherry-Picked Studies**

First, Ringgenberg "cherry picks" academic studies, apparently including only those studies that he believes will provide him an elasticity estimate as close to zero as possible.  While

---

[19] Assuming, *arguendo*, that Ringgenberg's use of a share balance rather than a measure of change were appropriate, it would contradict Stephenson's opinion that the market for ECD stock was efficient.  While efficient markets react immediately to the information conveyed by stock sales, Ringgenberg's analysis implies a market reaction for more than two years after the stock sales.  SOF ¶ 137.

he includes in his panel of academic estimates nearly all of the studies cited in an article—

"Wurgler"—marshaling the academic literature on estimates of elasticity for stocks, he

conspicuously omits the estimates from the same article that would lower his price impact

calculations and Plaintiffs' damages.  *See* SOF ¶ 138.

Also indicating that Ringgenberg's goal was to maximize the damages calculation, for

one of the studies that he chose to include in his panel—" Loderer"—Ringgenberg used the

*inverse* of the study's results, causing him to include an elasticity estimate that is off by a factor

of 50 and thereby inflating the price impact and his damages.[20]  Asked if he stood by his

testimony that a peer-reviewed, published paper had misstated the estimate, he equivocated:

> reading the table again I'm still thinking that is correct but it is possible that they
> presented the inverse of the inverse . . . . If it in fact turns out that I read further
> articles and it is [negative four], that would actually still be generally consistent
> with most of my opinion . . . . [But the option between negative 11.12 and
> negative 4.31 reported in Loderer that is consistent with Ringgenberg's stated
> conservatism] would be negative 11.

SOF ¶ 138.  That is, Ringgenberg testified that it was not important whether the elasticity was off

by a factor of 20 or a factor of 50 as long as the number was negative.[21]

Similarly, Ringgenberg cited to another study—"Kaul"—but rather than using the study's

published elasticity estimate of -10.5, he chose to use a different study's modification of the

estimate at -0.3, SOF ¶ 138, which changed the estimate by a factor of 35 and caused him to

estimate a larger price impact.  SOF ¶ 138.

---

[20] Not only did Ringgenberg incorrectly claim he should use the reciprocal of the Loderer estimate, he also
calculated the reciprocal incorrectly, asserting that -0.21 (rather than the correct -0.23) was the inverse of -4.31.
SOF ¶ 138.
[21]  Ringgenberg testified that elasticities could "in theory be anything from negative infinity to zero in this case,"
and suggests that there would be no difference between -0.3, -0.5, -0.7, and -4.0.  SOF ¶ 141.  Given the enormously
different price impacts that these different elasticity estimates would yield—and Ringgenberg's indifference as to
which negative elasticity is correct—his calculations are clearly unreliable and should be excluded.

In sum, merely by manipulating the elasticity estimates reported in two of the four academic studies he included in his "Mean Estimate of Elasticity" in Exhibit 3.1, Ringgenberg was able to change his estimate by a factor of eight (-0.59 rather than -4.8).  Had he included the remaining estimates reported in the Wurgler article and used the reported rather than modified estimates for Loderer and Kaul, Ringgenberg's mean elasticity estimate would have been -341.6—off from his estimate of -0.59 by a factor of more than 500.  SOF ¶ 138.  Thus the -1.74% (or $ -1.12) price impact he calculated for August 7, 2008 would have been less than -0.01% (or only a fraction of one cent).

### 2.   Ringgenberg's Calculation of "ECD Elasticity from Index Removal" Excludes Relevant Data

Ringgenberg's second elasticity input was based on his flawed analysis of stock returns for the two months in which ECD was removed from the Russell 2000 Index.  It is notable that this "event study" involved just *two* events—one removal in 1997 and another removal in 2011—both of which occurred outside the class periods that Plaintiffs have alleged.  SOF ¶ 139 (Dkt. 137 at 1).  He did not include in his analysis the times ECD was *added* to the index, although he acknowledged that adding a stock to an index should lead to a price increase, which would also show the elasticity of the demand curve for ECD's stock.  SOF ¶ 139.

Furthermore, Ringgenberg used *monthly* residual returns (which incorporate the market's net response to a full month's news) rather than weekly or daily data, SOF ¶ 140, which is inconsistent with established scholarly methods.  SOF ¶ 140.  Ringgenberg was unable to name a single academic study that used monthly residual returns to measure a change in price.[22]  SOF ¶ 140.  Moreover, he failed even to look at news for the two months he studied to see whether

---

[22] Daily stock data is widely available and commonly used by academics, including Ringgenberg himself in at least two of his published papers.  SOF ¶ 140.

other news would have been reflected in the month's return.  SOF ¶ 140.  He thus cannot claim

that his elasticity calculation resulted *only* from the index removals.  SOF ¶ 140.

 In sum, because Ringgenberg failed to consider obviously relevant data, his analysis must

be rejected as "unreliable."  *Doe*, 96 F. App'x at 759; *see also Rezulin*, 369 F. Supp. 2d at 425.

###   D. DeRosa and Ringgenberg Fail to Consider Alternative Explanations, Including the Financial Crisis and Ensuing Economic Recession

 DeRosa and Ringgenberg both compound their shortcomings in terms of expertise,

methodology, and data selection by failing to acknowledge market disruptions in 2008 and 2009

that they admitted were a "historic," SOF ¶¶ 50, 59, and "extreme downturn," beginning in the

third and fourth quarters of 2008.  SOF ¶ 50.  Notably, all three former ECD executives who

were deposed in this case testified that market, industry, and company-specific headwinds—not

short selling by Credit Suisse in 2008—ultimately drove ECD into bankruptcy.  *See, e.g.*, SOF ¶¶

73-76.  District courts must reject an expert's opinion as unreliable if the expert has not

"accounted adequately for obvious alternative explanations."  *Rezulin*, 369 F. Supp. 2d at 425.

## V. CONCLUSION

 As described herein, DeRosa and Ringgenberg are unqualified experts.  Their opinions

are unreliable and unsupported and must be excluded for many additional and independently-

fatal reasons.  As detailed above, their opinions ignore plausible alternatives, rest on insufficient

facts or data, are based on unreliable calculations at odds with the methodologies they espoused

and the evidentiary record, and draw inappropriate legal conclusions.  Defendants therefore

request that the Court exclude the testimony of DeRosa and Ringgenberg in the above-captioned

action.

Dated: March 28, 2017                        LATHAM & WATKINS LLP
New York, New York

                                             By:    /s/ Christopher J. Clark
                                                   James E. Brandt
                                                   Christopher J. Clark
                                                   Virginia F. Tent
                                                   Jessica D. Rostoker
                                                   885 Third Avenue
                                                   New York, New York 10022-4834
                                                   Tel: (212) 906-1200
                                                   Fax: (212) 751-4864
                                                   james.brandt@lw.com
                                                   chris.clark@lw.com
                                                   virginia.tent@lw.com
                                                   jessica.rostoker@lw.com

                                                   Michael E. Bern (*of counsel*)
                                                   555 Eleventh Street, NW, Suite 1000
                                                   Washington, D.C. 20004-1304
                                                   Tel: (202) 637-2200
                                                   Fax: (202) 637-2201
                                                   michael.bern@lw.com

                                                   *Attorneys for Defendants*
                                                   *Credit Suisse International and*
                                                   *Credit Suisse Securities (USA) LLC*