UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ECD INVESTOR GROUP, et al.,

                               **Plaintiffs,**

                -against-

CREDIT SUISSE INTERNATIONAL, et al.,

                            **Defendants.**

----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 9/1/2017 __

**14-CV-8486 (VM)(SN)**

**OPINION &
ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

This case arose from events preceding the demise of Energy Conversion Devices, Inc. ("ECD"), a solar panel manufacturer that went bankrupt in 2012. In June 2008, approximately four years before the bankruptcy, ECD contracted with Credit Suisse International and Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse") to execute an offering to raise capital for the company. This offering allowed investors to enter long positions in convertible notes and hedge their investments via "synthetic" short positions in ECD common stock. Such hedging was made possible by a "share lending facility," through which ECD lent 3.4 million shares to Credit Suisse for a nominal fee, so the bank could sell them short into the market to facilitate the investors' hedging. This type of arrangement, popularly termed in the financial media as a "Happy Meal" because of its favorable terms for investors, was typically used by cash-strapped companies with difficulties raising capital. The structure provided minimal risk for investors, who could benefit from bonds convertible into stock if the company did well, and profit from their countervailing short positions in case the company's prospects went sour.

Though ECD's performance immediately following the June 2008 Offerings was generally positive, and the company share price remained at or above the offering price for the next several months, ECD's stock price entered a tailspin from which it would never recover starting in the fall of 2008. Plaintiffs contend that the "Happy Meal" was to blame, at least in part, for ECD's demise, and that Credit Suisse misled ECD and its investors to benefit itself and its hedge fund clients who, rather than taking advantage of the share lending facility to offset the risk of their long positions in ECD's notes, instead conspired to take on excessive short positions and deliberately contributed to ECD's woes.

Plaintiffs' claims survived Credit Suisse's motion to dismiss, where Judge Marrero found that they had adequately pled the elements of misrepresentation and market manipulation claims under the Securities Exchange Act of 1934. Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60 (S.D.N.Y. 2015). Credit Suisse now moves for summary judgment, arguing that discovery has repudiated the core allegations of Plaintiffs' Consolidated Amended Complaint and demonstrated that, contrary to their allegations of unrestrained short-selling, Credit Suisse did nothing more than what it contracted to do—assist ECD's investors to take market-neutral positions in hedging between convertible notes and stock. Credit Suisse also moves to exclude the testimony of Plaintiffs' liability experts under the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702.

The Court holds that portions of Plaintiffs' experts' testimony must be excluded because it is speculative and not based on sufficient facts or data. Accordingly, Credit Suisse's Daubert motion is GRANTED in part and DENIED in part. Considering the remaining evidence in the record, the Court finds that Plaintiffs have failed to raise a genuine dispute of material fact concerning key elements of their securities fraud causes of action, and GRANTS Credit Suisse's

motion for summary judgment. Consequently, Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3), which was stayed pending consideration of Credit Suisse's summary judgment motion, is DENIED as moot.[1]

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise stated.

### A.    Introduction and Definitions of Financial Terms

ECD was a company that manufactured solar panels. ECF No. 176, Credit Suisse Rule 56.1 Statement ("CS St.") at ¶ 1. During the fall of 2007, ECD was a growth-stage company with a limited history of profits that sought to raise capital in order to maintain production of laminates for a growing solar energy market. Id. at ¶¶ 2–3. In order to do so, ECD turned to Credit Suisse to explore financing options. Id. at ¶ 6; ECF No. 178, Plaintiffs' Rule 56.1 Counterstatement ("Pls.' St.") at ¶ 155. Credit Suisse prepared a number of presentations for ECD management and ultimately recommended that ECD issue a "tandem offering" of convertible notes, coupled with an equity offering, including shares offered in connection with a "share lending facility." CS St. at ¶ 8; Pls.' St. at ¶¶ 159–60. The parties dispute whether Credit Suisse adequately informed ECD management of all of their financing options and truthfully disclosed the risks inherent in the offering structure, and whether ECD management carefully and competently analyzed the implications of Credit Suisse's proposal. See CS St. at ¶¶ 6–13; Pls.' St. at ¶¶ 159–63.

The "tandem offering" (hereinafter, the "June 2008 Offerings") agreed to by ECD and Credit Suisse consisted of two components—common stock and convertible notes. CS St. at ¶

---

[1] On December 12, 2016, all parties consented to my jurisdiction to rule on these motions pursuant to 28 U.S.C. § 636(c). ECF No. 145–47. Accordingly, any appeal from a judgment in this case may be taken to the Court of Appeals for the Second Circuit as from any other judgment of the district court pursuant to 28 U.S.C. § 636(c)(3) and Federal Rule of Civil Procedure 73(c).

20. Because, however, a significant client and target of the June 2008 Offerings were "convertible arbitrage investors" who would "hedge" their purchases of convertible notes by taking "short positions" in ECD's common stock, some explanation of the general concepts involved in convertible arbitrage investing is necessary in order to understand the mechanics of the tandem offering and the rationale for the "share lending facility" that accompanied it.

A "convertible note" is a debt obligation that at the holder's option may be exchanged for a specific number of shares of common stock. <u>Id.</u> at ¶ 21. It is a hybrid security composed of two elements: (1) a note in which the note's issuer promises to make periodic payments to the holder over the life of the note and repay the face value of the note at the end of its lifetime; and (2) an option to convert the note into a specified number of shares of the issuing company's common stock. <u>Id.</u> Any convertible note has a "conversion ratio," which is the number of shares into which it may be converted, and a "conversion price," which is a breakeven point above which the noteholder will profit from exercising its option to convert the note into stock.

A "short sale" is a transaction where an investor borrows and then sells common stock from a third party. <u>Id.</u> at ¶ 29. Generally, an investor pays a borrowing fee to the lender that depends on the market supply of shares for lending. Pls.' St. at ¶ 182. The "short sale" is eventually closed out when the investor buys back or otherwise obtains the borrowed shares and returns them to the share lender: this is called "covering the short." If the share price has decreased between the time the short seller borrowed the shares and the time he must return them, the seller makes money; if the share price has increased during this period, the seller loses money. CS St. at ¶ 29. Therefore, making a short sale is economically the opposite of purchasing the security, otherwise known as holding a "long position" in the security. <u>Id.</u>

Short selling is an important element of "hedging" an investment. A "hedge" is an offsetting investment that limits the downside risk of a principal investment. Id. at ¶ 34. Hedging involves the sale of one security or option against the purchase of another related security, with the object of minimizing the risk in one position while attempting to profit from inefficiencies in the market's valuation of the various securities. Id.

The level of such hedging is referred to as the "hedge ratio," which refers to the number of underlying common shares sold short divided by the number of shares into which the bonds are convertible. Id. at ¶ 38. A desired hedge ratio is a product of the issuer's share price relative to the conversion price. Id. As the company's share price increases above the conversion price, conversion becomes a near certainty and the hedge ratio approaches 100%; on the contrary, if the share price falls well below the conversion price, conversion becomes highly unlikely, and the hedge ratio approaches 0%. Id. When properly done, convertible arbitrage is non-directional; that is, it is not meant to profit from a decline in a company's share price. Id. at ¶ 36.

A "share lending facility" is created when a company lends a number of shares to a financial institution for the purpose of being lent out for shorting to investors who have purchased the company's convertible notes. Id. at ¶ 30. The purpose of such a facility is generally to guarantee to investors that they will be able to obtain a sufficient short position over the lifetime of the notes to permit adjustment of the hedge ratio to maintain their desired hedge position. Id.

A common method of hedging an investment is "delta-neutral hedging." Broadly speaking, "delta" refers to the change in the price of the convertible note with respect to the change in underlying common stock price. Id. at ¶ 39. Therefore, "delta-neutral hedging" is achieving the exact short position in common stock necessary to eliminate the risk from stock

price movement inherent in holding a long position in convertible notes at any given time. The delta of a convertible option does not remain constant, and therefore traders must generally adjust their positions dynamically to remain delta-neutral; when the delta increases, an investor must increase its short position or decrease its long position to remain delta-neutral, and vice versa if the delta decreases. Id. at ¶ 41. In the context of this case, "convertible arbitrage investors" were hedge funds who sought to hold a long position in ECD's convertible notes and a short position in ECD's common stock in order to hedge against movements in price of the underlying stock. Id.  at ¶ 36.

The meaning of the word "hedging" in the context of this case is contested by the parties, and is key to Plaintiffs' theory of the case. Plaintiffs argue that in the context of convertible arbitrage, industry custom dictates that "hedging" invariably refers to delta-neutral hedging only. Pls.' St. at ¶ 169. Moreover, Plaintiffs contend that this was the understanding that Credit Suisse and ECD had when they entered their agreement because Credit Suisse's presentations to ECD indicated that the purpose of the borrowed shares was to "hedge out the equity risk embedded in the convertible," with the "amount of selling the hedge fund does" being a "function of a number of shares underlying the convertible and the expected sensitivity of the convertible relative to the company's shares (the delta of the convertible)." Id. at ¶ 170. Plaintiffs also point out that, during their depositions, Credit Suisse witnesses indicated that they actually calculated a delta-neutral model hedge percentage that was similar to the model used by the convertible investors, and that there was no evidence that Credit Suisse considered any other variables in this transaction. Id.

For its part, Credit Suisse responds that delta is just one of the model outputs that convertible arbitrage investors rely upon to hedge their investments, with at least a half dozen other Greek letters referring to other risks. See CS St. at ¶ 42 (referring to variables representing

the rate of change of a security with relation to implied volatility, time, change in interest rates, spot exchange rates, change in the credit recovery rate, and change in the underlying stock dividend yield). According to this argument, investors could have chosen to hedge any number of variables, not just the delta, provided that they were generally seeking to reduce risk by making offsetting investments. Moreover, Credit Suisse argues that delta calculations themselves are not objective, and that each investor would have an individual proprietary model that could vary in its output. Id. at ¶¶ 40–41.

### B. The June 2008 Offerings

In total, ECD's June 2008 Offerings sold 1,460,500 shares of common stock at $72 per share and $316.3 million of five-year convertible notes that carried an interest rate of 3% per year and would mature on June 15, 2013. CS St. at ¶¶ 20, 22. The convertible notes had a conversion ratio of 10.8932 shares of ECD stock. Id. at ¶ 22. $250 million of the convertible notes were sold to convertible arbitrage investors, whereas the remainder were sold to long-only investors. Pls.' St. at ¶ 172.

Contemporaneous with its offerings, on June 18, 2008, Credit Suisse and ECD entered into a Share Lending Agreement ("SLA") establishing a share lending facility, which is substantially at issue in this litigation. The SLA stated, as relevant here, that ECD would lend Credit Suisse 3,444,975 shares of ECD stock for a borrowing fee of $0.01 per share "solely for the purpose of directly or indirectly . . . facilitating the sale and the hedging of the Convertible Notes by the holders thereof or, . . . with the prior written consent of the Lender, facilitating the sale and the hedging of any additional convertible securities which the Lender may issue from time to time by the holders thereof." Pls.' St. at ¶ 165. The 3,444,975 shares that Credit Suisse borrowed from ECD were equivalent to the total number of shares into which all the $316.3

million of the notes sold could be converted, and Credit Suisse was required to return the shares to ECD by the convertible notes' maturity date of June 15, 2013. CS St. at ¶ 23.

On the same date as the SLA was signed, Credit Suisse sold 2,723,300 of the borrowed shares into the market (in addition to the 1,460,500 shares sold by ECD). Id. at ¶ 24. By doing so, Credit Suisse established a short position in ECD stock. On June 20 and June 23, 2008, Credit Suisse sold and then immediately repurchased the remaining 721,675 borrowed shares through what is called a "double print" procedure. Id. at ¶¶ 24–25. The objective of a "double print" is to ensure that the shares are properly registered and freely tradable under the securities laws in the future, thus ensuring that Credit Suisse would have sufficient stock available to support hedges up to the total number of shares into which the notes were convertible, should it become necessary. Id. at ¶ 25.

After selling all 3,444,975 borrowed shares into the market, and then immediately repurchasing the 721,675 "double print" shares, Credit Suisse was left with a net short position of 2,723,300 shares. To facilitate hedging, Credit Suisse offered convertible notes investors the opportunity to acquire the economic substance of its short position through instruments called "total return swaps." Id. at ¶ 31. A total return swap is a private contract by which two parties agree to make payments to each other on the basis of the performance of different assets specified in the contract. Id. In this case, each total return swap entered into required investors to pay Credit Suisse the total return on ECD's stock, while Credit Suisse committed to paying investors the London Interbank Offered Rate ("LIBOR"), a benchmark interest rate that banks charge one another for short-term loans, minus a few basis points. Id. This resulted in these investors acquiring a synthetic short position that was economically equivalent to engaging in a short sale of ECD stock; if ECD's share price increased, swap holders would have been obligated

to pay Credit Suisse when unwinding or closing the swaps, but if ECD's share price decreased, Credit Suisse could end up paying them. Id. Credit Suisse argues that because a total return swap is a private, off-market transaction, it cannot affect a company's share price. Id. Plaintiffs respond that while this may be true of the total return swaps held by the investors themselves, the creation of any total return swap required an underlying short sale into the market by Credit Suisse, which can and did have a negative effect on ECD share prices. ECF No. 178, Plaintiffs' Response to Defendants' Statement of Undisputed Facts ("Pls.' Resp.") at ¶ 31.

Using a licensed modeling software, Credit Suisse calculated what it considered to be the appropriate delta-neutral hedge ratio of 0.78 for the ECD notes on the date of the offerings. CS St. at ¶ 45. Therefore, investors seeking a delta-neutral position would have had to acquire a short position equivalent to 78% of the shares into which their holdings in notes could be converted. Id.

### C.   Plaintiffs' Allegations of Credit Suisse's "Excess Short-Selling" in June 2008 Offerings

Plaintiffs do not dispute that 0.78 was an appropriate delta-neutral hedge ratio on the date of the offerings. See ECF No. 180-7, Expert Report of David M. DeRosa ("DeRosa Rpt.") at ¶¶ 70–71, 73. They do, however, argue that Credit Suisse in fact permitted its hedge fund clients to acquire a delta ratio of 1.0, by entering into total return swaps equivalent to 2,723,300 shares, when only 2,124,183 shares were necessary to create a delta-neutral hedge. Pls.' St. at ¶¶ 172–73, 177. Plaintiffs allege that Credit Suisse promised 40 of its hedge fund clients short positions equivalent to a full conversion amount of delta 1.0, rather than the "correct" delta-neutral ratio of 0.78, before the closing of the offerings. Id. at ¶ 174. Instead, allegedly to "create the appearance of a delta-neutral hedge," these same hedge funds bought long positions in 599,129 shares directly from ECD, which Plaintiffs refer to as the "plug shares." ECF No. 192, Credit Suisse

Reply 56.1 St. ("CS Reply St.") at ¶ 177.[2] Credit Suisse argues that, once the hedge funds' "long" position was properly accounted for, all of the hedge funds had a delta-neutral "net hedge ratio" of 0.78. CS St. at ¶ 45. Plaintiffs contend, however, that Credit Suisse placed no constraints on the hedge funds' ability to continue to sell the 599,129 shares and failed to monitor their use in any way, and therefore had no way of ensuring that investors actually maintained a delta-neutral hedge ratio. Pls.' St. at ¶ 177. Therefore, Plaintiffs argue that, rather than using the borrowed shares for "hedging," as permitted by the SLA, Credit Suisse in fact facilitated hedge funds' "directional bets," that in turn required it to short a larger than necessary amount of ECD stock.

Plaintiffs also object to Credit Suisse's "double print" sale and repurchase of the 721,675 remaining sales. They argue that Credit Suisse's records show that the double-print shares were not continuously held by Credit Suisse after they were repurchased, and account statements produced between June and August 2008 did not reflect that they were held by any Credit Suisse entity. Id. at ¶ 179. Therefore, Plaintiffs posit that Credit Suisse may have been shorting these shares during the period before August 7, 2008, when they were moved to a Credit Suisse segregated account. Id.

In sum, Plaintiffs argue that in order to be faithful to the language of the SLA, Credit Suisse should have sold short only the number of shares necessary to generate the exact number of total return swaps that would allow convertible arbitrage investors to achieve a delta-neutral hedge of 0.78 on their convertible notes holdings. This number of shares was 2,124,183. Id. at ¶ 177; DeRosa Rpt. at ¶ 78. Instead, they allege, Credit Suisse engaged in two unnecessary

---

[2] Plaintiffs appear to argue that the "plug shares" were borrowed shares that Credit Suisse sold directly to hedge fund investors. Pls.' St. at ¶ 177. Credit Suisse states that these shares were purchased in ECD's seasoned equity offering and were never part of the share lending facility. See ECF No. 180-73, Rebuttal Expert Report of Charles M. Jones ("Jones Rebuttal Rpt.") at ¶ 52 n.109.

transactions in June 2008 that allowed them to place all 3,444,975 shares into the market, but were inconsistent with the promises made in the SLA—Credit Suisse sold short an additional 599,129 shares to generate a number of total return swaps equivalent to a hedge ratio of 1.0, not 0.78, and it sold short the remaining 721,675 shares in an alleged "double print" transaction, but could not account for them immediately thereafter.

Credit Suisse argues that there is no basis for either of these assertions. First, even assuming that the SLA committed it to using the borrowed shares to assist its clients in establishing delta-neutral hedge positions only—which Credit Suisse does not concede—Credit Suisse contends that it did in fact establish delta-neutral hedge positions for its hedge fund clients. It argues that the proper 0.78 hedge ratio could have been achieved not only by selling total return swaps up to a hedge ratio of 78%, but also by investors' simultaneous acquisition of swaps up to a hedge ratio of 100% coupled with the necessary amount of additional long shares necessary to achieve a *net* hedge ratio of 78%. Therefore, because the convertible arbitrage investors also purchased 599,129 shares long from ECD, they could enter into an additional 599,129 total return swaps with Credit Suisse while maintaining delta-neutrality. CS St. at ¶ 45. As to the "double print" shares, Credit Suisse argues that, while there might have been a theoretical possibility that these shares *could* have been sold short between June 2008 and August 2008, Plaintiffs have uncovered no evidence that this actually occurred. CS Reply St. at ¶¶ 178–79.

According to Credit Suisse's expert Charles Jones, there are valid reasons why investors chose to enter into total return swaps up to a hedge ratio of delta 1.0 and offset them with "long" positions in ECD stock to achieve a net hedge ratio of 0.78 as to the convertible notes, rather than simply entering into total return swaps up to a hedge ratio of 0.78. Total return swaps,

which are bilateral contracts, are not conducive to frequent transactions, and therefore investors who wanted to adjust dynamically the size of their short positions in line with a changing delta to maintain delta-neutrality would prefer to hold ECD stock and adjust their position by buying or selling that stock directly into the market. See ECF No. 180-73, Rebuttal Expert Report of Charles M. Jones ("Jones Rebuttal Rpt.") at ¶ 52 n.109. Therefore, according to Credit Suisse, the structure of the offering permitted convertible noteholders flexibility to adjust their hedge ratio as needed. Id.

### D. Credit Suisse's Conduct During the Proposed Class Period After the June 2008 Offerings

In addition to challenging the propriety of the two aforementioned transactions at the time of the June 2008 Offerings, Plaintiffs argue that Credit Suisse's allegedly improper use of the borrowed shares continued throughout 2009 and 2010. Specifically, in January 2009, Plaintiffs' expert David DeRosa alleged that ECD's convertible notes had become a "busted convertible." A "busted convertible" is an instrument that behaves like a bond, not a bond with an option, because the price of both the note and the underlying stock have collapsed sufficiently. DeRosa Rpt. at ¶ 100.

According to DeRosa, for an investor to hedge a convertible note, the common stock must move in the same direction as the convertible note. Pls.' St. at ¶ 180. In other words, when the note position accumulates profits, a short position in the common stock should generate losses. ECF No. 180-7, DeRosa Rpt. at ¶ 88. Based on a regression analysis, DeRosa concluded that the price of the notes and the bonds had decoupled by January 2009, with bond prices moving steadily upward and the stock price continuing to fall. Pls.' St. at ¶ 181. Therefore, because changes in the price of ECD stock were allegedly no longer predictive of changes in the

price of ECD bonds, DeRosa argued that *any* further short selling of stock was no longer a hedge against price fluctuation in the notes, but rather a mere directional bet against the stock itself. Id.

According to Plaintiffs, because Credit Suisse's convertible note desk sold the hedge funds their initial note positions, was the market maker for the notes thereafter, and oversaw all or almost all secondary market trades in the notes, Credit Suisse knew the number of convertible notes its clients held and the synthetic short position that each client would have needed to maintain a delta-neutral hedge. Id. at ¶ 188. Armed with this knowledge, Plaintiffs allege, Credit Suisse's excessive short-selling and failure to unwind outstanding total return swaps after the convertible notes "busted" had the effect of circumventing normal market restrictions on shorting stock by virtually eliminating loan fees and allowing hedge fund investors to take short positions in ECD stock without having to access the expensive share lending market and pay the associated costs. Id. at ¶ 186.

Proceeding on this theory, DeRosa computed a daily "excess short shares" calculation for every day of the Proposed Class Period.[3] DeRosa Rpt. at ¶ 108. In doing so, he made three principal assumptions about the data. First, DeRosa did not incorporate the 599,129 "plug shares" in which convertible note investors acquired a long position in the Offerings, under the premise that those shares could have easily been resold or otherwise disposed of, because Credit Suisse had imposed no limitations on them. Id. at ¶ 79 (describing DeRosa's rationale for not counting these shares); CS St. at ¶¶ 118–19. Second, although they were undisputedly repurchased by Credit Suisse shortly after they were sold in June 2008, DeRosa included the "double print" shares in his calculations of excess shares for several months until August 7, 2008, when they were placed into a segregated Credit Suisse account called 2M2YG0. CS St. at

---

[3] The Proposed Class Period runs between June 18, 2008, and December 31, 2010. See ECF No. 137, Pls.' Class Cert. Mem. at 7.

¶ 135; ECF No. 179-47, DeRosa Deposition Transcript ("DeRosa Tr.") 217:25-219:25. DeRosa did this because Credit Suisse allegedly could not account for these shares' whereabouts during this period of time, and they could have theoretically been sold into the market. Id. Third, because DeRosa concluded that the convertible notes were "busted" by January 1, 2009, he assumed that the proper hedge ratio was zero for the entirety of 2009 and 2010. DeRosa Rpt. at ¶¶ 99–101; Pls.' St. at ¶ 181. Therefore, DeRosa deemed *all* outstanding short positions to be "excess short shares" during these periods, and argued that Credit Suisse should have unwound all of its total return swaps and repurchased all of the stock it sold short after January 2009, because the shares could no longer reasonably be characterized as being used for hedging, as required by the SLA. Id.

Based on these assumptions, DeRosa's "excess short shares" computation started at around 1 million in June 2008, and increased to approximately 1.8 million by August 6, 2008. See ECF No. 180-7, DeRosa Rpt. Appendix 9, Excess Short Share Calculations, at 183. The calculations during this period consists of two categories, "hedge fund synthetic short in excess of delta-neutral position" and "excess loan facility shares sold short." Id. at 183–97. On August 7, 2008, presumably due to the creation of Credit Suisse's segregated 2M2YG0 account, the number of "excess loan facility shares sold short" plummeted to zero, and the "total excess shorts" calculation decreased to approximately 325,000. Id. at 183. Throughout 2008, the number of "total excess shorts" in DeRosa's calculations generally declined, falling to a low of only 75,000 shares on December 31, 2008. Id. at 183–86. As of January 1, 2009, however, when the convertible notes became "busted" in DeRosa's calculation, this figure rose to approximately 1.2 million shares, reflecting his estimation that *all* of Credit Suisse's outstanding short positions

were "excess" at that point. Id. at 186. As Credit Suisse unwound its swaps and repurchased its stock, this number declined steadily.[4] Id. at 186–97.

Credit Suisse vehemently disputes all three assumptions in support of both its summary judgment and Daubert motions. First, it argues that simply ignoring the 599,129 "plug shares" purchased "long" by convertible arbitrage investors at or around the time of the June 2008 Offerings led to a deliberately misleading presentation of these investors' net hedge ratios and, therefore, a miscalculation of the "excess shares" that Credit Suisse had to sell short to maintain their total return swaps. CS St. at ¶¶ 118–23. Second, Credit Suisse characterizes DeRosa's inclusion of the 721,675 "double print" shares as "excess shares" from June to August 2008 as baseless, in the face of uncontested evidence of the bank's same-day repurchase of those shares. Id. at ¶ 135. The mere possibility that these shares could have been lent out for further short selling in that two-month period, Credit Suisse argues, was irrelevant given the lack of any evidence that any such shares were actually so used. Id.

As pertains to the "busted" convertible notes, Credit Suisse indicates that while DeRosa's Appendix 5 providing his "Daily Delta Calculation" decreases the option delta from 79% to 0% between December 31, 2008, and January 1, 2009, his Appendix 6 "Hedging Simulation" maintains deltas of over 70% through June 2009, and over 50% through February 2010. ECF No. 180-73, Jones Rebuttal Rpt. at ¶¶ 45–46. Credit Suisse's expert Jones challenges the variables and regression analysis used by DeRosa. Id. at ¶¶ 41–43. And finally, Jones notes that DeRosa's

---

[4] DeRosa's calculations throughout the Proposed Class Period also reflect his contention that, at certain times, "the total number of ECD shares segregated in account 2M2YG0 plus the number of outstanding synthetic short positions was less than the 3,444,975 shares borrowed by Credit Suisse from [ECD]." ECF No. 180-7, DeRosa Rpt. at ¶ 100. This figure, which appears as a third column in the chart, begins at around 100,000 shares on August 14, 2008, rises to a high of approximately 150,000 shares on September 26, 2008, falls to zero between October 14, 2008, and July 26, 2009 (with the exception of one approximately three-week period in November 2008), and then remains at around 2,000 shares between July 27, 2009, and December 31, 2010 (with a one week spike in February 2010). Id. at 183–97.

analyses were "ex-post and based on hindsight"—therefore, even if DeRosa were empirically correct that the relationship between the convertible notes and common stock had decoupled, he is only able to make this assessment because he has historical data for that time period, data that would not have been available to contemporaneous market participants. Id. at ¶ 44.

Credit Suisse lodges several other critiques of the Plaintiffs' "excess short shares" theory as a whole. First, Credit Suisse disputes Plaintiffs' contentions that convertible noteholders could not have created large short positions on the open market, independent of Credit Suisse's intervention; instead, they argue that data produced in discovery shows that some investors did do so, and that one, Highbridge Capital, purchased long over 400,000 and sold short over a million ECD shares in the open market between June 2008 and June 2009. Id. at ¶ 34. Second, Credit Suisse argues that Plaintiffs' position improperly presumes that Credit Suisse had both the obligation and the ability to monitor convertible noteholders' net hedging position throughout the term of the Proposed Class Period. Credit Suisse's expert Jones argues that Credit Suisse did not have and could not have had perfect data to determine this ratio. Id. at ¶ 37.

Instead, Credit Suisse argues that it and the hedge funds who engaged in convertible arbitrage acted appropriately, with notes investors generally compensating for the fall in ECD share price by reducing or unwinding their total return swaps, thereby causing Credit Suisse to purchase shares out of the market and place them in its segregated account. CS St. at ¶ 64. Credit Suisse notes that by December 21, 2008, account 2M2YG0 contained approximately 2.2 million shares, leaving approximately 1.2 million shares short in the market. Id. at ¶ 67. By June 3, 2009, account 2M2YG0 contained approximately 2.7 million shares, leaving approximately 600,000 short in the market. Id. By December 31, 2009, account 2M2YG0 contained approximately 3.3 million shares, leaving fewer than 200,000 shares short in the market, a figure that remained

stable throughout the end of the Proposed Class Period. Id. Plaintiffs do not dispute that Credit Suisse generally rebought these shares over time, but argue that the bank nonetheless permitted its clients to maintain damaging "excess short positions" over an extended period of time. Pls.' Resp. at ¶ 68.

### E. Evolution of ECD Stock Prices

Immediately after the June 2008 Offerings, the share price of ECD common stock rose from the offering price of $72 per share, to a high of $81.07 on June 23, 2008. ECF No. 180-7, DeRosa Rpt. Appendix 7, ECD Stock and Convertible Note Price History, at 148. Though the share price fell below the offering price between July 1, 2008, and August 19, 2008, it surpassed it once more between August 20, 2008, and August 29, 2008. Id. at 148–49. In the fall of 2008, however, ECD's share price began a steady decline, falling to $34.14 by October 31, 2008; $25.21 by December 31, 2008; $13.27 by March 31, 2009; and $4.60 by December 31, 2010. Id. at 148–61. By 2012, ECD filed for bankruptcy. CS St. at ¶¶ 69–70.

Credit Suisse offers many explanations for ECD's precipitous decline and eventual demise, many of which Plaintiffs do not dispute. In the fall of 2008, the capital and credit markets suffered a historic disruption, which affected the solar industry along with the broader market. Id. at ¶ 50. In 2009, the solar industry suffered specific challenges, including credit-challenged customers reluctant to invest in solar-related capital projects, reductions in subsidies for solar power, and competition with Chinese companies. Id. at ¶ 52. ECD's products used amorphous silicon, which was cheaper than the polysilicon used by most other manufacturers. Id. ECD, however, lost this price advantage when Chinese manufacturers began producing polysilicon more cheaply, and ECD was unable to compete with the resulting products. Id. at ¶ 53. ECD's former CEO Mark Morelli and Chairman of the Board of Directors Stephen

Rabinowitz, when deposed, both ascribed ECD's decline to these market factors. Id. at ¶¶ 55–56.[5]

Plaintiffs do not argue that Credit Suisse's allegedly excessive short sales were the exclusive, or even the predominant cause of the decline of ECD's share price and its eventual bankruptcy. They do, however, contend that Credit Suisse's alleged misuse of the borrowed shares adversely impacted ECD stock on every day of the Proposed Class Period, and allege that Credit Suisse's conduct in selling "excess" shares into the market caused up to 9.5% of the decline. Pls.' St. at ¶ 191. In reaching this conclusion, Plaintiffs rely on the "supply effect" theory supported by their expert Matthew Ringgenberg.

The "supply effect" theory suggests that an increase in the number of shares will cause the stock price to decrease until all of the shares are sold. ECF No. 180-14, Report of Matthew C. Ringgenberg ("Ringgenberg Rpt.") at ¶ 17. The magnitude of the price decline, according to Ringgenberg, is determined by the slope of the demand curve for the stock, or the elasticity of demand. Id. at ¶ 18. Ringgenberg calculated the elasticity of demand for ECD stock to be -0.47, and then incorporated DeRosa's calculations of "excess shares" and estimated a price impact from the introduction of those additional shares into the market. Id. at ¶ 43. He ultimately concluded that there was a negative price impact on every day of the Proposed Class Period, ranging from -0.4% on December 31, 2008, to -9.5% on August 6, 2008. Id. at ¶ 44.

Credit Suisse disputes Ringgenberg's analysis on numerous grounds. Because the inputs for Ringgenberg's model directly incorporate DeRosa's calculations of "excess shares," Credit

_____

[5] Plaintiffs do not dispute the content of Morelli and Rabinowitz's testimony. They do, however, note that Morelli and Rabinowitz are currently defendants in a lawsuit brought by ECD's Liquidation Trustee accusing them of breaching their fiduciary duties and duties of care to the corporation in Michigan state court. As such, Plaintiffs note that they had a vested interest in ascribing ECD's decline to market forces as opposed to their own negligence in, *inter alia*, entering into the Share Lending Agreement with Credit Suisse that is the subject of this litigation. Pls.' Resp. at ¶ 53.

Suisse argues that the model is based on unsupported assumptions regarding the "plug shares," double print shares, and the alleged "busting" of the convertible notes in January 2009, and therefore is itself unreliable.[6] Moreover, even if one accepts DeRosa's estimates of "excessive shares" to be an accurate representation of the number of short positions that Credit Suisse maintained that were over and above what was necessary to support delta-neutral hedging by ECD's investors, Credit Suisse points out that such estimates represent share balances and not new transactions. ECF No. 180-73, Jones Rebuttal Rpt. at ¶ 68. Therefore, because most of Credit Suisse's actual short selling was limited to the period shortly after the June 2008 Offerings and certain limited days thereafter that were insignificant when compared to Credit Suisse's repurchase of shares, any "selling pressure" from the "excess" short sales should have dissipated shortly after the transactions themselves. Id. at ¶ 69. Finally, Credit Suisse challenges Ringgenberg's estimates of ECD's stock elasticity as unscientific and unreliable, on the grounds that he did not properly incorporate all the studies relevant to the subject and utilized monthly instead of daily or weekly returns. CS St. at ¶¶ 138–40.

## DISCUSSION

I. **Credit Suisse's <u>Daubert</u> Motion to Exclude Testimony of Plaintiffs' Experts David DeRosa and Matthew Ringgenberg**

A. **Legal Standards for Admissibility of Expert Evidence**

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

---

[6] Indeed, Ringgenberg's results unsurprisingly track DeRosa's key assumptions. On August 7, 2008, when Credit Suisse opened its 2M2YG0 account containing all of the "double print" shares, Ringgenberg's price impact estimate plummets from a high of -9.51% on the previous day to -1.74%. ECF No. 180-14, Ringgenberg Rpt. at 42**.** Between December 31, 2008, and January 1, 2009, when the convertible notes "busted" according to DeRosa, the price impact estimate soars from -0.40% to -6.45%. Id. at 46.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). Under Federal Rule of

Evidence 702, expert testimony is admissible where:

> (a) the expert's scientific, technical, or other specialized
>     knowledge will help the trier of fact to understand the evidence
>     or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>     and
>
> (d) the expert has reliably applied the principles and methods to
>     the facts of the case.

"To determine whether a proposed expert's testimony passes muster under Rule 702, this

Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed

opinion is based on reliable data and reliable methodology; and (3) whether the proposed

testimony would be helpful to the trier of fact." SEC v. Tourre, 950 F. Supp. 2d 666, 674

(S.D.N.Y. 2013) (citing Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005)).

"Because the purpose of summary judgment is to weed out cases in which there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law, it is appropriate for district courts to decide questions regarding the admissibility

of evidence on summary judgment," including the admissibility of expert evidence. Raskin v.

Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (quotation omitted). Indeed, as the "gatekeeper for

expert testimony," the court "performs the same role at the summary judgment phase as at trial;

an expert's report is not a talisman against summary judgment." Id.

When evaluating the reliability of an expert's testimony, the court must "undertake a

rigorous examination of the facts on which the expert relies, the method by which the expert

draws an opinion from those facts, and how the expert applies the facts and methods to the case

at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). When conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Nonetheless, "conclusions and methodology are not entirely distinct from one another" and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

The court must also conclude that the proposed testimony will assist the trier of fact. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "This 'helpfulness' standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." Krys v. Aaron, No. 14-CV-2098 (JBS), 2015 WL 3660332, at *3 (D.N.J. June 12, 2015) (citing Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)) (internal quotation marks omitted). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008).

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (citing Daubert, 509 U.S. at 593 n.10).

**B.**     **Daubert Motion to Preclude Testimony of David DeRosa**

Plaintiffs rely on the testimony of David DeRosa to establish two key elements of their misrepresentation and market manipulation causes of action under the Exchange Act—material misrepresentation and scienter. Specifically, DeRosa concludes that Credit Suisse deliberately allowed investors to over-hedge the equity risk of the option embedded in ECD convertible notes beyond a delta-neutral hedge ratio, and that it continued to do so after the ECD convertible note "busted" in 2009, meaning that no further hedging was appropriate. ECF No. 180-7, DeRosa Rpt. at ¶ 6. Accordingly, in order to adjudicate Credit Suisse's motion for summary judgment, the Court must first consider Credit Suisse's Daubert motion to determine whether any portions of his testimony must be excluded. For the following reasons, Credit Suisse's Daubert motion as to DeRosa is GRANTED in part and DENIED in part.

**1.**     **DeRosa's Qualifications and Expertise**

Credit Suisse first argues that DeRosa's opinions should be excluded in whole because he is not qualified to testify as an expert on industry custom and practice with respect to the hedging

of investments in convertible notes and the establishment of share lending facilities to support such investments. Credit Suisse notes that DeRosa never traded or hedged convertible bonds, worked on or studied the negotiation of a share lending facility, published anything related to convertible securities, or testified in any matter concerning convertible securities. CS St. at ¶ 143. Plaintiffs respond that DeRosa sits on the boards of eight hedge funds who engage in convertible arbitrage, has 40 years of experience in capital markets, is the author of six books and numerous articles in the area, has a Ph.D. in finance and economics, and has been qualified as an expert witness by federal courts 19 times. Pls.' St. at ¶¶ 193–94.

The Court finds that, while DeRosa may not have specific experience in the establishment of share lending facilities and publications on the topic of convertible securities, his qualifications are nonetheless more than sufficient to render his expert opinions potentially useful to the trier of fact. "Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." SEC v. Revelation Capital Mgmt., Ltd., 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (citations omitted). In light of the liberal thrust of the Federal Rules on this issue, an expert "should not be required to satisfy an overly narrow test of his own qualifications." Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04-CV-7369 (LTS), 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) (citation omitted). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).

Here, DeRosa's long history of both academic and professional experience with capital markets renders him qualified to offer opinions in this case, including on the key issue of the

appropriateness of the hedging strategies facilitated by Credit Suisse. Any lack of direct experience with convertible securities, share lending agreements, or the specific transactions at issue here would go to the weight, and not the admissibility, of his opinions. Accordingly, DeRosa's testimony shall not be precluded on the basis of a lack of qualifications.

### 2. DeRosa's Opinions Regarding Excess Short Shares Generated by the June 2008 Offerings

#### i. Lack of Methodological Foundation for "Excess Short Shares"

Credit Suisse first alleges that there is no publication, relevant legal research, or peer reviewed studies addressing the "concept" of excess short shares, or any person in the financial economics field who specifically studies excess short shares. CS St. ¶ 143. According to this theory, because the idea of "excess short shares" is allegedly DeRosa's "creation from whole cloth," ECF No. 161, CS <u>Daubert</u> Br. at 10, his entire report should be disregarded.

This argument is easily dispatched. DeRosa makes clear that his calculation is nothing more and nothing less than the number of borrowed shares sold short by Credit Suisse in excess of the amount that he alleges were necessary to maintain a delta-neutral hedge ratio on the ECD notes purchased by convertible arbitrage investors. As long as the underlying assumptions and calculations regarding the number of notes and shares in the market and the appropriate hedge ratio are correct, the figure of "excess short shares" is derived via simple mathematics. Therefore, the lack of methodological foundation for the concept of "excess short shares" is no reason to exclude DeRosa's opinions.

#### ii. Alleged Contradictions Between Evidentiary Record and DeRosa's 2008 Excess Short Shares Calculations

Before the alleged "busting" of ECD's convertible notes in January 2009, Credit Suisse objects to two crucial assumptions DeRosa made. First, in calculating convertible notes

investors' hedge ratios, DeRosa did not incorporate the 599,129 "plug shares" in which convertible note investors acquired a long position in the June 2008 Offerings. Second, between their initial sale and repurchase on June 20 and June 23, 2008, and the creation of Credit Suisse's 2M2YG0 segregated account, DeRosa counted the 721,675 "double print" shares as excess short shares. Together, these two assumptions amounted to over 1.3 million shares, or over a third of the total number of borrowed shares in the share lending facility. The Court addresses each of these contentions in turn.

In his expert report, DeRosa's stated reason for not including the 599,129 "plug shares" sold long to convertible arbitrage investors in making his "excess short shares" calculations was because he was "unaware of any restrictions associated with these shares that would have prevented the hedge fund investors from selling the shares at any point, nor would Credit Suisse have any practical way to police any of the hedge fund investors' trades in ECD common stock." DeRosa Rpt. at ¶ 78.  At his deposition, DeRosa stated that he had "no idea what they did with these long shares. We don't know what they did with them. They may have sold them. They may have rented them out. Those are a mystery. We have no idea what happened to them." ECF No. 180-58, DeRosa Tr. at 97:15-19; see also id. at 122:11-17 ("[T]hey gave them the swap, gave them a Delta 100. Minus 100. When they gave them the shares they went down to 78. But they lost control of the shares and the hedge funds could sell those shares, they could lend those shares, they could do anything they wanted with those shares.").

DeRosa did not contest that all the convertible arbitrage investors for whom he calculated a hedge ratio of 1.0 would have had a 0.78 hedge ratio had he included the 599,129 "plug shares," both collectively and individually. See id. at 150:4-5. At the deposition, he was shown various documents reflecting the running balance of the hedge funds' notes and stock positions

excerpted from CS-1, a spreadsheet demonstrating all transactions with or through the Credit Suisse Securities USA unit between June 17, 2008, and February 14, 2012, with respect to ECD convertible notes and common stock. See ECF No. 195, Burstein Decl. at ¶ 2; ECF Nos. 180-105–14 (documents regarding individual hedge funds' positions shown to DeRosa). At DeRosa's deposition, counsel for Credit Suisse methodically examined the running balance of notes and stock positions for ten separate hedge funds, and DeRosa repeatedly admitted that had he calculated the shares sold long to each, he would have calculated a hedge ratio of 0.78. CS St. at ¶¶ 124–33.

In defense of his calculation, DeRosa repeatedly asserted that Credit Suisse made no efforts to monitor or control its clients' disposition of the "plug shares," that they could have been sold or lent to other investors on the same day they were sold, and that therefore they were properly excluded from his calculation of the funds' hedge ratios. But while DeRosa is correct that there was no restriction on the hedge funds' theoretical resale of the shares in question to unknown third parties, he ignored actual evidence of transactions between the funds and Credit Suisse reflected on CS-1.[7] For example, on June 18, 2008, the Canyon Capital fund purchased 5 million dollars' worth of convertible bonds, entered into total return swaps up to a delta ratio of 1.0, and purchased 12,000 shares of ECD common stock "long." ECF No. 180-58, DeRosa Tr. at 169–70. On September 3, 2008, Canyon Capital sold all of its convertible notes, unwound all of its total return swaps, but remained long in 5,000 shares of ECD common stock. Id. This continuing long position in ECD stock is not accounted for in DeRosa's calculations. Similarly,

---

[7] While DeRosa and Plaintiffs nominally object to the accuracy and completeness of CS-1, DeRosa used CS-1 data in computing the hedge ratio reflected in Appendix 4 of his report. See CS St. at ¶ 120; DeRosa Rpt. at ¶ 74. Therefore, because Plaintiffs have provided no basis to challenge CS-1's accuracy as to transactions between the funds and Credit Suisse and relied on its data themselves, the Court interprets any objections as to the accuracy of CS-1 as referring solely to the fact that the spreadsheet only reflects transactions entered into with Credit Suisse, and not between the funds and any third parties.

DeRosa made clear that he did not in any way account for transactions where hedge funds bought stock long and immediately sold their whole positions back to Credit Suisse, see id. at 196–97 (discussing Silverback Asset Management), id. at 199–201 (discussing Advent Capital).

DeRosa could not have considered data that was not before him as to the long position held by the convertible notes investors, such as that pertaining to such investors' transactions with unspecified third parties, although Plaintiffs could have pursued such information from the convertible notes investors themselves in discovery. There appears to be no explanation, however, for why DeRosa would ignore data that *was* before him, such as Canyon Capital's continued long holdings in ECD common stock in September 2008. Moreover, even if DeRosa were correct and considering the long positions were unreliable because of the *possibility* that such stock holdings could be sold or traded away, there is no basis for wholly ignoring the long positions altogether in his calculations. Though DeRosa repeatedly claimed that he did not include the long positions because he did not "know what happened to those shares," see, e.g., id. at 150:6-7, his calculations in fact rest on a wholly implausible assumption that *all* of the long positions were sold, lent, or otherwise discarded—because if *any* of the long shares were retained, the number of total return swaps that a hedge fund would need to maintain to reach a delta-neutral hedge of its notes position would increase, and therefore the number of "excess short shares" would decrease. DeRosa did not examine whether a single convertible arbitrage investor, much less *all* convertible arbitrage investors actually behaved this way as to ECD stock; rather, because there was a theoretical possibility that an investor *might* do so, he speculated that all investors actually did so. This speculation was especially unwarranted because while there was no evidence of *any* investors selling the entirety of their long positions, there was evidence that many investors did *not* do so, evidence that DeRosa wholly ignored.

A court may not admit an expert's opinions that are "without factual basis and are based on speculation or conjecture." Salvino, 542 F.3d at 311. Because DeRosa's opinion that convertible notes investors entered into total return swaps reflecting 599,129 "excess" short positions taken by Credit Suisse is predicated on an assumption wholly lacking in factual basis— namely, that the convertible notes investors eliminated their long positions immediately—it is not based on "sufficient facts or data" as required by Federal Rule of Evidence 702(b) and should be excluded.

DeRosa's decision not to account for Credit Suisse's uncontested repurchase of the 721,765 "double print" shares until the time in which they appeared in Credit Suisse's segregated 2M2YG0 account on August 7, 2008, suffers from similar deficiencies. Though his report does not entirely make clear why he counted the short sale into the market but not its virtually contemporaneous repurchase in making his "excess short shares" calculations, Plaintiffs argue that it was proper for DeRosa to do so because Credit Suisse's records "show that the double-print shares were not continuously held by Credit Suisse after they were repurchased" and claim that Credit Suisse's expert Jones conceded that Credit Suisse could have been engaged in shorting or share lending with those shares before August 7, 2008. Pls.' St. at ¶ 179. At his deposition, DeRosa contended that it was appropriate to include only the short sale of the "double print" in his calculations and not the repurchase because he did not "know what [Credit Suisse] did with the long buy." DeRosa Tr. at 212:14-15. Neither DeRosa nor Plaintiffs seriously dispute, however, that the "double print" actually happened; that is, that the sales sold short were actually repurchased by Credit Suisse on or around the same day they were sold, as reflected in the CS-1 spreadsheet from which DeRosa derived his hedge ratios.

Once again, DeRosa turns the theoretical possibility that Credit Suisse could have engaged in trading activity with *any* of the repurchased "double print" shares between June and August 2008 into the baseless assumption that it in fact did so with *all* of them. In this case, however, this assumption is even less plausible than the one concerning the "plug shares" because Credit Suisse has produced comprehensive records showing all purchases and sales of ECD common stock conducted under its auspices, <u>see</u> ECF No. 195, Burstein Decl. at ¶¶ 2–4, and there are no records of any of the "double print" shares being sold. It bears noting that these are the same records upon which DeRosa relied to make his general conclusions about excess short shares; therefore, if there were significant transactions of ECD common stock or notes with Credit Suisse that were not reflected in these records at all, it would render his entire report "unsupported by sufficient facts or data." DeRosa cannot rely on the same Credit Suisse records when it suits his analysis and ignore them when it does not.

Even assuming that Credit Suisse experienced some sort of accounting issue that led the bank to lose track temporarily of the repurchased "double print" shares, and these shares may have been made "available" to the stock loan department for short selling—which Credit Suisse disputes—this provides no evidence for DeRosa's conclusion that *all* of these shares were sold short into the market. Nor does DeRosa dispute that all of these shares were properly segregated into the 2M2YG0 account on August 7, 2008.

Accordingly, the evidentiary record provides no basis for DeRosa's conclusions as to the "double print" shares, and therefore his opinions as to these shares are not supported by "sufficient facts or data" as required by Federal Rule of Evidence 702(b) and must be excluded from consideration.

### 3. DeRosa's Opinions that ECD's Convertible Notes Were "Busted" After January 1, 2009

Credit Suisse also objects to DeRosa's contention that ECD's convertible notes "busted" at the beginning of January 2009, and his conclusion that notes investors should not have hedged their investments at all during the entirety of 2009 and 2010; in other words, that the hedge ratio had precipitously fallen from 79% on December 31, 2008, to 0% on January 2, 2009. Credit Suisse notes that, rather than using the actual calculations of the hedge ratio found in Appendix 6 of his report, DeRosa appears to have manually zeroed out the hedge ratios in reliance on his view that the note was "busted."

According to DeRosa, two things need to be true in order for an investor to need to hedge a convertible note: the note must be volatile in price, and the price of the instrument of hedging (in this case, shares of common stock), must move in the same direction as the note. DeRosa Rpt. at ¶¶ 87–88. Therefore, if the note increases in price, the short stock hedge position should accumulate losses, and vice versa. Id. While this was the case for the relationship between ECD common stock and the convertible notes in 2008, DeRosa argues that in 2009 and 2010, the synthetic short hedge positions often lost money when the convertible notes lost money, and the hedging relationship decoupled. Id. at ¶ 89.

DeRosa's regressions demonstrated that in 2008, both stock and note prices fell rapidly, and were therefore correlated. Id. at ¶¶ 92–93. In 2009 and 2010, however, his analysis suggested that changes in stock and note prices began to work in opposite directions, and shorting common stock was no longer an effective hedge for long positions in the convertible note. Id. at ¶¶ 96–98. Therefore, DeRosa concluded, "a convertible bond trader simply seeking to hedge the equity risk embedded in the . . . note would have regarded [it] as having a zero delta from the end of 2008 forward." Id. at ¶ 99. Any profit made by maintaining a hedged position

would have been a windfall generated by maintaining an over-hedged position, or a directional bet against ECD stock. Id.

Credit Suisse's expert Jones challenges DeRosa's conclusions regarding the alleged "busting" of the convertible notes on several grounds. First, Jones contends that in support of his decoupling thesis, DeRosa charted and visually examined the relationship between the prices of the two instruments rather than the relationship in the percentage change in price (the daily returns). ECF No. 180-73, Jones Rebuttal Rpt. at ¶ 42. According to Jones's regression analysis considering returns instead of price levels, there was a 0.26 regression coefficient between daily returns on the notes and the common stock; in other words, a one percent increase in stock price was on average associated with a 0.26 percent increase in the price of the notes. Id.

Second, Jones argues that DeRosa's regressions, which determine the relationship between "the simulated profit and loss on the hedged position" and "daily price changes in the ECD convertible note and daily price changes in ECD common stock," regress the cumulative profit and losses on the hedged positions summed up over many days on the daily returns of ECD stock and convertible notes. Id. at ¶ 43. Jones contends that such an approach—which compares a running balance of profits and losses on the hedged convertible notes position over time against the daily changes in the prices of the stock and notes—is unscientific and has not been utilized in any academic study. Id.

Third, Jones points out that the only way that DeRosa was able to conduct his study was because he had access to historical price data throughout 2009 and 2010; contemporaneous market participants, however, could not have possibly concluded that the hedge ratio of the notes had suddenly declined to zero on January 2, 2009, because they could not predict the future evolution of the notes and stocks. Id. at ¶ 44.

Credit Suisse, does not, therefore, dispute that DeRosa's conclusions are not supported by sufficient facts or data, but rather that his testimony is not "the product of reliable principles and methods" and that DeRosa has not "reliably applied" such principles and method to the facts of the case. The Court disagrees.

First, DeRosa has a colorable explanation for manually zeroing out the hedge ratios calculated in his Appendix 6. The hedge ratios that DeRosa calculated are based on the so-called Black-Scholes model, which measures the theoretical value of an option, DeRosa Rpt. at ¶¶ 31–36, and Credit Suisse does not challenge the appropriateness of this model. Jones Rebuttal Rpt. at ¶ 38 ("DeRosa's use of the Black-Scholes model with historical volatility of ECD returns is one potential method, among many, to estimate the theoretical hedge ratio of ECD convertible notes.") As DeRosa stated in his deposition testimony, however, the Black-Scholes model "calculated the value of an option on a share of stock." ECF No. 179-47, DeRosa Dep. Tr. at 80:9-11. A convertible note, however, "is a hybrid [that] can act like an option sometimes but like a junk bond at other times." Id. at 80:11-13. When a convertible note has taken on the characteristics of a junk bond, according to DeRosa, "the Black-Scholes model doesn't matter anymore," because shorting the stock is no longer an effective hedge for a long position in the note. Id. at 80:14-15.

In layman's terms, DeRosa argues that while the hedge ratio for the option remained above zero throughout 2009 and 2010, an investor concerned only with convertible arbitrage—that is, offsetting the downside risk of holding a long position in the notes—could not have reasonably believed that maintaining a synthetic short position in ECD stock would facilitate this goal. While Credit Suisse may dispute DeRosa's overall conclusions that the relationship between the returns on the notes and the stock had become so decoupled that the convertible note

had indeed "busted" by January 2009, or whether the decoupling was of sufficient magnitude so as to make any hedging impossible, both experts have marshalled regression analyses to support their positions and it would be inappropriate for the Court to intervene in this "battle of the experts" in a Daubert posture.

Similarly, Credit Suisse's challenges to the variables that DeRosa used—namely, visually comparing price levels instead of daily returns and regressing cumulative profits on daily returns—go to weight rather than admissibility. "Ordinarily, the failure to include a variable in a regression analysis will affect the probative value of the analysis and not its admissibility." Freeland v. AT&T Corp., 238 F.R.D. 130, 145 (S.D.N.Y. 2006) (citing Bazemore v. Friday, 478 U.S. 385, 400 (1986)).

Credit Suisse is correct, however, that DeRosa was able to conclude that the evolution of returns on ECD notes and stock decoupled only by analyzing post-hoc historical data. Convertible arbitrage investors could not literally have gone to sleep on December 31, 2008, confident that the appropriate delta-neutral hedge ratio was 79%, and then arisen in a frenzy on January 2, 2009, with the firm conviction that they needed to unwind immediately all of their total return swaps because the convertible note had busted. DeRosa's argument, however, including his calculation of "excess short shares" predicated on the "busting" of the convertible note in 2009, need not be taken to this absurd extreme. Instead, provided that one accepts the argument that the convertible notes could no longer be appropriately hedged, his analysis stands for the proposition that Credit Suisse knew or should have known that the notes "busted" at some point in 2009, and yet nevertheless failed to unwind its swaps or repurchase the borrowed shares it sold short into the market in sufficient numbers.[8]

---

[8] In Section II (C)(1)(ii)(b) of this Opinion and Order, the Court finds that this argument, even if fully credited, is not sufficient to save Plaintiffs' claims from summary judgment.

Accordingly, DeRosa's opinion that the convertible note "busted" in 2009 meets the requirements of Rule 702 and is admissible.

### 4. DeRosa's Interpretation of the Term "Hedging" in the Share Lending Agreement to Mean "Delta-Neutral Hedging"

Finally, Credit Suisse argues that DeRosa's contention that the term "hedging" was restricted to "delta-neutral hedging" should be excluded because it is based on suppositions unsupported by academic literature—essentially constituting *ipse dixit*—and because the meaning of "hedging" in the SLA should be determined by the Court as a matter of contract interpretation. The Court rejects these arguments.

DeRosa contends that industry custom and practice dictate that whenever "hedging" is referred to in the context of convertible arbitrage, market participants understand that to refer to delta-neutral hedging. See DeRosa Tr. at 130:12-14 ("[D]elta neutral hedge [is] considered the bread and butter hedge for convertible arbitrage funds . . . . That is what people think of.") While an expert may not "provide legal opinions, legal conclusions, or interpret legal terms," Highland Capital Mgmt. L.P. v. Schneider, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005), the definition of "hedging" is not a legal term but rather a contract term to whose interpretation industry trade practice is plainly relevant. See, e.g., Iacobelli Const., Inc. v. Cty. of Monroe, 32 F.3d 19, 25 (2d Cir. 1994) (admitting affidavits that "described industry practices and customs, defined terms of art used in the industry [and] explained the approach by which reasonably prudent contractors would interpret the contract documents"). While DeRosa could have supported his interpretation with extrinsic evidence, he was also entitled to rely on his experience in financial capital markets, experience that the Court has found qualifies him to be an expert in this case. Accordingly, DeRosa's opinions as to the meaning of "hedging" in the SLA is admissible.

### C. **Daubert** Motion to Preclude Testimony of Matthew Ringgenberg

Plaintiffs rely on the testimony of Matthew Ringgenberg for opinions regarding "(A) whether an increase in the supply of ECD common stock as a result of Defendants' alleged violation of the [SLA] could have adversely impacted the price of ECD shares during the Class Period; (B) the magnitude of the price impact [if any]. . .; (C) whether there is a common method by which Class Members' damages can be computed; and (D the magnitude of ECD's equity lending fees throughout the [Proposed] Class Period." ECF No. 180-14, Ringgenberg Rpt. at ¶ 2. Ringgenberg's opinions, therefore, are potentially relevant in (1) proving loss causation in the event that the Court determines that there is a genuine dispute as to whether Credit Suisse made a misstatement or omission of a material fact in the SLA and/or engaged in market manipulation with the requisite scienter; (2) the appropriateness of class certification under Rule 23; and (3) in an eventual trial, the quantum of damages owed to Plaintiffs. In Sections II.C and II.D of this Opinion and Order, however, the Court determines that it is unnecessary to reach the issue of loss causation because Credit Suisse is entitled to summary judgment on Plaintiffs' Exchange Act claims on other grounds, and, accordingly, denies Plaintiffs' motion for class certification in Section III.

As such, the Court need not pass on the admissibility of Ringgenberg's opinions and DENIES Credit Suisse's Daubert motion as to Ringgenberg as moot.

## II. Summary Judgment

### A. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23

(1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor. Id. at 257. Then "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. . . ." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible. . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

**B.      Securities Exchange Act Statutory Framework**

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, provides that it is unlawful, in connection with the purchase or sale of any security, "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) [t]o engage in any act, practice, or course of business which operates . . . as a fraud or deceit . . . ." 17 C.F.R. § 240.10b–5. Section 10(b) operates as a "broad" prohibition against manipulation, whether in the form of false statements or market manipulation. United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008).

In his decision denying in part Credit Suisse's motion to dismiss Plaintiffs' Consolidated Amended Complaint, Judge Marrero construed Plaintiffs' Section 9 claims as having been brought under Section 9(a)(2) and Section 9(a)(4) of the Exchange Act. As relevant here, Section 9(a)(4) makes it unlawful for any person selling or offering a security for sale "to make . . . any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading." 15 U.S.C. § 78i(a)(4). Section 9(a)(2) prohibits the making of a "series of transactions in any security . . . creating actual or apparent active trading in such security or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2).

**C.     Misrepresentation Claims Under Sections 9(a)(4) and 10(b) and Rule 10b-5 of the Exchange Act**

To state a claim for misrepresentation under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must establish: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misstatement or omission; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008). The requirements to state a claim under Section 9(a)(4), which closely parallels Section 10(b) and Rule 10b-5, are virtually identical, requiring: (1) misstatement or omission of material fact; (2) scienter; (3) made for the purpose of inducing a sale or purchase of a security; (4) on which the plaintiff relied; (6) that affected plaintiff's purchase or selling price. Salvani v. ADVFN PLC, No. 13-CV-7082 (ER), 2014 WL 4828101, at *12–13 (S.D.N.Y. Sept. 23, 2014). Credit Suisse moves for summary judgment on the grounds that there is no evidence in the record to support Plaintiffs' claims that Credit Suisse made a misstatement or omitted to state a material fact, that Credit Suisse acted with scienter, or that any alleged misstatement or omission by Credit Suisse caused any of Plaintiffs' losses.

**1.     Misstatement or Omission of Material Fact**

The threshold question in considering Plaintiffs' claims is whether there is a genuine dispute of material fact as to whether Credit Suisse made any misrepresentation or omission in Section 10(b) of the SLA, which stated that Credit Suisse was creating the share lending facility "solely for the purpose of directly or indirectly . . . facilitating the sale and the hedging of the Convertible Notes by the holders thereof . . . ."[9] Pls.' St. at ¶ 165.

---

[9] In their Consolidated Amended Complaint, Plaintiffs had also pleaded that there were similar misrepresentations made in ECD's prospectuses that could have been attributed to Credit Suisse. Judge Marrero dismissed these claims because Plaintiffs failed to plead that Credit Suisse "made" the statements

Credit Suisse argues that Plaintiffs cannot prevail because (1) their theory is dependent on the term "hedging" in the SLA meaning "delta-neutral hedging" only, and they have not proven this; and (2) even if the SLA does permit only "delta-neutral hedging," there is no evidence in the record that Credit Suisse used the borrowed shares in the share lending facility for anything other than promoting such hedging.

### i. Does the Term "Hedging" in the SLA Mean "Delta-neutral Hedging" Only?

As Judge Marrero wrote in denying Credit Suisse's motion to dismiss this case, "[i]f the term 'hedging' does not in fact refer to the specific, market neutral strategy alleged by Plaintiffs . . . then the [alleged] 'scheme' entailed little misrepresentation." Sharette, 127 F. Supp. 3d at 84. Accordingly, Credit Suisse argues that Plaintiffs have presented no industry testimony or secondary testimony, except for the interested *ipse dixit* of their expert DeRosa, that hedging must strictly refer to a market neutral investment strategy, instead of to a broader complement of strategies in which an investor takes short positions in one instrument to offset the risk of long positions in another.[10] Following this argument, even if Credit Suisse had permitted or encouraged convertible arbitrage investors to establish hedge ratios of 100% or 120%, instead of

in the prospectuses. See Sharette, 127 F. Supp. 3d at 92–93 (citing In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 485 (S.D.N.Y. 2012), aff'd, 525 Fed. App'x 16 (2d Cir. 2013)).

[10] Credit Suisse also suggests that because investors calculate deltas based on their own proprietary models that can yield differing results, CS St. at ¶¶ 40–41, it could not possibly have been committing itself to delta-neutral hedging only, given that there is no objective delta-neutral ratio to which it could be bound.

Plaintiffs point out, however, that Credit Suisse witnesses admitted that the differing models produce results that, if not identical, do not tend to differ by more than several percentage points. See Pls.' Resp. at ¶¶ 39–40; ECF No. 180-10, Tucker Martin Deposition Transcript ("Martin Tr.") 93:19-94:4 (Credit Suisse witness stating that convertible investors' delta estimates could deviate around five percent from Credit Suisse's calculated deltas). That various investors could calculate their deltas differently, within a reasonable margin of error, does not mean that Credit Suisse could not have committed itself to achieving a roughly delta-neutral hedge ratio through the SLA.

the delta-neutral calculation of 78%, it would still be using the borrowed shares "solely for the purpose of . . . facilitating the sale and hedging" of the convertible notes and therefore, would have made no misrepresentations in the SLA.

Plaintiffs respond that, in addition to their expert's testimony that a "delta-neutral hedge [is] considered the bread and butter hedge for convertible arbitrage funds," De Rosa Tr. 130:12-131:4, there is substantial evidence in the record that Credit Suisse represented to both ECD and convertible arbitrage investors that the purpose of the facility was to establish a delta-neutral position. Credit Suisse in fact calculated a delta-neutral hedge ratio of 0.78 and communicated this figure to potential investors. Pls.' St. at ¶¶ 170–71. Indeed, though Credit Suisse cites to textbook definitions referring to delta as only "one of the lower-risk hedge techniques . . . employed by convertible arbitrageurs," CS Reply St. at ¶ 169, and refers to many other variables represented by Greek letters that could be relied upon to hedge an investment, CS St. at ¶ 42, it presents no evidence that, in the context of the specific transaction at issue, any of the relevant market participants—Credit Suisse, ECD, or the convertible arbitrage investors—ever considered or were told to consider any such variables.

To be sure, the mere fact that Credit Suisse calculated what it considered to be a delta-neutral hedge ratio, conveyed that information to investors, and entered into transactions on that basis does not necessarily established that it was *obligated* to do so by the text of the SLA. Nevertheless, in the absence of any other evidence in the record that any relevant party believed that it was hedging on any basis other than delta-neutrality, the Court finds that a reasonable factfinder could determine that the term "hedging" in the SLA was properly understood by convertible arbitrage investors, Credit Suisse, and ECD as referring to delta-neutral hedging only. Drawing all inferences in the favor of Plaintiffs as the nonmoving party, as it must do on a

motion for summary judgment, the Court will therefore consider their claims assuming that the SLA does indeed compel Credit Suisse to use the borrowed shares to support roughly delta-neutral hedge positions by convertible arbitrage investors.

### ii. Is There Any Evidence that Credit Suisse's Statements in the SLA were False or Misleading?

Having acknowledged that a reasonable factfinder could determine that the SLA proclaimed that Credit Suisse was to use the borrowed shares for the exclusive purpose of promoting delta-neutral hedging of the convertible notes, the Court must now consider whether a genuine dispute of material fact exists as to whether this statement was false or misleading in light of Credit Suisse's conduct. Plaintiffs' primary arguments are that (1) Credit Suisse sold short 599,129 extra shares during the June 2008 Offerings, thereby facilitating convertible notes investors in engaging in activity other than the "hedging" contemplated by the SLA; and (2) Credit Suisse failed to take swift action to unwind its swaps and purchase back its short positions in 2009, when the convertible notes allegedly "busted" and no hedging was appropriate. [11]

### (a) Allegations Regarding Credit Suisse's Conduct During the June 2008 Offerings

Plaintiffs argue that Credit Suisse used almost half of the borrowed shares for "purposes other than hedging the convertible notes." ECF No. 172, Pls.' Opp. Br. at 23. In making this calculation, Plaintiffs, following the analysis of their expert DeRosa, contend that Credit Suisse

---

[11] Plaintiffs also argue that, in addition to the 599,129 "extra" shares that allegedly inflated investors' hedge ratios to 1.0, the 721,675 "double print" shares sold and repurchased on the same dates were also "misappropriated" by Credit Suisse for its own purposes because they were "made available to its stock loan department for share lending." ECF No. 172, Pls.' Opp. Br. at 19. The Court need not address this allegation at length because Plaintiffs have presented absolutely no evidence that a single one of the double-print shares were ever actually resold in the market, and all of the shares appeared in the 2M2YG0 segregated account by August 7, 2008. Nor have Plaintiffs argued that a "double print" transaction is generally improper, or—in the absence of any actual evidence that the shares were sold short into the market—would imply that the shares were being used for some purpose other than hedging. Therefore, the Court finds that there is no genuine dispute of material fact as to whether Credit Suisse's June 20 and June 23, 2008 "double print" transactions were in any way inconsistent with its statements in the SLA.

allowed convertible arbitrage investors to take synthetic short positions (through total return swaps) equivalent to a delta of 1.0, which was in excess of Credit Suisse's calculated delta of 0.78 and amounted to a sustained "directional bet" against ECD stock. Id. at 24. But, as discussed at length in regards to Credit Suisse's <u>Daubert</u> motion to exclude DeRosa's testimony, there is no rational basis to ignore the fact that the same investors simultaneously acquired both long and synthetic short positions in ECD common stock through the tandem offering, in such a way that if the 599,129 long positions were considered, the investors all reached a delta-neutral 0.78 hedge ratio. <u>See</u> ECF No. 180-58, DeRosa Tr. 149:20-150:5 (agreeing that if the long shares were counted "the hedge funds, collectively and individually . . . would all pretty much have a .78 hedge ratio").

Plaintiffs argue that Credit Suisse's conduct was nonetheless inconsistent with the SLA because the 599,129 long positions could have been traded away or sold short at any time. But as the Court explained in its decision to exclude these portions of DeRosa's testimony, this is little more than speculation. Despite conducting extensive discovery in this matter, Plaintiffs failed to take the deposition of a single fund investing in ECD's convertible notes, and have introduced no evidence into the record that any investor actually did unload their long positions in such a way or that Credit Suisse had any belief or agreement that they would do so.

Indeed, the necessary implication of Plaintiffs' argument is not merely that the term "hedging" in the SLA means "delta-neutral hedging." Plaintiffs' theory of the case, which hinges on the existence of "excess short shares," presupposes that any additional short position held by an investor—even if fully offset by a corresponding long position—is an "excess short share" that has a negative effect on ECD stock prices. Therefore, for Credit Suisse to be found liable, "hedging" would have to mean "delta-neutral hedging consisting exclusively of the acquisition

of the exact number of short positions in one instrument to offset the long position in a second instrument, with no other instruments involved."

This is a bridge too far. Plaintiffs have pointed to no authority that indicates that a delta-neutral hedge must be created by a short position in common stock *only*, and that it cannot be created by establishing a *net* delta-neutral hedge ratio itself consisting of both long and short positions in common stock. Credit Suisse, on the contrary, has established a credible reason for why investors would prefer to reach delta-neutrality in this fashion rather than by total return swaps alone—maintaining a delta-neutral hedge ratio is a dynamic process that requires frequent adjustment of the short positions, and swaps, which are private bilateral contracts, are far less conducive to frequent transactions than stock holdings. ECF No. 180-73, Jones Rebuttal Rpt. at ¶ 52, fn. 109.

Finally, any allegation that Credit Suisse agreed in the SLA to facilitate hedging only under the terms preferred by Plaintiffs is belied by the fact, fully disclosed to the market, that the share lending facility contained 3,444,975 shares, or the total number of shares into which all the notes—not only the notes purchased by convertible arbitrage investors—could be converted. This means that ECD and market participants as a whole were placed on notice that Credit Suisse would have broad discretion as to how to facilitate the hedging called for in the SLA, not straightjacketed into selling short only the exact number of shares necessary to establish delta-neutral synthetic short positions for investors holding no long positions in ECD stock. "The market is not misled when a transaction's terms are fully disclosed." In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010).

Moreover, Plaintiffs' implication that Credit Suisse had an obligation to monitor its investors' hedge ratios to ensure that they remained delta-neutral throughout the Proposed Class

Period is similarly infirm. First, even assuming that Credit Suisse could have imposed some sort of mechanism to prevent investors from selling their long positions of ECD stock, the imposition of such a restriction would be nonsensical. Plaintiffs do not contest, and DeRosa's calculations reflect, that a delta-neutral ratio changes over time, and that investors would have to do something to adjust their short position to maintain delta-neutrality. DeRosa Rpt. Appendix 5, Daily Delta Calculations, at 68–80. Therefore, the very point of investors' acquiring the long positions is so they could sell them, whether to Credit Suisse or to third parties, and be able to adjust flexibly their hedge ratios. Second, the Court declines to read the SLA's sparse language requiring the borrowed shares to be used "solely for the purpose of directly or indirectly . . . facilitating the sale and the hedging of the Convertible Notes by the holders thereof" as imposing upon Credit Suisse an open-ended obligation to ensure that all investors maintain a delta-neutral hedge ratio at all times, in the absence of any additional language in the agreement indicating that this might have been contemplated.

Therefore, even if the Court were to accept wholly Plaintiffs' theory that Credit Suisse's short sale of 599,129 additional shares into the market had a negative effect on ECD's stock prices, this would not raise a genuine dispute of material fact as to whether Credit Suisse made a misrepresentation in the SLA. While the Court has found that reading the SLA in the light most favorable to Plaintiffs could mean that it was intended to facilitate delta-neutral hedging only, no reading of the SLA commits Credit Suisse to promoting hedging on the exact terms demanded by Plaintiffs. Indeed, even if Credit Suisse were wholly negligent in allowing its clients to establish their net delta-neutral hedge ratios via a mixture of short and long positions in ECD common stock—an assumption that the evidentiary record does not support—and thereby caused some decline in ECD's stock price due to "supply effects," it would not have committed a

misrepresentation. The question before the Court is exclusively whether Credit Suisse acted "solely for the purpose of . . . facilitating the sale and the hedging of the Convertible Notes" with respect to the borrowed shares surrounding the June 2008 Offerings—not whether Credit Suisse did so wisely or prudently.

Considering the evidentiary record before it, the Court finds that there is no genuine dispute of material fact that Credit Suisse's initial actions around the time of the June 2008 Offerings were conducted "solely for the purpose of . . . facilitating the sale and hedging of the Convertible Notes," and therefore Plaintiffs cannot demonstrate any material misstatement or omission on these grounds.

### (b) Allegations Regarding Credit Suisse's Conduct After 2009

Plaintiffs also argue that Credit Suisse's failure to unwind its short positions in 2009, when their expert DeRosa argued the convertible notes were "busted" and no hedging was appropriate at all, is evidence of a misrepresentation in the SLA. Unlike the question of the 599,129 "excess shares" sold into the market during the June 2008 Offerings, the Court found that DeRosa's opinion that the convertible notes "busted" in 2009 were admissible expert testimony. Therefore, drawing all inferences in favor of the Plaintiffs at the summary judgment stage, the Court considers whether, assuming DeRosa's argument about the "busted" shares to be correct, Plaintiffs have raised a genuine dispute of material fact as to whether Credit Suisse's statements in the SLA were misleading.

In order to demonstrate the existence of a misstatement under the Exchange Act, Plaintiffs must demonstrate that the statement was "false when made." Sharette, 127 F. Supp. 3d at 89; see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) ("While the failure to carry out a promise in connection with a securities transaction might

constitute breach of contract, it 'does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.'") (quoting Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999)); Engstrom v. Elan Corp., PLC, No. 11-CV-1232 (SAS), 2011 WL 4946434, at *11 (S.D.N.Y. Oct. 18, 2011) ("Just because a corporation is later found to have breached a contract does not automatically give rise to a strong inference that it engaged in fraud beforehand.") Therefore, even assuming that Credit Suisse's failure to unwind all of its swaps and repurchase its short positions after the convertible notes allegedly "busted" in 2009 violated the SLA, Plaintiffs must raise a genuine dispute of material fact as to whether Credit Suisse had some level of intent or knowledge that it would so breach at the time the SLA was signed.

In denying Credit Suisse's motion to dismiss, Judge Marrero relied on various factual allegations made in Plaintiffs' Consolidated Amended Complaint that "support[ed] Plaintiffs' contention that [Credit Suisse] knew about (and in fact orchestrated) the alleged scheme in advance of the Offerings, which in turn supports a reasonable inference that the misstatements at issue were false when made." Sharette, 127 F. Supp. 3d at 90. These allegations referred to collusion with "predatory hedge funds" who made "huge short sales of ECD stock." At this stage, after discovery has closed, Plaintiffs must provide some evidence roughly contemporaneous with the date of the June 2008 Offerings suggestive of Credit Suisse's intent to maintain excess short positions in the market notwithstanding any "busting" or other significant fluctuations in the appropriate hedge ratio for the convertible notes. Such evidence, for example, could include direct or circumstantial evidence that (1) Credit Suisse knew or suspected that the convertible notes would "bust" in the future, yet intended to maintain short positions nonetheless; (2) Credit Suisse assured investors that they would maintain their short positions

regardless of the evolution of the relationship between the convertible notes and the common stock; or (3) any other types of communications suggestive of Credit Suisse's future intent to abandon delta-neutral hedging.

Once again, the record is wholly bereft of any such evidence. Credit Suisse hotly contests DeRosa's argument that the convertible notes "busted," and argues that it helped investors maintain delta-neutral hedge ratios throughout the Proposed Class Period. Nothing suggests that this is a mere litigation position. There are no internal Credit Suisse documents or communications with investors contemporaneous with the June 2008 Offerings that suggest that the statements made in the SLA were "false when made." Nor do Plaintiffs argue that Credit Suisse predicted that in the fall of 2008, the capital and credit markets would suffer a "historic disruption" affecting the global economy, and the solar industry in particular, CS St. at ¶ 50, and—months before this disruption, when ECD share prices were still rising—conspired preemptively to maintain excess short positions when this would occur.

Accepting DeRosa's "busted" convertible theory as true for the purpose of this motion, there may be genuine questions of material fact as to whether Credit Suisse's alleged tardiness in unwinding the total return swaps, repurchasing the shares it sold short, and placing these shares in the 2M2YG0 segregated account was negligent.[12] The securities laws invoked by Plaintiffs, however, do not protect investors against Credit Suisse's simple negligence, or from its failure to follow Plaintiffs' preferred investment strategies; they protect investors against fraud, which requires that they prove that Credit Suisse "secretly intended not to perform or knew [that] [it]

---

[12] It should be noted, however, that Credit Suisse did begin to unwind the swaps and decrease its short positions in 2009; starting at over 1.2 million net short positions in the market on January 1, 2009, Credit Suisse reduced its position to 890,544 by February 1, 2009, to 372,894 by June 9, 2009, and to 188,990 by September 29, 2009. See DeRosa Rpt. Appendix 9.

could not perform" its responsibilities under the SLA in June 2008. <u>ATSI Commc'ns, Inc.</u>, 493 F.3d at 105 (quoting <u>Gurary</u>, 190 F.3d at 44).

After extensive discovery, Plaintiffs have failed to raise a genuine dispute of material fact as to whether Credit Suisse made a misrepresentation or omission in the SLA that was "false when made," and Credit Suisse is entitled to summary judgment on Plaintiffs' misrepresentation claims under Section 9(a)(4) and 10(b) and Rule 10b-5 of the Exchange Act.

### 2. Scienter

Though the Court has concluded that no dispute of material fact exists as to whether Credit Suisse made a misstatement or omission of a material fact in the SLA that was false when made, Credit Suisse is also entitled to summary judgment on the misrepresentation claim on the independent ground that Plaintiffs cannot prove that Credit Suisse acted with the requisite scienter.

For a defendant to be found liable under the Exchange Act, it must act with "a mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007). This mental state can be established if Plaintiffs demonstrate "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." <u>ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009). In the absence of evidence of actual intent, the Court of Appeals has cautioned that recklessness in the securities fraud context refers to "a state of mind *approximating actual intent,* and *not merely a heightened form of negligence*." <u>S. Cherry St., LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 109 (2d Cir. 2009) (quotation omitted).

In finding that Plaintiffs had adequately pleaded scienter, Judge Marrero found that Plaintiffs' allegations that Credit Suisse acted to promote irresponsible short selling to attract a highly lucrative hedge fund clientele were sufficient to prove "motive and opportunity" to commit fraud. <u>Sharette</u>, 127 F. Supp. 3d at 96. Furthermore, Judge Marrero found that, when considered in combination, the fact that Credit Suisse structured the June 2008 Offerings, the existence of solicitation conversations with the hedge funds before the Offerings that allegedly permitted Credit Suisse to know how their clients were going to use the Credit Suisse-designed instruments to manipulate the price of ECD stock, and the presence of "high-volume short selling" after the date of the Offerings were sufficient to demonstrate "strong circumstantial evidence of conscious misbehavior or recklessness." <u>Id.</u> at 97–102. At the same time, the Court noted that "a tandem offering of common stock and convertible notes, even with a low borrowing fee, does not necessarily suggest illegal behavior or a departure from the standards of ordinary care," and that "opposing, nonculpable inferences that may be drawn from the facts pleaded." <u>Id.</u> at 97, 102.

Discovery in this case has demonstrated that these nonculpable inferences are the only ones that a reasonable factfinder could draw. As discussed at length in the portions of this Opinion and Order addressing Credit Suisse's <u>Daubert</u> motion, Plaintiffs' allegations that "high-volume" short-selling occurred after the June 2008 Offerings relies on the portions of DeRosa's testimony that are unmoored from the factual record. Once this testimony is excluded under a proper exercise of the Court's evidentiary gatekeeper function, there is no evidence of high-volume short selling beyond that necessary to establish roughly delta-neutral hedge ratios for Credit Suisse's clients. Nor is there any evidence that the pre-Offerings solicitation conversations were nefarious in content: rather, the uncontested testimony is that Credit Suisse promised its

clients what it actually did: a sale of total return swaps generating synthetic short positions up to

a delta hedge ratio of 1.0, reduced to a net delta-neutral ratio of 0.78 by sales of long positions in

ECD common stock. <u>See, e.g.</u>, ECF No. 179-15, Martin Tr. 67:18-69:16 (Credit Suisse banker

describing conversations where hedge fund clients collectively request swaps equaling a 1.0

delta hedge ratio); ECF No. 180-10, Martin Tr. 83:20-84:21 (explaining that the same clients

also bought stock positions to reduce the ratio to 0.78). And, as Credit Suisse points out,

Plaintiffs failed to depose a single hedge fund in this matter, and have not presented any other

evidence, direct or circumstantial, that Credit Suisse acted with scienter.[13]

Accordingly, the Court finds that Credit Suisse is entitled to summary judgment on the

independent ground that Plaintiffs have failed to raise a genuine dispute of material fact as to

whether Credit Suisse acted with "a mental state embracing intent to deceive, manipulate, or

defraud."

### 3.    Loss Causation

If Plaintiffs were able to prove that Credit Suisse misstated or omitted a material fact and

did so with the requisite scienter, they would also need to demonstrate "both transaction and loss

causation." <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 769 (2d Cir. 1994)

---

[13] Plaintiffs also argue that scienter can be demonstrated by the "hefty fees that Credit Suisse was paid" for underwriting the Offerings, the fact that Credit Suisse generated investment income based on each total return swap because it could sell a share of ECD stock short and keep the proceeds, and alleged deception of ECD management by telling them that the shares would be used only for hedging and not directional bets. ECF No. 173, Pls.' Opp. Br. at 22–23. As Judge Marrero noted, the fact that Credit Suisse was paid an underwriting fee "does not by itself support a strong inference of scienter," and is no more than an allegation of a "general business motive to make a profit." <u>Sharette</u>, 127 F. Supp. 3d at 94 (citing <u>In re UBS AG Sec. Litig.</u>, No. 07-CV-11225, 2012 WL 4471265, at *14 (S.D.N.Y. Sept. 28, 2012)).

The same is true for any claim that Credit Suisse earned money by entering into additional total return swaps—even if this was the case, the fact that a bank profits from providing services to its clients is hardly sufficient to suggest scienter. Finally, ECD's management was placed on full notice that the hedge ratios would be made via a combination of synthetic short positions and long positions in common stock, and consistently denied that they were deceived in any way by Credit Suisse. CS St. at ¶ 13.

(citation omitted). Transaction causation is akin to reliance, and requires only an allegation that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003). Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Id.; see also 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under [the PSLRA], the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.")

The Court has concluded that Credit Suisse is entitled to summary judgment because Plaintiffs have failed to raise a genuine dispute of material fact as to whether Credit Suisse made a misstatement or omission in the SLA with the requisite scienter. As such, the Court need not consider whether any hypothetical misrepresentation was the proximate cause of any investment loss suffered by Plaintiffs. See In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) ("failure to prove any one of the required elements "necessarily renders all other facts immaterial and renders summary judgment in favor of defendants").

### D.     Market Manipulation Claims Under Sections 9(a)(2) and 10(b) and Rule 10b-5 of the Exchange Act

A claim of market manipulation under Section 10(b) and Rule 10b–5 "requires a plaintiff to allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." ATSI Commc'ns, Inc., 493 F.3d at 101. The term "manipulative" is "virtually a term of art when used in connection with securities markets [that] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price

of securities." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976) (internal quotation marks omitted). "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011). The "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." Id.

To assert a claim under Section 9(a)(2), a plaintiff must show "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others . . . ." SEC v. Malenfant, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (quotation omitted).

Mirroring its arguments regarding Plaintiffs' misrepresentation claims, Credit Suisse contends that it is entitled to summary judgment because Plaintiffs cannot establish a genuine dispute of material fact as to whether Credit Suisse engaged in market manipulation or acted with the requisite scienter and cannot prove loss causation.

In his decision denying Credit Suisse's motion to dismiss, Judge Marrero noted that creating a vehicle for short selling—even in high volumes—is not, by itself, manipulative" and that to be a manipulative act, "short selling must be willfully combined with something more to create a false impression of how market participants value a security." Sharette, 127 F. Supp. 3d at 82 (citing ATSI Commc'ns, Inc., 493 F.3d at 101); see also SEC v. Masri, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) ("[I]f an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation."). Judge Marrero found that Plaintiffs had adequately

pleaded the "something more" by alleging that Credit Suisse orchestrated the tandem offerings for the purposes of allowing their clients to make huge profits by tanking the price of ECD stock, withheld this purpose from ECD and investors, and intentionally lent out far more shares for short sales than necessary for legitimate hedging. Sharette, 127 F. Supp. 3d at 83. Judge Marrero specifically noted that, to the degree that they existed, "private communications between the Credit Suisse Defendants and their clients as they allegedly collaborated [to] carry out an unlawful scheme to manipulate the price of ECD stock" were likely to be in the exclusive control of Credit Suisse and the convertible notes investors at the pleading stage, and therefore discovery was appropriate in determining whether market manipulation indeed occurred. Id.

As discussed in Section III.C.1, there is no evidence that Credit Suisse engaged in any misrepresentations in the SLA or in the rollout of the June 2008 Offerings. The evidence instead plainly demonstrates that Credit Suisse informed ECD and market participants of its intent to set up delta-neutral hedge ratios through a combination of total return swaps and long positions in ECD common stock and actually did so. Because Credit Suisse did not deceive the market as to how it intended to use the shares in the SLA, and "the market is not misled when a transaction's terms are fully disclosed," Wilson, 671 F.3d at 130, Plaintiffs have pointed to no actionable manipulative behavior. Moreover, in discovery, Plaintiffs have unearthed no private communications tending to show that Credit Suisse conspired with hedge funds to manipulate downwards the price of ECD stock, nor is there any indication that Credit Suisse conducted its transactions for anything other than legitimate economic reasons.

Accordingly, because Plaintiffs cannot raise a genuine dispute of material fact that manipulative acts or "a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security" occurred with the requisite

scienter, the Court grants Credit Suisse summary judgment on Plaintiffs' market manipulation claims for substantially the same reasons that it does so on their misrepresentation claims.

## III.    Class Certification

Because the Court grants Credit Suisse summary judgment on all of Plaintiffs' outstanding claims, Plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23 is DENIED as moot.

**CONCLUSION**

Credit Suisse's <u>Daubert</u> motion is GRANTED in part and DENIED in part as to Plaintiffs' expert David DeRosa and DENIED as moot as to Plaintiffs' expert Matthew Ringgenberg. Plaintiffs' motion for class certification is DENIED as moot. Credit Suisse's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motions pending Dkt. No. 136, 156, 157 and 187, enter judgment for the Defendants, and close this case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      September 1, 2017
            New York, New York